

**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE DISTRICT OF DELAWARE**

| | |
|---|---|
| In re: | Chapter 11 |
| W.R. GRACE & CO., et al., | Case No. 01-01139 (JKF) |
| Debtors. | (Jointly Administered) |

## STATEMENT OF ISSUES TO BE PRESENTED ON APPEAL AND DESIGNATION OF ITEMS TO BE INCLUDED IN RECORD ON APPEAL OF APPELLANT, PRUDENTIAL INSURANCE COMPANY OF AMERICA, REGARDING THE BANKRUPTCY COURT'S OCTOBER 24, 2006 ORDER (DOCKET NO. 13457)

Pursuant to Fed. R. Bankr. P. 8006, Appellant, Prudential Insurance Company of America ("Prudential"), hereby files its Statement of Issues to be Presented on Appeal and Designation of Items to be Included in the Record on Appeal, in connection with Prudential's Notice of Appeal From the October 24, 2006 Order (Docket No. 13457) of United States Bankruptcy Court Judge Judith K. Fitzgerald (the "Bankruptcy Court") (Docket No. 13553, filed on November 1, 2006).

### ISSUES TO BE PRESENTED ON APPEAL

1.      Did the Bankruptcy Court err in disregarding a June 9, 1994 Opinion and Order entered by the United States District Court for the District of New Jersey, which Opinion and Order required that the statute of limitations of New Jersey be applied to Prudential's claims?

2.      Did the Bankruptcy Court err by failing to apply the doctrine of issue preclusion to bar the above-captioned Debtors from relitigating an issue that was extensively litigated and decided by the June 9, 1994 Opinion and Order entered by the United States District Court for the District of New Jersey?

3.      Did the Bankruptcy Court err by refusing to find that the June 9, 1994 Opinion and Order of the United States District Court for the District of New Jersey was a final order?

4.      Did the Bankruptcy Court err in its choice of law analysis and application, resulting in the dismissal of Prudential's claims on a statute of limitations basis?

5.    Did the Bankruptcy Court err by reaching a decision that replaced Prudential's pre-bankruptcy state law rights with the less favorable state law rights of the bankruptcy forum chosen by the Debtors?

6.    Did the Bankruptcy Court err by failing to follow Delaware choice of law doctrine as recently stated in <u>Saudi Basic Industries Corp. v. Mobil Yanbu Petrochemical Co., Inc.</u>, 866 A.2d 1 (Del. 2005), and by allowing the Debtors, who chose Delaware as the litigation forum, to misuse the forum-shopping prevention provisions of the Delaware "Borrowing Statute," 10 Del. C. § 8121, to bar Prudential's claims?

7.    Did the Bankruptcy Court err in failing to consider the "resident exception" to Delaware's "Borrowing Statute," 10 Del. C. § 8121, in dismissing Prudential's claims?

8.    Did the Bankruptcy Court err in dismissing Prudential's claims on a statute of limitations basis without the development of a proper factual record?

## DESIGNATION OF CONTENTS FOR INCLUSION IN RECORD ON APPEAL[1]

### A.    Items from the Bankruptcy Court Record

| Item No. | Docket No. | Description |
|---|---|---|
| 1. | 9315 | Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims |
| 2. | 10571 | Response to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as It Relates to Damage at (1) Century Center I (Claim No. 6945); (2) Century Center IV (Claim No. 6948); (3) Brookhollow (Claim No. 6949); (4) First Florida Tower (Claim No. 6951); (5) Northwest Financial Center (Claim No. 6947); (6) Short Hills Office Building (Claim No. 6952); (7) Southdale Office Complex (Claim No. 6946) and (8) 110 Milam (Claim No. 6950) |
| 3. | 10686 | Exhibit A to Response to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as It Relates to Damage at (1) Century Center I (Claim No. 6945); (2) Century Center IV (Claim No. 6948); (3) Brookhollow (Claim No. 6949); (4) First Florida Tower (Claim No. 6951); (5) Northwest Financial Center (Claim No. 6947); (6) Short Hills Office Building (Claim No. 6952); (7) Southdale Office Complex (Claim No. 6946) and (8) 110 Milam (Claim No. 6950) |

---

[1] Each designated document includes any and all attachments and exhibits.

| Item No. | Docket No. | Description |
|---|---|---|
| 4. | 10687 | Exhibit B and C to Response to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as It Relates to Damage at (1) Century Center I (Claim No. 6945); (2) Century Center IV (Claim No. 6948); (3) Brookhollow (Claim No. 6949); (4) First Florida Tower (Claim No. 6951); (5) Northwest Financial Center (Claim No. 6947); (6) Short Hills Office Building (Claim No. 6952); (7) Southdale Office Complex (Claim No. 6946) and (8) 110 Milam (Claim No. 6950) |
| 5. | 10688 | Exhibit D to Response to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as It Relates to Damage at (1) Century Center I (Claim No. 6945); (2) Century Center IV (Claim No. 6948); (3) Brookhollow (Claim No. 6949); (4) First Florida Tower (Claim No. 6951); (5) Northwest Financial Center (Claim No. 6947); (6) Short Hills Office Building (Claim No. 6952); (7) Southdale Office Complex (Claim No. 6946) and (8) 110 Milam (Claim No. 6950) |
| 6. | 10689 | Exhibit E and F to Response to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as It Relates to Damage at (1) Century Center I (Claim No. 6945); (2) Century Center IV (Claim No. 6948); (3) Brookhollow (Claim No. 6949); (4) First Florida Tower (Claim No. 6951); (5) Northwest Financial Center (Claim No. 6947); (6) Short Hills Office Building (Claim No. 6952); (7) Southdale Office Complex (Claim No. 6946) and (8) 110 Milam (Claim No. 6950) |
| 7. | 10690 | Exhibit G to Response to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as It Relates to Damage at (1) Century Center I (Claim No. 6945); (2) Century Center IV (Claim No. 6948); (3) Brookhollow (Claim No. 6949); (4) First Florida Tower (Claim No. 6951); (5) Northwest Financial Center (Claim No. 6947); (6) Short Hills Office Building (Claim No. 6952); (7) Southdale Office Complex (Claim No. 6946) and (8) 110 Milam (Claim No. 6950) |
| 8. | 10691 | Exhibit H to Response to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as It Relates to Damage at (1) Century Center I (Claim No. 6945); (2) Century Center IV (Claim No. 6948); (3) Brookhollow (Claim No. 6949); (4) First Florida Tower (Claim No. 6951); (5) Northwest Financial Center (Claim No. 6947); (6) Short Hills Office Building (Claim No. 6952); (7) Southdale Office Complex (Claim No. 6946) and (8) 110 Milam (Claim No. 6950) |
| 9. | 10692 | Exhibit I, J and K to Response to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as It Relates to Damage at (1) Century Center I (Claim No. 6945); (2) Century Center IV (Claim No. 6948); (3) Brookhollow (Claim No. 6949); (4) First Florida Tower (Claim No. 6951); (5) Northwest Financial Center (Claim No. 6947); (6) Short Hills Office Building (Claim No. 6952); (7) Southdale Office Complex (Claim No. 6946) and (8) 110 Milam (Claim No. 6950) |

| Item No. | Docket No. | Description |
|---|---|---|
| 10. | 10693 | Exhibit L to Response to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as It Relates to Damage at (1) Century Center I (Claim No. 6945); (2) Century Center IV (Claim No. 6948); (3) Brookhollow (Claim No. 6949); (4) First Florida Tower (Claim No. 6951); (5) Northwest Financial Center (Claim No. 6947); (6) Short Hills Office Building (Claim No. 6952); (7) Southdale Office Complex (Claim No. 6946) and (8) 110 Milam (Claim No. 6950) |
| 11. | 10694 | Exhibit M and N to Response to the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as It Relates to Damage at (1) Century Center I (Claim No. 6945); (2) Century Center IV (Claim No. 6948); (3) Brookhollow (Claim No. 6949); (4) First Florida Tower (Claim No. 6951); (5) Northwest Financial Center (Claim No. 6947); (6) Short Hills Office Building (Claim No. 6952); (7) Southdale Office Complex (Claim No. 6946) and (8) 110 Milam (Claim No. 6950) |
| 12. | 11428 | Brief In Support of Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims |
| 13. | 11592 | Sur-Reply of the Debtors' Fifteenth Omnibus Objection (Substantive) to Asbestos Property Damage Claims as it Relates to Damage at:(1) Century Center I (Claim No. 6945) and (2) Century Center IV (Claim No. 6948) |
| 14. | 11691 | Transcript of Hearing Held before the Honorable Judith K. Fitzgerald 1/24/06 |
| 15. | 11727 | Debtors' Supplemental Brief as to Two Prudential Claims Barred by Statute of Limitations under Georgia Law |
| 16. | 13129 | Supplemental Brief of the Prudential Insurance Company of America as to (I) Issue Preclusion of Debtors' Claims Objections and (II) Applicable Choice of Law |
| 17. | 13240 | Supplemental Brief in Support of the Application of Georgia's Statute of Limitations to Prudential Insurance Company of America's Asbestos PD claims for Georgia Buildings |
| 18. | 13342 | Transcript of Hearing Held on September 25, 2006 before Hon. Judith K. Fitzgerald |
| 19. | 13457 | Order: Disallowing and Expunging as Time-Barred Two Asbestos PD Claims Filed by Prudential Insurance Company of America on Account of Buildings Located in Georgia |
| 20. | 13553 | Notice of Appeal #06-70 from the October 24, 2006 Order of United States Bankruptcy Court Judge Judith K. Fitzgerald |

**B.**    **Items from the Record of** *The Prudential Insurance Co. of America, et al. v. U.S. Gypsum, et al.*, **Civ. Act. No. 87-4238 (HAA), currently pending in the United States District Court for the District of New Jersey**[2]

| Item No. | Description |
|---|---|
| 21. | Opinion and Order dated June 9, 1994 denying Defendant's Motion for Summary Judgment |
| 22. | Opinion and Order dated August 26, 1994 denying Defendants' Motions for Interlocutory Appeal (Docket No. 340) |
| 23. | Order Dated December 28, 1994 by the United States Court of Appeals for the Third Circuit denying Petition for Writ of Mandamus (Case No. 94-5690) |
| 24. | Order and Opinion dated June 20, 2001 granting Defendants' Motion for Summary Judgment (Opinion reported as: Prudential Insurance Co. of America v. U.S. Gypsum Co., 146 F. Supp. 2d 643 (D.N.J. 2001)) |
| 25. | Opinion dated February 20, 2004 of the United States Court of Appeals for the Third Circuit (Reported as Prudential Insurance Co. of America v. U.S. Gypsum Co., 359 F.3d 226 (3d Cir. 2004)) |

[remainder of page intentionally left blank]

[2] The proceedings in the United States District Court for the District of New Jersey were heavily litigated, resulting in hundreds of documents filed with the Court. In its pleadings before the Bankruptcy Court, Prudential offered to make available to the Bankruptcy Court items from the District Court litigation docket. (See, e.g., Supplemental Brief of the Prudential Insurance Company of America as to (I) Issue Preclusion of Debtors' Claims Objections and (II) Applicable Choice of Law (Docket No. 13129) at 10, n. 3.) As a result, Prudential further designates and will make available to this Court any and all pleadings from the District Court litigation that were offered to the Bankruptcy Court for its review.

Wilmington, Delaware
Dated: November 13, 2006

By:_____/s/ Laurie S. Polleck_____
     Laurie S. Polleck, Esq. (#4300)
     JASPAN SCHLESINGER HOFFMAN LLP
     913 North Market Street, 12th Floor
     Wilmington, DE 19801
     Tel: (302) 351-8000
     Fax: (302) 351-8010
     Email: lpolleck@jshllp-de.com

     - and -

     RIKER DANZIG SCHERER HYLAND
      & PERRETTI LLP
     Joseph L. Schwartz, Esq..
     Curtis M. Plaza, Esq.
     Craig T. Moran, Esq.
     Headquarters Plaza
     One Speedwell Avenue
     P.O. Box 1981
     Morristown, New Jersey 07962-1981
     (973) 538-0800
     Email: jschwartz@riker.com
     Email: cplaza@riker.com
     Email: cmoran@riker.com

     Co-counsel for Appellant, The Prudential Insurance
     Company of America

3702776.2

NOT FOR PUBLICATION

**FILED**

⌐JUN 0 9 1994

AT 8:30 ...............⎺... M
WILLIAM T. WALSH
CLERK

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
THE PRUDENTIAL INSURANCE      )
COMPANY OF AMERICA, et. al.,  )
                  Plaintiffs,)
                             )
v.                           )
                             )
U.S. GYPSUM, et. al.,        )
                  Defendants.)
─────────────────────────────)
```

Civ. Action No. 87-4238
(HAA)

**O P I N I O N**

**Ackerman, D.J.**

The defendants in this action -- W. R. Grace & Co.-Conn. ("Grace"), United States Gypsum Company ("U.S. Gypsum"), National Gypsum Company ("National Gypsum"), United States Mineral Products, Inc. ("U.S. Mineral"), Asbestospray Corporation ("Asbestospray") and Keene Corporation ("Keene")[1] -- supplied products containing asbestos to buildings which plaintiffs -- The Prudential Insurance Company of America and two of its subsidiaries (hereinafter "Prudential") -- subsequently acquired.

Prudential claims the following:

The use of the buildings identified in the Appendix to this First Amended Complaint has been and will be materially impaired due to the presence of the asbestos-containing materials of defendants in the buildings, both through a diminution of market value and physical property damage to the buildings. Because of the contamination caused by the asbestos-containing materials

---

[1] I am informed by Keene's counsel that Keene is in bankruptcy. However, the court has not been officially informed of this fact and no proceedings have been initiated to remove Keene from this litigation. Therefore, as far as the court is concerned, at this point in time, Keene is an active defendant in this matter.

in plaintiffs' buildings, plaintiffs have paid and will continue to pay substantial costs and fees relating to abatement and buildings monitoring actions, buildings survey and testing costs, tenant relocation costs, operations and maintenance program costs for asbestos-containing materials before their removal from buildings, substantial disruption to their business, substantial property damage to their property . . . and other costs associated with the contamination or potential contamination of the buildings. Plaintiffs have also suffered and will suffer, among other damages, the loss of rental income from the buildings during abatement procedures or due to premature tenant departures, and the diminution in the commercial value of the properties.

Prudential's Amended Complaint, ¶30.

This case has a lengthy and convoluted procedural history, which is not worth detailing at this juncture. Suffice it to say that after the first found of discovery, the parties made a plethora of motions.  In July, 1993, this court denied Defendants' Motion to Dismiss Plaintiff's RICO Claim on Substantive Grounds, and also denied Plaintiff's Motion to Strike the Defendants' Statute of Limitations Defenses on Equitable Grounds.  The court then granted defendants' motion to certify the RICO ruling for interlocutory appeal pursuant to 28 U.S.C. §1292, and stayed this action pending the Third Circuit's determination.  On October 13, 1993, the Third Circuit declined to hear the interlocutory appeal.

This Opinion addresses the remaining motions in the case.

They are:

(1) U.S. Gypsum and Asbestospray's motion for summary judgment dismissing plaintiff's RICO claim as barred by the statute of limitations;

(2) Defendants' motion for summary judgment dismissing plaintiffs' common law tort and fraud claims as barred by the applicable statute of limitations;

(3) Defendants' motion for summary judgment dismissing plaintiffs' complaint as barred by the applicable statutes of repose;

(4) Defendants' motion for summary judgment dismissing plaintiffs' breach of warranty claim as barred by the applicable statutes of limitation;

(5) Defendants' motion for summary judgment dismissing plaintiff's claims under the applicable Unfair Trade Practices Acts.

This opinion first sets out the standard for summary judgment, then addresses each motion in turn.

I.  Standard for Summary Judgment

Federal Rule of Civil Procedure 56 provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law.  See also Todaro v. Bowman, 872 F.2d 43, 46 (3d Cir. 1989); Chippolini v. Spencer Gifts, Inc., 814 F.2d 893, 896 (3d Cir.), cert. dism'd, 483 U.S. 1052 (1987).  Put differently, "summary judgment may be granted if the movant shows that there exists no genuine issues of material fact that would permit a reasonable jury to find for the nonmoving party." Miller v. Indiana Hospital, 843 F.2d 139, 143 (3d Cir.), cert. denied, 488 U.S. 870 (1988).  An issue is "genuine" if a reasonable jury could

possibly hold in the nonmovant's favor with regard to that issue. See <u>Anderson v. Liberty Lobby, Inc.</u>, 477 U.S. 242, 247-48 (1986). A fact is material if it influences the outcome under the governing law. <u>Id</u>. at 248.

Within the framework set out above, the moving party essentially bears two burdens: First, there is the burden of production, of making a prima facie showing that it is entitled to summary judgment. This may be done either by demonstrating there is no genuine issue of fact and that as a matter of law, the moving party must prevail or by demonstrating the nonmoving party has not shown facts relating to an essential element of the issue for which it bears the burden. Once either showing is made, this burden shifts to the nonmoving party who must demonstrate facts supporting each element for which it bears the burden as well as establish the existence of genuine issues of material fact. Second, there is the burden of persuasion. This burden is a stringent one which always remains with the moving party. If there remains any doubt as to whether a trial is necessary, summary judgment should not be granted. See <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 330-33 (1986); <u>Adickes v. S.H. Kress & Co.</u>, 398 U.S. 144, 157-61 (1970); Advisory Committee's Notes on Fed. Rule of Civ. Pro. 56(e), 1963 Amendment; see generally C. Wright, A. Miller, & M. Kane, Federal Practice and Procedure §2727 (2d ed. 1983).

II. <u>RICO Claim</u>

4

Defendants U.S. Gypsum and Asbestospray move for summary judgment dismissing Prudential's RICO claim as barred by the statute of limitations.

In the case of <u>Agency Holding Corp. v. Malley-Duff & Assoc.</u>, 483 U.S. 143, 156 (1987), the Supreme Court held that civil RICO actions must be brought within four years of the date of accrual. The Third Circuit, in turn, has defined the date of accrual as follows:

> [T]he limitations period for a civil RICO claim runs from the date the plaintiff knew or should have known that the elements of the civil RICO cause of action existed . . . . <u>Keystone Insurance Co. v. Houghton</u>, 863 F.2d 1125, 1130 (3d Cir. 1988).

However, if "as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur . . . the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity." <u>Id</u> at 1126.

Prudential argues first that it did not know of (and should not have known of) facts which would constitute the basis of a RICO cause of action until the mid-1980s at the earliest. Secondly, Prudential argues that at any rate, the statute of limitations began to run over and over again because the defendants continued -- and continue -- to commit predicate acts. I will address these in turn.

In <u>Glessner v. Kenney</u>, 952 F.2d 702 (3d Cir. 1993), the Court upheld a district court finding that the plaintiffs were

aware of the elements of their RICO claim more than four years prior to their filing of their complaint. In that case, the defendants had advertised their products as "state of the art residential heating systems that were highly efficient and would result in considerable savings in home oil heating costs." Id. at 705. The plaintiff purchased his unit in 1977, "knew in the early 1970's of both the carbon monoxide emissions and the need for 'extraordinary amounts of servicing' because he worked for the defendant . . . and further knew his own unit began pulsating within three years of its 1977 installation." Id. at 707. Thus, plaintiff knew of his injuries well before the suit was filed in 1988.

U.S. Gypsum argues that by 1983, Prudential knew of the building contamination and further, the promotional literature put out by defendants had been published prior to Prudential's purchase of the buildings. Thus, the argument goes, Prudential relied on the alleged misrepresentations and then realized that they were false. This, the defendants argue, is analogous to Glessner, in which plaintiffs' knowledge of problems inconsistent with the manufacturers' representations constituted knowledge of the basis for the RICO claims. As U.S. Gypsum put it in its reply brief: "presumably . . . Prudential bases its claim of ignorance on the legal supposition that it did not know of its RICO claims until some creative person within Prudential developed the specific idea of pleading a RICO theory." Reply Brief in Support of Defendant United States Gypsum Company's Motion for Summary Judgment on

6

<u>Plaintiffs' RICO Claims Based on Statute of Limitations Grounds</u> at 3.

The argument is not without merit. But <u>Glessner</u> never really what it means to be aware of the elements of a RICO claim. It appears, though, that the plaintiffs did not appeal the district judge's finding that they knew of the elements prior to 1984. Rather, the issue on appeal was whether plaintiffs suffered <u>further</u> injury after 1984 that restarted the statute of limitations.

In this case, it is clear that knowledge of the elements of a RICO claim means knowledge that the defendants engaged in predicate acts of mail or wire fraud constituting a pattern of racketeering activity. The facts put forward by U.S. Gypsum and Asbestospray in support of their respective motions simply do not establish such knowledge on Prudential's part. Rather, the defendants' facts go to Prudential's knowledge of this injury. The two types of knowledge are different.

At any rate, there also is a disputed issue of fact as to whether, even if Prudential knew of the elements of its cause of action, the statute of limitations began running anew after that time.

Defendants rely on another part of <u>Glessner</u> to support their argument that it did not. In <u>Glessner</u>, the plaintiffs argued that "although they realized that their . . . units needed extensive servicing prior to June, 1984, their RICO actions are timely because they replaced their units after June, 1984, within the limitations period." <u>Glessner</u>, 952 F.2d at 707. Holding that

"further injury under Keystone means a new and distinct injury from the initial injury", id. at 708, the Court upheld the dismissal.

Defendants' reliance on Glessner is somewhat misplaced. Although Prudential does argue that it sustained new injury, its primary argument is that the defendants committed further predicate acts. As noted above, the commission of further predicate acts can restart the statute of limitations. But any predicate acts which may restart of the statute of limitations must be of the same character as the pattern of conduct that constitutes the basis for the RICO claim. Thus, in Davis v. Grusemeyer, 996 F.2d 617 (3d Cir. 1993), the Court held that "[a]n attempt to cover up a completed scheme of criminal activity . . . does not constitute a predicate act in furtherance of a RICO conspiracy that might itself postpone accrual of [the RICO claim]." Id. at 626. This case is not like Davis, however. Here, defendants' alleged acts of concealment are precisely the conduct that Prudential claims constitutes unlawful RICO activity. In other words, the alleged continuing acts of concealment and misrepresentation -- committed over decades and decades -- are in fact the predicate acts that Prudential claims lulled them into a false sense of security about the dangers of asbestos.

U.S. Gypsum nonetheless claims that the further predicate acts involve simple lobbying, which is protected by the first amendment. However, as this court noted in its July, 1993 Opinion, plaintiff alleges more than lobbying activities directed at the public generally. As I noted then, plaintiff alleges that:

In 1983, the EPA mentioned in a guidance document called the Blue Book that commercial buildings should consider operations and maintenance programs to monitor in-place asbestos. In response to the Blue Book, in 1984, defendants Grace, U.S. Gypsum, National Gypsum, and Keene joined with AIA/NA's special counsel and formed the Safe Buildings Alliance ("SBA"), which focused on problems associated with asbestos in buildings. In 1984 the SBA published and distributed a booklet called "What You Should Know About Asbestos in Buildings." The booklet stated that "experts believe that removing asbestos-containing materials in buildings often does more harm than good" and that proper removal does not pose a potential health hazard. <u>In 1986, the booklet was revised and targeted towards building owners and managers.</u>

Looking at the facts in the light most favorable to plaintiff, this representation can be seen as more akin to promotional marketing literature than to lobbying activity. As such, I cannot say as a matter of law that the AIA/NAS actions cannot constitute a predicate RICO act.

Finally, Asbestospray contends that since it stopped marketing asbestos in the early 1970s and since it dissolved as a corporation in 1982, it cannot be held liable under RICO. However, ordinary conspiracy law governs section 1962(d), and, as long as Asbestospray did not withdraw from the conspiracy, it may be liable when its co-conspirators continue with predicate acts. The record does not evince any clear evidence of Asbestospray's withdrawal, such as notifying other asbestos companies of its refusal to be part of any scheme.

Therefore, I will deny the motion to dismiss the RICO claim on the basis of the statute of limitations.


III. Statute of Limitations

9

First, I will address defendants' motion for summary judgment dismissing Prudential's claim as barred by the statute of limitations. The threshold inquiry is into what state's law should govern.

## A.   Choice of Law

The defendants contend that the applicable statute of limitations is the statute of the state in which each affected building is located. Thus, for example, Prudential's claim regarding a building in Wisconsin is governed by Wisconsin law. And so on. In defendants' view, these statutes mandate that all of Prudential's claims be dismissed. Prudential responds by arguing that New Jersey's fairly lengthy statute of limitations applies to all of its state law claims.

A federal court sitting in diversity must apply the conflicts of law rules of the forum state, see Klaxon Co. v. Stentor Electric Mfg Co., 313 U.S. 487 (1941); Henry v. Richardson-Merrell Inc., 508 F.2d 28, 31 (3d Cir. 1975). Thus, New Jersey conflicts of law principles govern the choice of law in the instant case.

First, it must be said that there are definite conflicts between the laws of the various states. The states where the buildings are located provide limitations periods varying from two to six years. Moreover, the states' discovery rules vary. Thus, a conflicts analysis is necessary.

The general common-law rule distinguished between

10

conflicts of law regarding substantive legal questions and conflicts of law regarding the applicable statute of limitations. The general rule was that the statute of limitations was a procedural rule. Thus, irrespective of the substantive law that governed the claim, the forum state's statute of limitations applied.

However, in 1973, when given the opportunity to revisit the statute of limitations issue, the New Jersey Supreme Court expressed dissatisfaction with the general rule. Deciding that the time was ripe to depart from the rule, the Court held that:

> [w]hen the cause of action arises in another state, the parties are all present in and amenable to the jurisdiction of that state, New Jersey has no substantial interest in the matter, the substantive law of the foreign state is to be applied, and its limitation period has expired at the time suit is commenced here, New Jersey will hold the suit barred. In essence, we will "borrow" the limitations law of the foreign state.

However, the Court made it clear that it was articulating only a very narrow exception from the general rule. In its own words:

> We presently restrict our conclusion to the factual pattern identical with or akin to that in the case before us, for there may well be situations involving significant interests of this state where it would be inequitable or unjust to apply the concept we here espouse.

Heavner v. Uniroyal, Inc., 63 N.J. 130, 141 (1973). Subsequent cases have emphasized that the Heavner rule is a narrow exception to the general rule. As the New Jersey Supreme Court stated several years later, "[t]he Heavner rule provides a limited and special exception to the general rule that the rule of the forum determines the applicable period of limitations." O'Keefe v.

11

<u>Snyder</u>, 83 N.J. 478, 490 (1980).

More specifically, when New Jersey retains a substantial interest in the matter, the <u>Heavner</u> exception is inapplicable and New Jersey courts afford plaintiffs the benefit of New Jersey's statute of limitations.  As the Third Circuit noted in a case decided soon after <u>Heavner</u>, "[i]mplicit in <u>Heavner</u> is a finding that New Jersey was a disinterested forum"; thus, in a tort suit, where the primary purpose of a recovery is to "compensate plaintiffs for their injury", New Jersey's interest is substantial.  <u>Henry</u>, 508 F.2d at 33.  Similarly, in <u>Allen v. Volkswagen of America, Inc.</u>, 555 F.2d 361 (3d Cir. 1977), the Court again looked primarily to whether New Jersey had a substantial interest in the case.[2]

Thus, the question is whether, since Prudential is domiciled in New Jersey, this state retains a substantial interest in the matter such that its limitations period should apply.

In <u>Draper v. Airco, Inc.</u> 580 F.2d 91 (3d Cir. 1978), the Third Circuit held that when the plaintiff is domiciled in New Jersey, the <u>Heavner</u> exception simply does not apply.  Rather, New Jersey's interest in compensating its domiciliary was sufficiently

_____

[2] Both parties contend that after <u>Heavner</u>, New Jersey applies the governmental interest approach to statute of limitations questions.    It is true that New Jersey generally applies the governmental interest analysis to choice of law issues.  <u>See</u>, <u>e.g.</u>, <u>Van Slyke v. Worthington</u>, 265 N.J. Super 603 (Law Div. 1992)(citing cases).    However, the New Jersey and Third Circuit cases indicate that when the plaintiff is domiciled in New Jersey, the state does not engage in the balancing required by the governmental-interest approach to decide upon the applicable statute of limitation.  <u>See</u>, <u>e.g.</u> <u>In re Reach, McClinton & Co., Inc.</u>, 102 B.R. 392, 397-98 (D.N.J. 1989)(Lifland, D.J.).

substantial to outweigh all other factors warranting application of a foreign state's limitations law. As the Court put it in <u>Warner v. Auberge Gray Rocks, Inn., Ltee.</u>, 827 F.2d 938, 941 (3d Cir. 1987), "it is clear that when a plaintiff suing on an out-of-state cause of action is domiciled in New Jersey, the courts of New Jersey are not disposed to find that, within the meaning of the <u>Heavner</u> formulation, 'New Jersey has no substantial interest in the matter.'"    In fact, in a 1986 case, the Court of Appeals found reversible error where the district court applied a foreign state's statute of limitations to an action in which the plaintiffs were domiciled in New Jersey. <u>Dent v. Cunningham</u>, 786 F.2d 173, 177 (3d Cir. 1986). See also <u>Pine v. Eli Lilly & Co.</u>, 201 N.J. Super. 186 (A.D. 1985) ("New Jersey has a clearly recognized governmental interest in the compensation of its domiciliaries. . . <u>which is alone</u>" sufficient to outweigh all other factors, including an interest in deterring forum-shopping) (emphasis added); <u>In re Reach</u>, 102 B.R. at 399 (same).

The defendants argue that New Jersey's interest in compensating its domiciliaries is significantly diminished by the fact that virtually all the cases endorsing the domicile rule are personal injury cases, and that New Jersey's interest in compensating domiciled plaintiffs is significantly diminished when the plaintiff is a large corporation. The language of the cases does not, however, support this interpretation. In fact, in <u>In re Reach</u>, the court concluded that "a corporate plaintiff which is incorporated in New Jersey is entitled to rely on New Jersey's

13

applicable statute of limitations when filing a suit in New Jersey, notwithstanding the fact that the corporate plaintiff's other ties in New Jersey may be slim." Id. at 399.

Defendants next argue that New Jersey's statute of limitations should not apply because one of the three named plaintiffs, a subsidiary of Prudential, was incorporated in another state. There is no dispute that Prudential, the corporate parent and primary plaintiff in this case, is incorporated in New Jersey and has its principal place of business in Newark, New Jersey. PIC Realty Corporation ("PIC"), another named plaintiff, however, is incorporated under the laws of Delaware. PIC maintains its principal place of business in Newark, New Jersey.[3]

New Jersey law provides that a corporation is a "domiciliary" of its state of incorporation. See State v. Garford Trucking, 4 N.J. 346, 351 (1950); In re Reach, 102 B.R. at 399. Nevertheless, New Jersey's statute of limitations rule is premised on New Jersey's compensation interest. Thus, the question is whether New Jersey has an interest in compensating a corporation incorporated in a foreign state with its principal place of business in New Jersey. New Jersey clearly has such an interest. The case of Eastern Seaboard Pile Driving Corp. v. New Jersey Property-Liability Ins. Guaranty Ass'n., 175 N.J. Super. 589 (App. Div. 1980) is indicative. There, the Court held that the plaintiff, which was incorporated in Delaware and had its principal

_____

[3] 745 Investment Properties, another named plaintiff, is no longer a party to this action. Therefore, its location has no bearing on this case.

14

place of business in New Jersey, was a "resident" of New Jersey under the New Jersey Property Liability Insurance Guaranty Act. Therefore, plaintiff was entitled to the benefits of the statute. The Court held that determining whether a corporation is a resident "depends upon the aim and context of the statute" in question. <u>Id</u>. at 592.

In keeping with this, New Jersey's strong policy in favor of compensating its domiciliaries seems logically to extend to corporations with their principal place of business in this state. Even if this were not so, however, the minor stake of PIC in this litigation, in comparison to Prudential, its corporate parent, merits the application of New Jersey's statute of limitations in this case.

Defendants also claim that the application of the domiciliary rule would be just as mechanical as the forum state rule, which New Jersey allegedly abandoned. The old rule was abandoned because New Jersey found itself in the troubling position of adjudicating cases in which it had little or no interest. But as <u>Heavner</u> and its progeny demonstrates, New Jersey has consistently treated the question of statute of limitations differently than other questions of substantive law. In other words, in this narrow area, there is essentially a presumption that the forum state's statute of limitations applies, which is based on New Jersey's substantial interest in compensating its domiciliaries. Defendants' policy arguments are well taken but ultimately made to the wrong forum -- the role of this court is to

15

predict how the New Jersey Supreme Court would rule.

At any rate, this is not a case where the plaintiff's only connection to New Jersey is the fact that it is domiciled in New Jersey. Two of the buildings involved in this litigation are located in New Jersey, and the defendants have some contacts with New Jersey. Moreover, many of the corporate financial decisions for which Prudential seeks compensation took place in New Jersey.

Finally, defendants point to areas of law in which New Jersey applied the law of a different state, even when the plaintiff was domiciled in New Jersey. Again, though, New Jersey treats statute of limitations differently than other substantive choice of law questions.

Thus, I conclude that because plaintiff Prudential is a New Jersey domiciliary whose primary place of business is in New Jersey, the New Jersey Supreme Court would be persuaded by its interest in compensating its domiciliary to apply its own statute of limitations in this case.

## B.  Statute of Limitations

New Jersey employs the discovery rule to toll statutes of limitation. Thus, the statute of limitations begins to run only when the plaintiff knows facts or has reason to know facts that would form the basis of a cause of action. See  Viviano v. CBS, Inc., 101 N.J. 538, 546 (1986) ("Under [discovery] rule, a cause of action does not accrue 'until the injured party discovers, or by an

16

exercise of reasonable diligence and intelligence should have discovered that he may have a basis for an actionable claim.") (citing Lopez v. Swyer, 62 N.J. 267, 272 (1973)).

New Jersey's statute of limitations in this area is six (6) years.  Prudential filed its complaint on October 20, 1987. Thus, the critical date is October 20, 1981.  If Prudential knew of or should have discovered the basis of its claim before that date, the claim is barred and must be dismissed.

Here, the parties hotly dispute what facts a plaintiff must know in order to start the statue of limitations clock.

In the recent case of Savage v. Old Bridge-Sayreville Medical Group, P.A., 134 N.J. 241, 247 (1993), the New Jersey Supreme Court made clear that two distinct kinds of knowledge must be attributable to plaintiff before the statute or limitations may begin to run. First, the plaintiff must have knowledge of the injury; and second, plaintiff must have knowledge of fault. Thus, "when a party is either unaware that he has sustained an injury or, although aware that an injury has occurred, he does not know that it is, or may be, attributable to the fault of another, the cause of action does not accrue until the discovery of the injury or facts suggesting the fault of another person." Id. (quoting Tevis v. Tevis, 79 N.J. 422, 432 (1979)).  Specifically, knowledge of fault requires "the awareness of facts that would alert a reasonable person exercising ordinary diligence that a third party's conduct may have caused or contributed to the cause of injury and that conduct itself might possibly have been

17

unreasonable or lacking in due care." Id. Furthermore the court stated that knowledge of injury plus knowledge of cause does not "logically or necessarily" equal knowledge of fault. Id.

Applied to this case, in order for the statute of limitations to begin running, Prudential would have to be aware not only of the presence of asbestos in its buildings, but further that it has suffered damage by the asbestos and that the presence of this hazardous material in Prudential's buildings was possibly caused in part by the unreasonable actions of another.[4]

Defendants argue that Prudential's suspicions prior to 1981 constitute actual knowledge that begins the running of the statute of limitations. See Reply Brief of Defendant, W.R. Grace Co. -- Conn., In Support of its Motion for Summary Judgment to Dismiss Plaintiffs' Amended Complaint As Barred By the Statute of Limitations in New Jersey at 8.  Defendants further argue that Prudential confuses knowledge of injury with knowledge of the extent of the injury, and that in fact, Prudential did have actual knowledge of its injuries, even if those injuries were slight at the time of its initial knowledge.

It is true that some courts have held that suspicions trigger the statute of limitations.  For instance, in Board of Education of the School District of the City of Detroit v. Celotex Corporation, No. 84-429634 (Circuit Court, Wayne County Michigan)

---

[4]Prudential argues in addition that before the statute of limitation begins to run, it would need confirmation by an expert that the buildings were in fact contaminated and it would need actual knowledge of the identity of the defendants. Because of the disposition of the motions, I need not reach those issues.

(March 1, 1988), aff'd on this ground, 493 N.W.2d 513, 519-20 (Mich. App. 1992) (applying Michigan law), the court found that plaintiff's claim accrued when it obtained a general knowledge of the hazards of friable asbestos as well as knowledge that its buildings contained asbestos. Similarly, in Roseville Plaza Ltd. Partnership v. U.S. Gypsum Co., 811 F. Supp. 1200 (E.D. Mich. 1992), the Court rejected defendants' argument that the plaintiff's cause of action accrued only when it discovered that its buildings were actually contaminated. Instead, the court held that the statute of limitations had accrued when plaintiffs were informed by the Michigan Department of Public Health of the presence of asbestos, and of the fact that asbestos presents a potential for danger. Id. at 1207-09.

In Roseville Plaza, however, the court was motivated in significant part by the fact that "plaintiff waited four years after receiving the MDOPH investigation to order a professional survey of the asbestos-containing materials in Roseville Plaza." Id. at 1209. Thus, as the court put it, plaintiffs' cause of action had accrued because "plaintiffs should have discovered its claims through the exercise of reasonable diligence before May 31, 1988" (emphasis added). Celotex is also better characterized as a "should have known" case, since that is the nature of the two-component test of knowledge of a generalized potential for danger and knowledge that the plaintiff's buildings contained asbestos. To be sure, in most cases, "known" and "should have known" are combined in the analysis. But because of the character of

19

defendants' motion, that is not the case here.[5]

At any rate, in light of the requirements of Savage, I believe that New Jersey courts would find that Prudential had actual knowledge of its injury only when it came into knowledge that the asbestos in its buildings posed a hazard that needed addressing. The Eighth Circuit recently adopted this approach while interpreting North Dakota law. MDU Resources Group v. W.R. Grace & Co., 14 F.3d 1274 (8th Cir. 1994). In that case, the Court reasoned that "the injury for which asbestos plaintiffs are being recompensed is the contamination of their buildings and not the mere presence of asbestos." Id. at 1279. Thus, the court held:

the District Court erred when it instructed that the issue for purposes of the statute of limitations was when MDU learned of the presence of asbestos in its building; instead, the proper question was when MDU could have learned with the exercise of reasonable diligence, that its building had been contaminated by asbestos. Id. at 1279.

This is clearly a correct description of the discovery rule, one that would be applied in New Jersey, see, e.g. Board of Trustees of Middlesex County College, No. W-38801-88, slip op. at 3 (N.J. Super. Law Div. August 20, 1992) (unpublished opinion) ("statute of

---

[5]Defendants filed a supplemental motion for summary judgment based on the argument that Prudential cannot satisfy the due diligence requirement. This is essentially a "should have known" argument. In July of last year, in deciding Prudential's equitable estoppel motion, I found that there were disputed issues of fact concerning whether defendants fraudulently concealed material information about the hazards of asbestos. I also held that Prudential is entitled to try to prove that because of the extent of the fraud (if any), a due diligence requirement arose late or never arose. Because of this finding, I am unable to grant defendants' motion on this ground.

limitations does not run until asbestos in a building poses an actual hazard.") As the court put it, "[r]egardless of the plaintiff's knowledge of a potential cause of action, no cause of action exists until the plaintiff suffers some compensable harm." Id. at 1278. Thus, mere suspicions are not enough to satisfy the actual knowledge test. (Although, of course, suspicions may be enough to put Prudential on inquiry notice). And, in order for Prudential to know of its injuries, it must know that the asbestos in its buildings poses a hazard. Without this, Prudential has suffered no harm.

Defendants' arguments do not end here, though. They point to several pre-1981 factual scenarios in the record, which, they contend, demonstrate that Prudential had actual knowledge of facts constituting its cause of action. I will address a number of these factual scenarios -- the ones I consider exceptionally important.[6]

### (1) Presence of Asbestos

First, defendants point out that prior to 1981, Prudential was aware of the presence of asbestos-containing materials in its buildings. Def. U.S. Gypsum Co. Reply Brief at 5 (hereinafter U.S. Gypsum brief). This fact by itself, though, does not satisfy the Savage threshold, since the presence of asbestos is

---

[6]The parties should be aware, however, that the court has examined the 12(g) statements in great detail and, in all situations not specifically addressed in this opinion, finds disputed issues of fact.

not synonymous with the presence of a danger resulting from the presence of asbestos. <u>Board of Trustees</u> slip op. at 3; <u>MDU Resources Group</u>, 14 F.3d at 1279 (statute of limitations begins to run when plaintiff knew or should have known that building was contaminated by asbestos).

### 2. BOMA Material

Second, defendants cite material published by a group called the Building Owners and Managers Association ("BOMA"). Defendants contend that BOMA's newsletter referred repeatedly to the dangers of asbestos. <u>Def. 12(g) Statement</u> at ¶¶ 54-63. While this information may well be relevant in determining what Prudential should have known, it is impossible -- in light of Prudential's counterstatement -- for this court to hold -- without making a credibility determination -- that Prudential actually knew of these publications.

### 3. Federal, state and local regulation

Third, defendants point to the increasingly strict regulation of asbestos by the federal government, by several cities and by the State of New Jersey. See <u>Defendants Rule 12(g) Statement</u>, ¶¶45; <u>see also</u> <u>Brief of United States Gypsum Company in Support of its Motion for Summary Judgment</u> at 9 (summarizing defendants' Rule 12(g) statement). The Rule 12(g) statement goes into great detail about the controversy about asbestos in schools that occurred in the mid and late 1970s. Indeed, these regulations

and public debates resulted in a series of personal injury lawsuits against asbestos companies alleging health problems due to asbestos. Def. 12(g) Statement ¶¶ 46-53. Moreover, as a result of public concern over asbestos in schools, campaigns were begun and certain schools were closed.

Plaintiffs make several responses to these facts, including the following: (1) The bulk of the legislation did not address the asbestos problem of this case, namely the alleged harmful affect of in-place asbestos; (2) Agents of plaintiffs were not aware of particular newspaper articles and other media distributions about the potential effect of in-place asbestos; (3) Agents of Prudential were unaware of the asbestos-related lawsuits being filed. Keeping in mind that defendants' motion is based on Prudential's actual knowledge, I must find that there are disputed material facts, whatever a jury might find about what Prudential should have known.

### 4. Testing performed at various buildings

Fourth, defendants note that "[b]efore 1981, Prudential received requests for testing and expressions of concern from employees, tenants and one its liability insurer's [sic] regarding the presence of asbestos-containing materials." U.S. Gypsum brief at 5.

To support this allegation, defendant first describes incidents that occurred at the IBM Building in Jacksonville, Florida. In 1979, IBM, the building's major tenant, raised a

concern about asbestos to the building's manager, Sidney Register, and arranged for air-tests to determine the concentrations of asbestos.    IBM forwarded the reports to Mr. Register, which disclosed the presence of a certain level of asbestos. IBM then requested that the asbestos be encapsulated or removed.  Defendants have submitted a series of letters and testimony memorializing Prudential's response to the situation.       Of    particular importance is a meeting that allegedly took place between three Prudential representatives and Edmund Drazga, President of KRC Research, an asbestos consulting firm.  Apparently at Prudential's request, Mr. Drazga submitted a proposal to encapsulate the asbestos at the IBM building, sent it to Mr. Register, who in turn sent it to Earl Starr for approval. See e.g. Defendant's Exhibit 71 (June 12 letter from Ronald Harmson to Earl Starr). However, in January 1981, IBM decided not to proceed with the KRC proposal.

This last fact, combined with Prudential's contention that all tests done showed an asbestos concentration within acceptable limits, make it impossible to determine that Prudential had knowledge of actual injury at this time.  Rather, Prudential argues, it approached the problem only as a tenant-relations situation, and when IBM was satisfied, Prudential pursued the it no further.  The fact that the asbestos appeared to be within limits, and the fact that IBM continued as a tenant, make it possible that Prudential was unaware of any harm to the building.  Of course, a jury may find that after these incidents, Prudential should have known about facts constituting a cause of action.  But on this

24

summary judgment motion, I cannot find that this scenario -- looked at in a light most favorable to plaintiff -- constitutes <u>actual</u> knowledge on the part of Prudential.

Next, the defendants discuss a series of incidents that occurred at the Five Penn Center in Philadelphia, Pennsylvania.

First, defendants point to a letter from R.L. Albertson, Prudential's Associate General Manager, to the prior owner of the building. This alleged letter charges that the prior owner breached the purchase contract because "[i]t appears that the building was in violation of law pertaining to concentrations of air-borne asbestos on and prior to the date of settlement under said Agreement of Sale." Defendant's exhibit 104 (September 29, 1976 letter from R.L. Albertson to Uris Buildings Corporation). Prudential's response is to quote deposition testimony from Mr. Albertson flatly denying preparing the letter, signing the letter and mailing the letter.

This creates a classic dispute of fact.

Defendants also point to a June 1971 letter to 5 Penn Center from Jessie Lieberman, Chief of the Occupational and Radiological Health Section of the Philadelphia Department of Public Health, notifying the building management of its intent to "conduct air measurements for concentrations of airborne asbestos" in the building. This letter, defendants contend, was delivered to Carolyn Hatcher, the Prudential representative responsible for sales and management agreements, on September 29, 1976. Once again, Ms. Hatcher testified that she had not seen the letter.

This also creates a dispute of fact.

Also in 1976, Traveler's Insurance Company apparently requested that Prudential perform tests to determine the amount of airborne asbestos in the building, and in 1979, Travelers commissioned its own tests. But, as Prudential points out, the tests may have shown that the asbestos level was acceptable.

Next is a report issued by John G. Reutter Associates that analyzed the asbestos content in the building. This report was commissioned after a doctor in the group discovered loose asbestos in his office. A January 15, 1981 report was written in somewhat ominous terms, and essentially recommended additional investigations. A subsequent report, however, issued February 4, 1981, found that asbestos levels in various parts of the building were below the OSHA limits. Therefore, Prudential and Prudential's contract manager for the building, Eastman-Arnold Company, concluded that there was "nothing to be concerned about." The record does reflect that Prudential nonetheless commissioned some special cleaning of the building. Prudential maintains that the "special cleaning" it did at Five Penn Center was performed in "the interest of tenant relations, and in order to appease Colonial Penn." These facts push Prudential closer and closer to the wall, but I must remain cognizant of the standard for summary judgment. If Prudential's argument about the content of asbestos and its knowledge of the early 1970s letters is plausible to a jury, it may be that it did not have actual knowledge at that time.

Defendants also cite to a request by a tenant at the

26

Kent-Albert Building in Ottowa, Canada. A tenant in the building requested certain unspecified tests to be performed. Prudential's counterstatement indicates that the results showed the asbestos to be "non-hazardous" and that "no control procedures" were required. Prudential conveyed these results to the tenant. According to Prudential, no further discussion of asbestos at the Kent-Albert Building arose prior to the sale of the property in December 1981. It is difficult to see how requested testing by a tenant which showed no problem with the asbestos, and which did not result in any further actions by the tenant, alerted Prudential that the asbestos in its buildings posed a hazard.

Defendants then point to a series of incidents that occurred at the Prudential Center in Boston, Massachusetts. According to the affidavit of George A. Hindy, Manager of the Building Service Division of the Prudential Center at the time, in 1978 an OSHA inspector visited the building in response to a concern raised by a Prudential employee about asbestos problems in the 5th floor media room. The OSHA inspector took air samples, but later informed Mr. Hindy that the air quality was "healthful". Affidavit of George A. Hindy, January 15, 1992, Exhibit 178 to Plaintiff's Counterstatement and Response. Mr. Hindy also apparently requested a written copy of the OSHA test results. The report stated that "[a]nalysis indicated .01 asbestos fibers per cubic centimeter of air, which is well below the OSHA standard allowable . . ." Defendant's Exhibit 144.

Defendant points to other testing and memoranda related

27

to the Boston site.  For instance, testing performed by the Haller Laboratory at the Prudential Center to determine the contents of the fireproofing concluded that the fireproofing was probably nonhazardous in the absence of vibratory conditions.  This and other evidence adduced by defendants is susceptible to different interpretations and cannot be the basis for a grant of summary judgment.

To summarize defendants' arguments relating to testing requested at various buildings, the legal standard is that one must have knowledge of injury and that this injury was caused by the possibly unreasonable acts of another.  While expressions of concern by tenants about asbestos might be somewhat indicative of the potential for injury, such expressions do not necessarily go to knowledge of contamination by asbestos.  Prudential has adduced evidence intended to demonstrate that the tests performed at the requests of tenants indicated that the asbestos was nonhazardous.

### 5.  Zielinski material

Next, defendants cite to memoranda and statements made by Arcadius Zielinski, an architect in Prudential's Corporate Services & Building Department, which detail the presence of asbestos in various Prudential buildings, and cite applicable regulations in the event of the removal of asbestos.  It is true that Mr. Zielinski does appear to indicate that prior to 1981 he believed that asbestos was a hazard.  See, e.g. Zielinski Deposition

28

Transcripts, October 20, 1987, August 2, 1989, September 19, 1991;
Exhibit 100 to Plaintiffs' Counterstatement and Response to the
Rule 12G Statement Submitted by Defendant.  However, a close review
of all the submitted portions of Mr. Zielinski's deposition
demonstrates first, that he was often confused about the questions
and about what his thinking was in the late 1970s and early 1980s,
and second, that Mr. Zielinski may not have been concerned with
alleged contamination or hazards in Prudential's buildings.  See,
e.g.  Transcript, Zielinski Deposition, October 1, 1987 at 161
(testimony that if asbestos was "firm" it is not a hazard); Id. at
208 (testimony that nothing need be done to in-place asbestos
unless there is disturbance).  Thus, it would be inappropriate for
the court to rely on this evidence to grant defendants' motion
based on Prudential's actual knowledge.

        Finally, the defendants claim that Prudential's "attempts
to minimize its knowledge of its injury by asserting that air-level
testing showed low levels of airborne asbestos, is inconsistent
with Prudential's position that it is seeking to recover for the
mere presence of asbestos-containing materials without regard to
air levels.  Indeed, Prudential has not shown a change in air
levels or that any such change brought about this action."  This
argument simply does not address the question of when Prudential
knew of its injury.  Prudential's argument is essentially that it
learned of its injury very late, and then came to believe that any

presence of asbestos is hazardous.

## IV.  Statute of Repose

Defendants next move to dismiss plaintiffs' complaint because it is barred by various states' statutes of repose.  This too requires a choice of law analysis.

### A.  Choice of Law

Statutes of repose serve a similar purpose to statutes of limitations.  Like limitations period, repose periods -- if elapsed -- prevent plaintiffs from filing an action on a particular claim. Unlike statutes of limitations, though, statutes of repose are unrelated to when the cause of action accrues.  Rosenberg v. Town of North Bergen, 61 N.J. 190, 199 (1972).  Rather, a typical statute of repose "prevents what might otherwise be a cause of action from ever arising" after a specified period of time.  Id. at 199., Van Slyke, 265 N.J. Super. at 608.  Statutes of repose are, therefore, principles of substantive law and would ordinarily require a governmental interest analysis.  Id.

In this case, defendants are essentially using the statue of repose as a statute of limitations, to argue to the court that plaintiff's causes of action are time-barred.  See Brief in Support of Defendant, W.R. Grace & Co.-Conn.'s Motion for Summary Judgment to Dismiss Plaintiff's Amended Complaint Upon the Statutes of Repose at 7 ("While statues of limitation and repose differ, their underlying policies are the same").  And in fact, a statute of repose, in balancing the right to recover with the interest of

promoting timely and efficient litigation, raises many of the same policy concerns as a statute of limitations. And that is what this series of motions is all about. Therefore, this court concludes that in this case, the New Jersey Supreme Court would apply the same choice-of-law analysis in choosing New Jersey's statute of repose as it would in choosing the correct statute of limitations to apply. Accord, Mowrey v. Duriron Co., Inc., 260 N.J. Super. 402, 415 n.5 (App. Div. 1992) (even though case involved statute of repose, "we see no reason to depart from the Heavner analysis").

It is true that the recent case of Van Slyke v. Worthington applied the governmental interest analysis to a statue of repose question. That court, however, focussed on the particular facts of the case, namely that if New Jersey law applied, the statute of repose would bar plaintiff's claim and New Jersey's compensation interest would be defeated. Van Slyke, 265 N.J. Super. at 613.

But even using the governmental interest analysis, I find that New Jersey would not apply the statutes of repose of the non-forum states.

Under the governmental interest analysis, the court applies the law of the state with the greatest interest in governing the particular issue. Veazey v. Doremus, 103 N.J. 244, 249 (1986); Henry, 508 F.2d at 32. If a conflict exists, the court must assess the governmental policies of each state to determine which law to apply. The emphasis is on the quality, and not the quantity, of contacts.

Defendants are certainly correct in pointing out that the states where the various buildings are located have a strong interest in determining the fate of claims related to those respective buildings. The other important concerns are the interest in avoiding stale claims and the plaintiff's right to have an adjudication of its claim and receive compensation if the claim is meritorious. As detailed above, when the plaintiff is domiciled in New Jersey, New Jersey courts place strong emphasis on its compensation interest -- particularly when the alternative is to foreclose any forum to the plaintiff. Thus, I believe that even under a governmental interest analysis, New Jersey would apply its own law regarding statutes of repose.

### B. The substantive issue

In light of the foregoing discussion, since New Jersey law governs the application of statutes of repose, and since New Jersey does not have an applicable statute (and in fact, the defendants have not moved on any such statute), the defendants' motion for summary judgment based on the statutes of repose is denied.

### V. Defendants' motion on breach of warranty claim

Defendants next move to dismiss plaintiff's breach of warranty claim, as barred by the statute of limitations. The parties, for once, agree on a number of points here: First, that the UCC provides the relevant statute of limitations; second, that

normally, the statute of limitations is four years from the date of performance of the contract; and third, that the UCC provides a limited exception for warranties of future performance.[7] Prudential has conceded that any claim it has for breach of an express warranty for present performance are barred by any and all applicable statutes of limitations. It claims, though, that it has made out a claim for breach of a warranty of future performance.

The Uniform Commercial Code provides generally that "[a]n action for breach of any contract for sale must be commenced within four years after the cause of action has accrued." N.J.S.A. 12A:2-725 (1). It further provides that:

> A cause of action accrues when the breach occurs, regardless of the aggrieved party's lack of knowledge of the breach. A breach of warranty occurs when tender of delivery is made, except that where a warranty <u>explicitly</u> extends to future performance of the goods and discovery of the breach must await the time of such performance the cause of action accrues when the breach is or should have been discovered.

N.J.S.A. 12A:2-725 (2) (emphasis added).

There are a few principles discernible from the UCC itself. First, any warranty for future performance must be express, because implied warranties "by their very nature . . . never explicitly extend to future performance." <u>Western Recreational Vehicles, Inc. v. Swift Adhesives, Inc.</u>, ___ F.3d ___,

---

[7] To some extent, the parties dispute the law to be applied. First, it does not appear that any conflicts exist, so this court can apply law governing the UCC. Second, to the extent that any conflicts do exist, this court will apply New Jersey law, since even under that law (which Prudential wishes applied), this claim must be dismissed.

1994 WL 176740 (9th Cir. (Wash.), May 11, 1994) (No. 92-36879, 92-36899).  The UCC also provides a definition of express warranties. Section 2-313 states:

> (1) Express warranties by the seller are created as follows:

> (a) Any affirmation of fact or promise made by the seller to the buyer which relates to the goods and becomes part of the basis of the bargain creates an express warranty that the goods shall conform to the affirmation or promise.

> (b) Any description of the goods which is made part of the basis of the bargain creates an express warranty that the goods shall conform to the description. N.J.S.A. 12A:2-313(1).

In this case, Prudential's claims can be divided into two categories:  First, it claims that at the time of the contracts, the defendants, through advertising and promotional literature, provided express warranties of future performance.  Second, it contends that after the initial contracts were entered into, the defendants, through responses to inquiries, continued to make representations about future performance.

First, I will address Prudential's claim that the defendants made a number of warranties for future performance prior to or at the time of the sale.  It cites to the following as warranties of future performance given in "Advertisements and Product Descriptions."  <u>Plaintiff's Brief in Opposition to Defendant W.R. Grace & Co.'s Motion for Summary Judgment (1) On Plaintiff's Breach-of-Warranty Claims Based Upon the Statutes of Limitations and (2) On Plaintiff's Statutory Claims Under the Unfair and Deceptive Trade Practices Act</u> at 4.  The citations are

divided into categories based on the individual defendant.

<u>Grace</u>

(1)  Promotional literature describes Zonolite
Vermiculite, an asbestos-containing product as containing
"an amazing mineral discovered during World War I".  In
one sentence of a several page brochure, the company
stated **"permanent -- Inorganic, sterile, will not rot or
decompose.  Moisture does not harm Zonolite.  Even if
accidentally wetted, it regains its original efficiency
when dried out.**  <u>Appendix in Support of Plaintiff's
Motion to Strike Defendants' Statute of Limitations
Defenses Upon the Grounds of Equitable Estoppel</u>, Volume
II §A at 2 (emphasis in original) (hereinafter,
references to this Appendix will be cited as A, followed
by the volume of the appendix, followed by the particular
section (A, B, C, D, or E), followed by the page number).

(2)  Other promotional literature contains a similar
description of Zonolite as "Permanent -- Inorganic,
sterile, will not rot or decompose."  AII §A at 12;

(3)  Several pieces of literature refer to the zonolite
brand of vermiculite as durable.  AII §A at 22, 30, 38,
and 46;

(4)  Literature states:  "And you don't build a dusting
problem into your building when you specify Mono-Kote.
It dries hard, not punky . . . doesn't 'snow' when the
building vibrates.
     "All in all, it simply makes sense to specify
Zonolite Mono-Kote.  It gives you the fire protection you
need where the fire protection belongs . . . on the steel
itself.  It requires little or no policing.  And it
causes no problems after it's in place."  AII §A at 103.

(5)  Another piece of literature states that "[s]ubjected
to hurricane force winds for over 85 hours, MONO-KOTE
demonstrated <u>no erosion</u>."  (emphasis in original).  AII
§A at 105.

(6)  A Zonolite pamphlet states that "[i]ndependent
laboratory test subjected standard, machine-applied Mono-
Kote surface to winds exceeding hurricane velocity . . .
over 100 M.P.H. for 87 hours . . . with no erosion."  AII
§A at 124.

(7)  Literature contains additional reference to test
showing no erosion at hurricane-velocity winds.  AII §A

35

at 131.

(8) Literature states:  "The fireproofing material shall not be subject to losses from the finished application by sifting, flaking or dusting.  This performance shall be measured by the results of a test for erosion resistance when subjected to high velocity air flow cross the surface of dried samples. . . . Material shall not crack or delaminate when the structural element is subjected to downward deflection of 1/120 of the span." AII -§A at 141.

(10)  Material states that "[e]xisting formulations of Mono-Kote contain minimal amounts of asbestos which are 'locked in' during the mixing process.  Mono-Kote is wet-mixed, pumped and sprayed, and hardens to a cementitious mass."  AII §A at 142.

(11)  Further reference to wind velocity test: "[Z]ero erosion, after being tested in 100 m.p.h. winds for 87 hours.  Result:  no 'dusting' in air-conditioning and ventilating systems."  AII §A at 148.

(12)  Literature states  "Monokote, a cementitious, plaster fireproofing stays applied during application and throughout subsequent construction procedures <u>for the life of your building</u>."  AII §A at 159 (emphasis added).

### United States Gypsum

(1)  Literature about SprayDon, an asbestos product manufactured and marketed by United States Gypsum Co., Inc. (hereinafter U.S. Gypsum) states that U.S. Gypsum's method of application  "results in a mat that is hard, firm -- so durable that it can be used on sidewalls . . . ."  Also:  "no cracking from shrinkage or fire" and able to withstand erosion.  AII §B at 235.

### Asbestospray

(1)  Promotional literature states that "[l]aboratory tests prove that Type S Surface Sealer, used by the Asbestospray corporation in its asbestos products, will enable Asbestospray to withstand flow of air up to 1500 feet per minute without dusting or flaking."  AII §C at 372.

(2)  Literature states that among the advantages of Asbestospray are:  "High bonding strength -- provides a permanent surface that will not crack, dust or flake."

AII §C at 374, 381, 387, 395, and 403.

(3)      Similarly, other literature **states** that "Asbestospray forms a strong, lasting bond **with** steel, masonry, plaster, gypsum lath and other rigid surfaces." AII §C at 386.

(4) Another product description details the Fireproofing advantages of Asbestospray's product:    "Permanent. Asbestospray forms an extremely strong bond with the surface to which it is applied. . . . . Laboratory tests prove that Type S Surface Sealer will enable Asbestospray to withstand flow of air up to 1500 feet per minute without dusting or flaking."  AII §C at 387, 395, and 403.

(5)  In another reference to testing, literature states that "Field tests have been run in areas used for this purpose and definitely prove that there is no erosion of the installed material."  AII-§C-413.

### Keene Corporation

(1)   Literature states that "[l]aboratory tests prove Pyrospray Fireproofing effectively resists erosion, dusting or flaking due to high velocity air movement." AII §D at 480.

### United States Mineral Products

(1) Literature states that "Under normal structural movement of framing, floor or roof sections, BLAZE-SHIELD Type D maintains high bond strength without surface cracking or spalling.  Shrinkage cracks, resulting in limited effective fire retardancy, are eliminated." AII §E at 490.

(2)  "The monolithic coating [of Blaze-Shield Type H] absorbs normal structural movement without surface cracking or spalling."  AII §E at 492, 500, and 502.

(3)  Literature states that "[w]ith Blaze-Shield Type D, old heavy wet mix materials are eliminated and it provides permanent protection to deflection, impact, structural systems without surface cracking or spalling due to normal structural expansion or contraction." AII-E-498.

Prudential is correct in its contention that express

warranties can be made through advertising. Indeed, advertisements are obviously constructed to induce purchases, and when purchasing decisions are reasonably made based on advertisements, the representations contained in the advertising become part of the bargain. See, e.g. Cipollone v. Liggett Group, Inc., 893 F.2d 541, 564 n.20 (3d Cir. 1990), modified, 112 S.Ct. 2608 (1991); see also Spring Motors Distributors, Inc. v. Ford Motor Co., 191 N.J. Super. 22, 46 (App. Div. 1983), rev'd in part, 98 N.J. 555 (1985) ("The seller need not use the formal words such as 'warrant' or 'guarantee' or have the specific intention to make a warranty in order that an express warranty arise . . . . [A] warranty that a machine is 'well-constructed,' 'satisfactory,' or 'in good working order' will ordinarily bind the seller."  (quoting 1 Anderson, Uniform Commercial Code (2nd ed. 1970), §2-313:37 at 502)).

But the question here is not whether the representations in the promotional literature were express and therefore part of the bargain; rather, the issue before the court is whether the literature conveyed representations regarding future performance.

Courts generally have narrowly construed the definition of "explicit" in deciding whether a warranty extends to future performance under the UCC. Stating the general rule, one court has held that the term explicit in this context means "not implied merely or conveyed by implication; distinctly stated; plain in language; clear, not ambiguous; express; unequivocal." Binkley Co. v. Teledyne Mid-America Corp., 333 F. Supp. 1183 (E.D. Mo. 1971) (quoting Hvidsten v. Northern Pacific Ry. Co., 76 N.D. 111, 121,

(1948), <u>aff'd</u>, 460 F.2d 276 (8th Cir. 1972) (<u>cited with approval in</u>
<u>Jones & Laughlin Steel Corp. v. Johns-Manville Sales Corp</u>, **626 F.2d**
**280, 291 n.25 (3d Cir. 1980)**).

     <u>Jones & Laughlin</u> is instructive about the standard that
must be met before a warranty for future performance may be found.
In that case, the plaintiff claimed that the defendant, who had
sold it a roof, had made an express warranty about future
performance. Johns-Manville had made the following representations
during negotiations:

> Johns-Manville has been reducing roofing felts made of
> asbestos for over 100 years. On the record, Johns-
> Manville can cite many asbestos roofs that, today, are
> still performing satisfactorily after more than forty
> (40) years of exposure to heat, cold, water, air and even
> fire. And, all of this service with minimum maintenance
> and repair costs.
>
>        \*   \*   \*
>
> Improved Fesco Board resits the tensions, twists and
> pulls created by high winds, tornadoes, hurricanes and
> building movements. Laboratory tests pictured here,
> demonstrate Improved Fesco Board's great tensile strength
> and outstanding resistance to diagonal shear and
> horizontal shear . . . Many roof insulations barely meet
> the Factual Mutual minimum requirements but Improved
> Fesco Board withstands 120 miles per hour with a 100%
> factor of safety.

<u>Jones & Laughlin</u>, 626 F.2d at 291. Nonetheless, the Court of
Appeals held as a matter of law that "[t]he statements regarding
the strength and wind resistance of Fesco Board, as well as the
boast that many roofs . . . are still performing satisfactorily
after more than forty (40) years of use, may not reasonably be
relied on by Jones & Laughlin as <u>explicit</u> extensions of any
warranty to cover the future performance of the product . . . ."

Id. at 291.

The vast majority of courts -- including New Jersey appellate division courts -- have, in line with the Third Circuit's view, construed the UCC language narrowly. What this means is that in order for there to be a warranty of future performance, the warranty must "make specific reference to a future time".  Fire Dist. No. 9 v. American La France, 176 N.J. Super. 566, 573 (App. Div. 1980); Spring Motors, 191 N.J. Super. at 47.  As stated very recently by the Ninth Circuit:

> "Most courts have been very harsh in determining whether a warranty explicitly extends to future performance. Emphasizing the word 'explicitly', they have ruled that there must be specific reference to a future time in the warranty.  As a result of this harsh construction, most express warranties cannot meet the test . . . ."  Western Recreational Vehicles, Inc., 1994 U.S.App. LEXIS at *8 (citing Standard Alliance Industries, Inc. v. Black Clawson Co., 587 F.2d 813, 820 (6th Cir. 1978), cert. denied, 441 U.S. 923 (1979).

It is possible to read Cipollone somewhat broader than Jones & Laughlin.[8]  In the more recent case, the defendants' advertisements had represented that according to scientific tests performed on tobacco, cigarettes are not harmful.  Writing for the Court, Judge Becker wrote that representations of "studies" conducted by medical specialists on individuals who had smoked for thirty years could be

---

[8]Although it could be argued that Cipollone speaks to warranties for future performance, Prudential relies on the case for the proposition that the defendants gave express warranties. Prudential's brief divides as follows:  (1) Defendants gave express warranties; (2) The warranties extended to future performance. Prudential's brief in Opposition to Breach of Warranty Claim, at 16-24.  Cipollone is cited only in the first section.

taken as "representing that smoking for a long period of time was safe". Cipollone, 893 F.2d at 576.   The whole series of advertisements -- including representations that a particular brand of cigarettes was "just what the doctor ordered" told the Court that "a reasonable jury could conclude from these advertisements, and the many others entered into evidence, that [the defendant] had represented to the consumer that the long-term smoking of chesterfield or L & M cigarettes would not endanger the consumer's health, and that these warranties were untrue." Id. at 575-76.

Cipollone, however, addressed neither the standard for finding an express warranty of future performance nor the statute of limitations question.  The arguments before the court, and the decision that was rendered, addressed simply the question of whether there was "sufficient evidence to support a jury finding that Mrs. Cipollone's injury was caused by Liggett's breach of express warranty". Id. at 574.  The question of causation is different from the question of whether an action is time-barred.

Prudential relies primarily on several cases for the proposition that the representations in this case amounted to representations of future performance.  These cases, however, while citing the general rule, do not really analyze the representations at issue to determine whether they in fact meet the rigorous test. For example, in Kansas City v. W.R. Grace & Co., 778 S.W.2d 264 (Mo. Ct. App. 1989), the Missouri Court of Appeals addressed the trial court's grant of summary judgment to a series of asbestos companies on the plaintiff's express warranty of future performance

41

claim.  The record contained representations that the defendants'
products were "easy to maintain", and that they provided a
permanent surface that would not crack or dust.  The appeals court
simply cited the statements and held that the representations
constituted an express warranty of future performance.  The court
did not address whether the representations were explicit (although
they were) or whether they unambiguously and explicitly warranted
the product for a particular time period.

    This was also the case in Mittasch v. Seal Lock Burial
Vault, Inc., 42 A.D.2d 573, 344 N.Y.S.2d 101 (App. Div. 1973).
There, the defendant had represented that the burial vault it sold
plaintiff would perform satisfactorily at all times.  The Appellate
Division stated, again without analysis, that "[i]n our opinion,
defendants' warranty that the burial vault would give 'satisfaction
at all times' explicitly extended to future performance."

    This approach has been criticized by the Ninth Circuit as
being at odds with the language of the UCC.  Western Recreational
Vehicles, 1994 WL 176740 at 4-5.  Indeed, the cases fail to take
into account the policies and balancing behind the UCC's
provisions.  For one thing, the cases do not pay sufficient
attention to the fact that the future performance provision is an
exception to the general rule.  And the general rule provides a
useful rule to govern sales specifically and business situations
generally.  It makes eminent sense to provide a four year statute
of limitations when a product is sold and a warranty is given.  But
if a purchaser wishes the seller to guarantee the product for

years, decades or forever, the law requires a special explicit-
ness, to ensure that the parties have in fact bargained for the
additional warranty. Thus, the requirement that the warranty be
explicit ensures that the parties get what they intended. In the
absence of such explicit language, the UCC establishes "a
reasonable period of time, four years, beyond which business
persons need not worry about stale warranty claims . . . ."
Standard Alliance, 587 F.2d at 820. As one court has held, the
general rule "serves the important function of providing a point of
finality for businesses after which they can destroy their business
records without the fear of a subsequent breach of contract for
sale or breach of warranty suit arising to haunt them." Ontario
Hydro v. Zallea Systems, Inc., 569 F. Supp. 1261, 1266 (D.Del.
1983). Put differently, the explicitness requirement ensures that
before the exception applies, "the parties to the contract have
knowingly agreed to alter the usual statute of limitations."
Stumler v. Ferry-Morse Seed Co, 644 F.2d 667, 672; see also H. Sand
& Co. v. Airtemp Corp., 738 F.Supp. 760, 770 (S.D.N.Y. 1990),
modified 934 F.2d 450 (2d Cir. 1991) ("The drafters of the UCC
decided that the seller's need to have some clearly defined limit
on the period of its potential liability outweighed the buyer's
interest in an extended warranty and reserved the benefits of an
extended warranty to those who explicitly bargained for them.")
Moreover, "[a]ny harshness that results from the statute is
directly attributable to the restrictive language of the code,
which leaves courts with no alternative but to render a narrow

decision." <u>Western Recreational Vehicles</u> at *5 (<u>quoting</u> <u>Poppenheimer v. Bluff City Motor Homes, Div. of Bluff City Buick Co.</u>, 658 S.W.2d 106, 111 (Tenn. App. 1983)).

Thus, the provision must be applied narrowly. With this in mind, I do not believe that the representations amount to warranties of future performance. It is fairly clear that these representation amount to representations of current use. But they simply do not rise to that level of specificity required for future use. Many of the representations refer to test results. In <u>Jones & Laughlin</u>, the Third Circuit specifically rejected the notion that representation of test results could create an express warranty of future performance. Similarly, while many of the representations describe the product as durable and permanent and not subject to cracking, that is a far cry from an <u>explicit</u> representation that the product is warranted for a specific future time. Moreover, the statements are briefly worded in the context of lengthy promotional literature. They certainly are not the bargained-for representations contemplated by the UCC.

The closest example to a warranty of future performance is Grace's representation that Monokote stays applied for construction projects for the life of the building. But even this statement does not provide a warranty for a specific time in the future. <u>See, e.g.</u>, <u>South Burlington School Dist. v. Calcagni-Frazler-Zajchowski Architects, Inc.</u>, 410 A.2d 1359, 1366 (1980) (refusing to apply exception to representation that product would last as long as the built-up roofing would last.) Moreover, that

particular representation is ambiguous, in that it is unclear whether it is speaking about future construction projects or about the life of the building generally.

In short, to hold that the representations in the promotional literature rose to the level of an explicit representation referring to specific future date would allow the exception to swallow the rule. I decline to follow that path.

Prudential does not end its argument here, however. It contends that representations made by the defendants after the contracts were completed presented future warranties. These representations occurred through responses from the defendants to inquiries about their asbestos products.

The following list is derived from Prudential's exhibits:

(1) April 28, 1969 letter from Thomas F. Egan, Manager Fireproofing Products for Zonolite, a division of Grace, states that "Zonolite Mono-Kote has been tested for dusting and air-erosion with 105 M.P.H. winds for 87 hours and no loss of material. This would hold as to application for our plaster or acoustical plaster." AIII §B at 127.

(2) December 9, 1970 letter from William V. Culver, District Manager of Grace, to the Chief Industrial Hygienist of Workmen's Compensation Board, states that "Mono-Kote is a cementitious brand of fireproofing which does contain approximately 8& asbestos. I hasten to point out that being mixed in a plaster mix with water and pumped as a slurry, at no time is the asbestos free as occurs with the normal sprayed fibrous kind of fireproofing." AIII §B at 169.

(3) January 15, 1971 letter disseminated by W.R. Grace (actually written by the Texas Vermiculite Company) to Neuhaus & Taylor, Architects, states that "If we are fortunate enough to supply your [building] we will be

supplying Mono-Kote which has had an excellent history and does not contribute to health hazards." AIII §B at 171 (emphasis added).

(4) February 8, 1971 letter from Thomas F. Egan of Grace to McNulty Bros. Co., an architecture firm, states that Mono-Kote "has a definite set containing approximately 60% gypsum and 'locks' the fiber in the hardened mass." Further, "The in-place density is assured and provides tested --- erosion hardness for use in plenums." It further states, however, that "[f]rom the test data, we contend that Mono-Kote is not causing the health hazard that is being charged." AIII §B at 176-77.

(5) November 15, 1972 letter from R.O. de Bastian of Grace to Sayre & Associates states that under applicable regulations, "exposure [to asbestos] shall not exceed 5 fibers per milliliter greater than 5 microns in length. Tests have shown that Mono-Kote is well below these standards." AIII §B at 200.

(6) October 25, 1972 letter from the Carpenter Plastering Company to Henry C. Back Company, attaching literature furnished by W.R. Grace & Co. showing technical data and specifications in connection with Zonolite Mono-Kote fireproofing. This material states that "[i]ndependent laboratory test subjected standard, machine-applied Mono-Kote surface to winds exceeding hurricane velocity . . . over 100 M.P.H. for 87 hours . . . with no erosion." Further, "[t]he fireproofing material shall not be subject to losses from the finished application by sifting, flaking or dusting." AIII §B at 202.

(7) January 25, 1977 letter from Robert A. Merther of Grace states "This is to certify that no commercial asbestos is used in the manufacture of MONOKOTE Fireproofing. Further, any trace contaminates of naturally occurring forms of asbestos in MONOKOTE are bound in the 'in-place' MONOKOTE, so as to prevent asbestos fibers from entering the environment." AIII §B at 236.

(8) Draft of a letter from Merther of Grace to the Supervising Principal of Berne-Knox-Westerlo Central School District states that "Zono-Coustic acoustical plaster sets to a relatively hard condition. The asbestos which was in the material, therefore, is bound in the set plaster and is not free to enter the environment." AIII §B at 238.

(9) March 7, 1977 letter from Grace to Horner & Krause

Architects, states that "[B]ecause in place 'Monokote' is a hard plaster like material, it is our opinion that in place MK-3 poses no health hazard to building occupants." AIII §B at 242.

(10)  March 18, 1977 letter from Grace to the Illinois Superintendent of Education, responds to concerns about pre-1973 monokote:

> "The material manufactured by our company . . ., because it provides a much more durable surface, is far less likely to be damaged and quite difficult to remove. Furthermore, although prior to 1973 , MONOKOTE MK-3 was manufactured with 5 asbestos, the asbestos was housed in the in-place material by the set gypsum and therefore not free to enter the environment. We understand, in fact, that tests have been run in buildings which have been sprayed with MONOKOTE MK-3 with these tests showing no detectable levels of asbestos fibers coming from the MONOKOTE Fireproofing. It is our opinion, therefore, that in-place MONOKOTE MK-3 Fireproofing presents no hazards to building occupants due to release of asbestos fibers in the air. Air sampling tests in buildings would confirm this." AIII §B at 247.

(11)  The record contains a number of letters written by representatives of defendant companies from January 18, 1979 through June 7, 1982, responding to concerns expressed by architects, school boards and others. Typically, the letters assure the writers that "Because of the 'setting' characteristic of many materials sold prior to reformulation without asbestos, we believe that the asbestos fibers would be encapsulated in the matrix. This conclusion assumes that the material is undisturbed and has suffered no in-place damage." The letters go on to advise on the course to take (removal or sealing) if the material has been "subjected to external forces which have left the surface sifting and flaking". AIII at §B 264 (see also AIII §B at 266-329).

(12)  September 19, 1975 letter from a U.S. Gypsum scientist to Bristol Meyers Industries, stating that in some of defendants' material:

> "the asbestos fibers are securely embedded in the gypsum plaster matrix and would not be released to the air unless it were forcefully pulverized.

> "In summary, asbestos is a minor additive in both products, and is embedded in the matrix of the

47

plaster for the purpose of modifying its dry and/or wet integrity.  In my opinion it would not present a health hazard in the context of the Occupational Safety and Health Administration regulations that are aimed at controlling excessive airborne concentrations for full-time occupational exposure to free asbestos."  AIII §D at 415.

(13)  January 21, 1977 letter from U.S. Gypsum to a Mrs. Sandra Malikin states:

"The small amount of asbestos is securely embedded in the mortar matrix and should not be released to the air unless it is forcefully pulverized.  There is no possibility of asbestos contamination from normal air currents or water leakage. . . .
"I am not aware of, nor can I conceive of, a hazardous exposure resulting from a properly installed and maintained LC-NC Spray Texture Ceiling."  AIII §C at 424.

(14)  December 10, 1976 letter from U.S. Gypsum to Radey & Radey Associates, an architectural firm, regarding the products Audicote and Sabinite, states:

"The asbestos fibers are securely embedded in the mortar matrix and should not be released to the air unless it is forcefully pulverized or abraded.  I am not aware of, nor can I conceive of, a hazardous exposure resulting from a properly installed and maintained AUDICOTE or SABINITE Acoustical Plaster ceiling.  However, if there is concern about the surface, for whatever reason, I would suggest that the ceiling be painted . . . ."  AIII §C at 433; see also AIII §C at 437, AIII §C at 450; AIII §C at 482; AIII §C at 484.

(15)  January 29, 1979 letter from U.S. Gypsum to A.E. Zielinski, regarding the asbestos-containing products Audicote and Sabinite.  U.S. Gypsum represented that it was "not aware of, nor can [it] conceive of a hazardous exposure resulting from a properly installed and maintained [asbestos-containing material.]"  Exhibit 101 to Prudential's Motion to Strike Defenses;

(16)  February 1, 1979 memorandum from Grace to Sales Organization and March 7, 1977 letter from Grace to Jack Herner, regarding concerns of health hazards from in-place asbestos-containing construction materials:  ". . . In-place [asbestos-containing material] poses no health hazards to building occupants".  AIII §B at 233, 240-41.

(17)  December 20, 1980 letter from Grace to C.H. Easton states that "The presence of asbestos fiber . . . should not be of concern."  AIII §B at 312.

(18)  April 20, 1983 memorandum from Grace to Sales Organization states in "Attachment A" that "The asbestos fireproofing and plastering products which were produced in the past by [Grace] were cementitious material and were applied in a wet slurry form.  Because of this, they did not, in our opinion, pose a health problem in spite of their commercial asbestos content (which generally ranged between 12 and 19&).  AIII §B at 346-49.

Prudential is correct in their assumption that post-sale representations can constitute binding warranties.  As the Tenth Circuit put it in e.g. Downie v. Abex Corp., 741 F.2d 1235, 1240 (10th Cir. 1984), in quoting with approval the Official Comments to the UCC:

> The precise time when words of description or affirmation are made . . . is not material.  The sole question is whether the language . . . [is] fairly to be regarded as part of the contract.  If language is used after the closing of the deal (as when the buyer when taking delivery asks and receives an additional assurance), the warranty becomes a modification, and need not be supported by consideration if it is otherwise reasonable and in order.

This is a sound principle, since post-sale representations allow the seller to attempt to promote future sales as well as to generate good will for its business.  See, e.g. Downie, 741 F.2d at 1240 (citing Bigelow v. Agway, Inc., 506 F.2d 551, 555 n.6 (2d Cir. 1974)).

But, even assuming that the representations constitute

warranties[9], there still remains the question of whether these constitute representations of future performance. Here, the representations are even more keyed to the present than those described in the previous section. There are no explicit warranties for a specified time in the future.

Thus, at best, the warranties are additional present warranties, and as such, should extend the limitations period for no longer than four years. And, the latest letters cited were written in the early 1980s, none prior to four years before this action was filed.

Therefore, I will grant defendants' motion for summary judgment and dismiss Prudential's breach of warranty claim.

## VI.  Claim Under New Jersey Consumer Fraud Act

Defendants next move to dismiss plaintiff's allegations of violations of consumer Fraud statutes. Prudential responded by stating that it wished to proceed solely on the basis of the New Jersey Consumer Fraud Act, N.J.S.A. 56:8-1.

The Act prohibits:

> The act, use or employment by any person of any unconscionable commercial practice, deception, fraud, false pretense, false promise, misrepresentation, or the knowing, concealment, suppression or omission, of any material fact with intent that others rely upon such concealment, suppression or omission, in connection with the sale or advertisement of any merchandise . . . , or with the subsequent performance of such person as aforesaid . . . .

---

[9]As to at least the more recent letters, this remains questionable. Those letters tend to speak in terms of opinion, rather than representation of fact.

50

Defendants make several arguments for why this claim should be dismissed.

First, they contend that the Act was meant to apply only to sales of ordinary consumer goods and was not intended to protect massive commercial entities like Prudential. While it is true that "certain practices unlawful in a sale of personal goods to an individual consumer would not be held unlawful in a transaction between particular business entities", the Act fairly clearly applies to business entities generally. See <u>Hundred East Credit Corp. v. Shuster Corp.</u>, 212 N.J. Super. 350, 355 (App. Div. 1986) (while "the strongest case for relief is presented by the poor, the naive and the uneducated, others can qualify as consumers as well"); N.J.S.A. 56:8-1(d) (defining person as "any natural person or his legal representative, partnership, corporation company, trust, business entity or association . . . .") Here, while defendants and plaintiff are large corporations, the disparity in their respective knowledge about asbestos is clearly material. Thus, I decline to hold as a matter of law that the Act does not intend to protect Prudential in this matter.

Moreover, this case is not like <u>BOC Group, Inc. v. Lummus Crest, Inc.</u>, 251 N.J. Super. 271 (Law Div. 1990), in which the Court dismissed a claim under the Act. The claim in that case involved three parties which the court characterized as "large corporations who negotiated for years before entering into a multi-million dollar contract for the sale of a design and for services collateral thereto." <u>Id.</u> at 280. The court relied on the peculiar

51

nature of the contract, and the fact that "plaintiff . . . knew it was purchasing a new, state of the art idea which was still in an experimental phase . . . . Plaintiff independently tested [the] design repeatedly before it entered into an agreement with defendant for its implementation." Id. at 281.  Those mitigating circumstances simply are not present in this case, where the plaintiff entered into ordinary building agreements that contained asbestos products placed by defendants.[10]

Defendants next argue that plaintiff's claim fails because of lack of privity.  New Jersey courts have squarely rejected this argument. See, e.g., Perth Amboy Iron Works, Inc. v. American Home Assur. Co., 226 N.J. Super. 200, 211 (App. Div. 1988).[11]

_____

[10]Defendants also rely on two New Jersey District court cases: Unifoil Corp. v. Cheque Printers and Encoders, Ltd., 622 F. Supp. 268, 270 (D.N.J. 1985); Werner & Pfleiderer Corp. v. Gary Chemical Corp., 697 F. Supp. 808, 814-15 (D.N.J. 1988).  The latter case held that the Act does not apply to protect "commercial entities involved in a dispute which is essentially contractual in nature, and the disputed performance is covered by the contract."  Gary Chemical, 697 F. Supp. at 815.  Not only are those cases inapposite -- this case is essentially a tort case -- but the Appellate Division has expressly reached a contrary conclusion.  Dreier Co., Inc. v. Unitronix Corp., 218 N.J. Super. 260 (App. Div. 1986).

[11]Finally, defendants make an amalgam of arguments in one section of the brief; some of these arguments are difficult to follow.  But they include
    (1) By proceeding based solely on the New Jersey statute, plaintiff has improperly amended its complaint without leave of the court.  It is unclear why Prudential's willingness to abandon certain claims implicates the concerns of Fed. R. Civ. P. 15.  At any rate:  (1) Under the liberal interpretation of the Rule, Prudential would certainly have been entitled to amend; (2) To the extent that defendants believe that Prudential is improperly trying to use the Consumer Fraud Act to get at actions not covered by the Act, they may make an appropriate in limine motion.
    (2)    Plaintiff has not proved reliance on any of

Therefore, I decline to dismiss Prudential's claims under the New Jersey Consumer Fraud Act.

## CONCLUSION

For the reasons detailed above, I will deny all of the defendants' motions except its motion for summary judgment dismissing Prudential's breach of warranty claim. That motion is granted.

---

defendant's statements. But Prudential has alleged that because of defendants' fraudulent failure to disclose, the asbestos problem never entered into Prudential's business deliberations. At this point in the litigation, I decline to dismiss the claim on this ground.

**FILED**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

JUN 0 9 1994

AT 8:30 ................. M
WILLIAM T. WALSH
CLERK

| | |
|---|---|
| THE PRUDENTIAL INSURANCE )<br>COMPANY OF AMERICA, et. al., )<br>Plaintiffs, )<br>)<br>v. )<br>)<br>U.S. GYPSUM, et. al., )<br>Defendants. )<br>_____) | Civ. Action No. 87-4238<br>(HAA)<br><br>**ORDER** |

Ackerman, D.J.

This matter having come before the court upon a series of motions made by defendants in this matter; and this Court having considered the entire record in the case, including the submitted briefs; and for the reasons expressed in an Opinion issued this same day; and for good cause shown,

IT IS ON THIS _9th_ day of June, 1994,

ORDERED that:

(1) Defendant U.S. Gypsum's and Asbestospray's motion for summary judgment dismissing plaintiff's RICO claim as barred by the statute of limitations is DENIED;

(2) Defendants' motion for summary judgment dismissing plaintiffs' common law tort and fraud claims as barred by the applicable statute of limitations is DENIED;

(3) Defendants' motion for summary judgment dismissing plaintiffs' complaint as barred by the applicable statutes of repose is DENIED;

(4) Defendants' motion for summary judgment dismissing

plaintiff's claims under the applicable Unfair Trade Practices Acts is DENIED; and

(5) Defendants' motion for summary judgment dismissing plaintiffs' breach of warranty claim as barred by the applicable statutes of limitation is GRANTED.

Harold A. Ackerman, U.S.D.J.

2

NOT FOR PUBLICATION

**FILED**

**UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY**

AUG 26 1994

AT 8:30 ............... M
WILLIAM T. WALSH
CLERK

THE PRUDENTIAL INSURANCE COM-
PANY OF AMERICA, et al. )
) Civ. Action No. 87-4227
        Plaintiffs ) (HAA)
)
v. )
)
UNITED STATES GYPSUM COMPANY ) **OPINION & ORDER**
et al. )
)
        Defendants. )
)

Ackerman, D.J.

This case issue is back before the court upon another series
of motions by various defendants, to certify particular questions
for interlocutory appeal. The motions arise out of a June 10,
1994 Order deciding a series of motions by defendants on several
counts of plaintiffs' complaint. This is not the first time such
a motion was made. Rather, last summer, after this court denied
defendants' motion for summary judgment on plaintiffs' RICO
claims, defendants successfully moved to certify the order for
immediate interlocutory appeal. The Third Circuit Court of
Appeals declined to hear the appeal. In fact, one of the issues
defendants seek certified in this motion is precisely the issue
that was certified last summer and rejected by the Third Circuit.

While an appeal normally may be taken only when a District
Court has issued a final Order, see 28 U.S.C. §1291, a narrow
exception to the general rule is provided in 28 U.S.C. 1292(b).

Under this section, an issue may be certified for interlocutory appeal when the issue (1) involves a controlling question of law for which; (2) there is substantial ground for difference of opinion; and (3) an immediate appeal may materially advance the ultimate termination of the litigation.  Only when all three of these factors are present may a district court certify a question for interlocutory appeal.  Katz v. Carte Blanche Corp., 496 F.2d 747, 754 (3d Cir. en banc); cert denied, 419 U.S. 885 (1974). These requirements must be stringently observed, see Milbert v. Bison Laboratories, Inc., 260 F.2d 431, 433 (3d Cir., 1958), and certification should be granted sparingly.  See id.; see also Canale v. Yegen, 789 F.Supp. 147, 152 (D.N.J. 1992).

After considering the parties' submissions in support of and in opposition to the motions, and after reviewing the record in this case with the above-mentioned standard in mind, it is apparent that defendants have not met the standard for certifying a question for interlocutory appeal.

THEREFORE IT IS ON THIS 26th day of August, 1994

ORDERED that defendants' motions for interlocutory appeal are denied.

Harold A. Ackerman, U.S.D.J.

UNITED STATES COURT OF APPEALS FOR THE THIRD CIRCUIT
November 14, 1994
#C-37

No. 94-5690

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA; et al.
v.
UNITED STATES GYPSUM COMPANY; et al.
(Related to Newark NJ District Civil No. 87-cv-04227)

THE PRUDENTIAL INSURANCE COMPANY OF AMERICA
v.
NATIONAL GYPSUM COMPANY
(Related to Newark NJ District Civil No. 87-cv-04238)

THE HONORABLE HAROLD A. ACKERMAN, Nominal Respondent
W.R. Grace & Co. - Conn., and United States Gypsum Company, Petitioners

PRESENT: MANSMANN, COWEN and MCKEE, Circuit Judges.

Petition for Writ of Mandamus,

Angela Perricone    597-1092
Deputy Clerk

————————— O R D E R —————————

The foregoing *petition for Writ of Mandamus is denied.*

By the Court,

Carol Los Mansman
Circuit Judge

Dated: DEC 2 8 1994
Aw1/cc: EJG? AJM  GOM
         EAB  PCBF  Hon. HAA
         EMD  AAK

346a

**FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

2001 JUN 20 ₱ 1: 21

UNITED STATES
DISTRICT COURT

```
                                    )
THE PRUDENTIAL INSURANCE COMPANY     )
OF AMERICA, ET AL.,                  )
                                     )        Civ. No. 87-4227
            Plaintiffs,              )        Civ. No. 87-4238
                                     )             (HAA)
        v.                           )
                                     )
UNITED STATES GYPSUM COMPANY         )        ORDER
ET AL.,                              )
            Defendants.              )
                                     )
```

FILED
JUN 2 0 2001
AT 8:30 .............. M
WILLIAM T. WALSH
CLERK

ENTERED
ON THE DOCKET
JUN 2 0 2001
By _____
(Deputy Clerk)

WILLIAM T. WALSH, CLERK

**Ackerman, D.J.**

This matter having come before the Court on a motion by defendant United States

Gypsum Company ("Gypsum") for partial summary judgment against plaintiff, the Prudential

Insurance Company of America ("Prudential") on the grounds of *res judicata* or lack of subject

matter jurisdiction; for summary judgment dismissing Prudential's Racketeer Influenced and

Corrupt Organizations Act ("RICO") claims as barred by the statute of limitations; and for

summary judgment dismissing Prudential's RICO claims on substantive grounds, and this court

having considered the arguments of counsel for Gypsum and for Prudential, and for the reasons

set forth in an opinion issued this same day:

IT IS on this 20th day of June, 2001,

ORDERED that Gypsum's motion for summary judgment as to the Gaslight Tower of

1

Twin Towers; Northland Towers; Five Penn Center; One Embarcadero Center; Two

Embarcadero Center; Prudential Plaza, Denver; and Renaissance Tower is GRANTED; and IT IS

ORDERED that Gypsum's motion for summary judgment as to the South Tower of the

Twin Towers and Century Center IV is denied; and IT IS

ORDERED that Gypsum's motion for summary judgment dismissing Prudential's

Racketeer Influenced and Corrupt Organizations Act ("RICO") claim as barred by the statute of

limitations is GRANTED; and IT IS

ORDERED that Prudential's remaining state-law claims are dismissed.

Hon. Harold A. Ackerman, U.S.D.J.

2

**FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

ORIGINAL FILED
JUN 20 2001
T. WALSH, CLERK

| | |
|---|---|
| THE PRUDENTIAL INSURANCE COMPANY OF AMERICA, ET AL., | ) |
| | ) |
| Plaintiffs, | ) Civ. No. 87-4227 |
| | ) Civ. No. 87-4238 |
| v. | ) (HAA) |
| | ) |
| UNITED STATES GYPSUM COMPANY ET AL., | ) **OPINION** |
| | ) |
| Defendants. | ) |

Ackerman, D.J.

This matter comes before the Court on a motion by defendant United States Gypsum

Company ("Gypsum") for partial summary judgment against plaintiff, the Prudential Insurance

Company of America ("Prudential") on the grounds of *res judicata* or lack of subject matter

jurisdiction; for summary judgment dismissing Prudential's Racketeer Influenced and Corrupt

Organizations Act ("RICO") claims as barred by the statute of limitations; and for summary

judgment dismissing Prudential's RICO claims on substantive grounds. For the reasons stated

below, Gypsum's requests are granted in part and denied in part.

### I. Background

In 1987, Prudential brought a complaint against seven former manufacturers of asbestos-

containing materials ("ACMs") to recover costs for monitoring, removing and dealing with

1

ACMs used in Prudential's buildings. Prudential's complaint originally encompassed sixty-one buildings and now includes eighteen buildings. The current active defendants in the action are U.S. Gypsum and United States Mineral Products Company ("USMP"). Prudential also has outstanding claims against Asbestospray Corporation ("Asbestospray")[1] and W.R. Grace & Co.-Conn ("Grace"). Grace and Gypsum filed papers joining their defenses of the motions presently before this court. Grace, however, filed a voluntary petition for relief pursuant to Chapter 11, Title 11 U.S.C. on April 2, 2001, prior to oral argument of this motion. As a result of provisions of 11 U.S.C. §362(a), this matter is automatically stayed against Grace. Having found no unusual circumstances that would cause the matter to be stayed as to the remaining co-defendants (*See McCartney v. Integra National Bank North*, 106 F.3d 506, 510 (3d Cir. 1997)), this matter will proceed as to the remaining defendants.

Subject matter jurisdiction for Prudential's original Complaint was based solely on a claim arising under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"). The court dismissed Prudential's CERCLA claim on March 28, 1989, but granted Prudential's motion for leave to file a First Amended Complaint that added nine new counts, including a RICO claim, which then became the sole basis for federal jurisdiction.

U.S. Gypsum and Grace had previously defended against a class action in which Prudential was initially determined to be a member of the plaintiff class, *Prince George Center*,

---

[1] Robert J. Gilson, counsel for Prudential, indicated to this court that Asbestospray "went out of business and dissolved back in the seventies, and my understanding is that they exhausted all insurance proceeds, and what was left was simply placed into court with the inaction trying to say we have about $3 million of insurance proceeds left and we have hundreds of millions of dollars in claims." Transcript of Proceedings, April 18, 2001, p7. Mr. Gilson also indicated that Prudential is seeking leave against Asbestospray, but that "at present they have not participated. *Id.*

2

*Inc., et al. v. United States Gypsum Co. et al.*, No. 5388 (Pa. Common Pleas, Phila.

Cty.)(hereinafter "*Prince George Center*"), litigated in the state courts of Pennsylvania. *Prince*

*George Center* settled claims relating to buildings that "were leased in whole or in part to the

United States or any agency thereof at any time between April 30, 1984 and December 22, 1994

inclusive and contained asbestos-containing products at any time during such period . . . ."

Plaintiff's Second Brief in Opposition to Motions by Defendants For Partial Summary Judgment,

p4.   Prudential subsequently petitioned the Pennsylvania Court of Common Pleas to be excluded

from the class.   Prudential's arguments included assertions that it had inadvertently failed to send

a letter opting out of the class; that it was unaware of its inclusion in the class settlement; and

that the defendants knew of the Prudential's failure to opt out but did not notify either this court

or Prudential of the settlement prior to its finalization.   Prudential appealed the Court of

Common Plea's adverse decision to the highest court of Pennsylvania and to the United States

Supreme Court without success.

    In the motions currently before the court, Gypsum asserts that Prudential's claims as to

eight of the eighteen buildings are precluded by the *Prince George Center* class action.[2] Gypsum

also asserts that under the *Rooker-Feldman* doctrine, this court lacks subject matter jurisdiction

to hear Prudential's claims in this case.   Prudential responds that Gypsum is estopped from using

the *Prince George Center* judgment in this case for three reasons: because Gypsum stipulated to

try claims related to all eighteen buildings in this court; because Gypsum breached its ethical

---

[2] While Gypsum allegedly produced the asbestos in only three of the eight buildings that arguably fall within the *Prince George Center* settlement, since Prudential indicated at the April 18, 2001 hearing that it intended to hold Gypsum liable for Prudential's claims as to all eighteen buildings in this action on a conspiracy theory, Gypsum proceeded with its affirmative defense of *res judicata* as to all eight of the buildings. *See* Transcript of Proceedings, April 18, 2001, pp9-13.   This court has not yet ruled on Prudential's assertion of conspiracy.

3

duties; and because Gypsum made affirmative misrepresentations in interrogatory answers. Prudential further contends that Gypsum waived the use of the *Prince George Center* judgment in this action. Even if this court finds that Gypsum is not estopped and did not waive use of the *Prince George Center* decision, Prudential argues that Gypsum has not proven that the eight buildings fall within the *Prince George Center* class.

Gypsum also contends that the statute of limitations had run on Prudential's RICO claim, the only claim tying the case to federal court, before Prudential filed its case in October of 1987. U.S. Mineral joins Gypsum in this motion. Prudential responds that it only learned of its injuries when it undertook abatement of asbestos in conjunction with the demolition of one of its buildings in 1984, and only understood the extent of its injuries after commissioning a study of the ACMs in its holdings in 1985. Prudential also claims that the statute of limitations period was tolled by Gypsum's fraudulent concealment of the hazards of ACM.

This court will first address Gypsum's claims as to the court's subject matter jurisdiction and the preclusive effects of the *Prince George Center* judgment on this case. The court will then turn to Gypsum's statute of limitations claims.

## II. Subject Matter Jurisdiction and Preclusion

### A. Summary Judgment Standard

Rule 56 of the Federal Rules of Civil Procedure provides that summary judgment may be granted only if the pleadings, supporting papers, affidavits, and admissions on file, when viewed with all inferences in favor of the nonmoving party, demonstrate that there is no genuine issue of material fact and that the movant is entitled to judgment as a matter of law. *See also Todaro v. Bowman*, 872 F.2d 43, 46 (3d Cir. 1989); *Chippolini v. Spencer Gifts, Inc.*, 814 F.2d 893, 896

4

(3d Cir.), *cert. dism'd*, 483 U.S. 1052 (1987). Put differently, "summary judgment may be

granted if the movant shows that there exists no genuine issues of material fact that would permit

a reasonable jury to find for the nonmoving party." *Miller v. Indiana Hospital*, 843 F.2d 139,

143 (3d Cir.), *cert. denied*, 488 U.S. 870 (1988). An issue is "genuine" if a reasonable jury could

possibly hold in the nonmovant's favor with regard to that issue. *See Anderson v. Liberty Lobby,*

*Inc.*, 477 U.S. 242, 247-48 (1986). A fact is material if it influences the outcome under the

governing law. *Id.* at 248.

The party seeking summary judgment always bears the initial burden of production, i.e.,

of making a prima facie showing that it is entitled to summary judgment. *Celotex Corp. v.*

*Catrett*, 477 U.S. 317, 323 (1986). This may be done either by demonstrating there is no genuine

issue of fact and that as a matter of law, the moving party must prevail or by demonstrating that

the moving party has not produced evidence relating to an essential element of the issue for

which it bears the burden of proof at trial. *Id.* at 322-23. Once either showing is made, the

burden shifts to the nonmoving party who must demonstrate facts supporting each element for

which it bears the burden of proof as well as establish the existence of genuine issues of material

fact. *Id.* at 324.

At the summary judgment stage, however, a court may not weigh the evidence or make

credibility findings–these tasks are left to the factfinder. *Petruzzi's IGA v. Darling-Delaware*,

998 F.2d 1224, 1230 (3rd Cir. 1993). Therefore, to raise a genuine issue of material fact, "'the

[summary judgment] opponent need not match, item for item, each piece of evidence proffered

by the movant,' but simply must exceed the 'mere scintilla' standard." *Id.* See also *Anderson,*

477 U.S. at 252 ("the mere existence of a scintilla of evidence in support of the [nonmovant's ]

5

position will be insufficient; there must be evidence on which the jury could reasonably find for the [nonmovant].")

## B. *Rooker-Feldman*

Gypsum contends that under the *Rooker-Feldman* doctrine, Prudential is barred from bringing its claims of estoppel and waiver. The *Rooker-Feldman* doctrine holds that a federal district court does not have jurisdiction to review a final adjudication of a state court or to consider claims that are inextricably intertwined with the state court decision. *Rooker v. Fidelity Trust Co.*, 263 U.S. 413 (1923); *District of Columbia Court of Appeals v. Feldman*, 460 U.S. 462 (1983); *In re: General Motors Corp. Pickup Truck Fuel Tank Products Liability*, 134 F.3d 133 (3d Cir. 1998). The Third Circuit has found that *Rooker-Feldman* is a jurisdictional doctrine grounded in the principle that appellate jurisdiction over state court decisions lies with the Supreme Court of the United States, not with federal district courts. *Parkview Associates Partnership v. Lebanon*, 225 F.3d 321, 329 (3d Cir. 2000). As such, it is distinct from preclusion doctrines, which rest upon the Full Faith and Credit Statute. *Id.* Moreover, as a jurisdictional doctrine, *Rooker-Feldman* "must override preclusion doctrine where it applies." *Id.* Therefore, this court will first consider whether the *Rooker-Feldman* doctrine applies in this case.

Gypsum contends that because the Pennsylvania Court of Common Pleas already decided issues essential to Prudential's claims of estoppel and waiver, if this court were also to hear and decide these claims, it would effectively be reviewing and potentially reversing the Pennsylvania court. Prudential responds that it is not seeking reversal of the Pennsylvania judgment and grants the Pennsylvania judgment preclusive effect in all other future proceedings. Instead, Prudential

attempts to demonstrate that the Pennsylvania decision should not be given preclusive effect in the instant case because it would not be given such effect under Pennsylvania law. Specifically, Prudential argues that, for purposes of this New Jersey action, the defendant waived the use of the Pennsylvania judgment and is estopped from the use of that judgment.

As Gypsum points out, the Pennsylvania court already made findings on the same issues that ground Prudential's claims of waiver and estoppel. Prudential is not, however, seeking relief from the Pennsylvania court's decision, but instead is seeking to determine whether Gypsum has waived or is estopped from asserting that the Pennsylvania opinion is *res judicata*. The doctrines of waiver and *res judicata* are not intended to provide relief for the plaintiff from prior judgments but rather to preclude the defendant from obtaining an inequitable result. Therefore, if this court were to determine that Gypsum has waived or is estopped from raising its claims in the instant action, this court's decision would not effectively reverse the Pennsylvania court's decision that Prudential may not opt out of the class action generally. Prudential would still be bound by the Pennsylvania decision, except where Pennsylvania law would find that the defendant should not be so bound. Unless this court would effectively reverse the state court's decision, the *Rooker-Feldman* doctrine is not implicated in this action.

Gypsum's attempt to analogize the facts of this case to those of *GM Motors*, in which the *Rooker-Feldman* doctrine precluded a district court from reversing a state court judgment, does not succeed. In the *GM Motors* case, the plaintiffs had been party to a class action, in which a district court's certification of the class was vacated and a settlement set aside. Rather than cure the defect in the certification, representatives of the parties proceeded to settle the class action in state court in Louisiana. Certain members of the plaintiff class sought relief from the Louisiana

7

judgment in federal court, but the Third Circuit rejected their claim on the ground that "in order for us to grant appellants' requested relief, we would first have to determine that the state court judgment was erroneously entered. *Rooker-Feldman* bars exactly this sort of intermediate appellate review of state court judgments and divests this Court of subject matter jurisdiction of this appeal." *GM Motors*, 134 F.3d at 143.

Because Prudential's defenses are not intended to provide relief from the Pennsylvania judgment but only to give that judgment the same effect in federal court that it would have in a Pennsylvania court, this court's decision is not barred on jurisdictional grounds. Instead, Gypsum's concerns are more appropriately addressed under preclusion doctrines, which provide a measure of repose and protect parties from having to litigate the same claims or issues in different jurisdictions.

## C. Prudential's Claims of Estoppel and Waiver

As both parties agree, the decision of the Pennsylvania Court of Claims should be granted full faith and credit. *See* U.S. Gypsum's Memorandum of law, p24; Prudential's Brief, vol. I, p16. Section 1738 of chapter 28 of the United States Code Annotated provides that the judicial proceedings of any state shall be given full faith and credit "in every court within the United States." The U.S. Supreme Court has held that "many courts" encompasses federal courts. *See Allen v McCurry*, 449 U.S. 90, 96 (1980); *Davis v. Davis* 305 U.S. 32, 40 (1938). Therefore, this court must give the Pennsylvania court's final judgment the same effect as such judgment would be given in Pennsylvania, including claim preclusive and issue preclusive effect. *See Ballent v.*

8

*City of Wilkes-Barre*, 699 A.2d 309, 313 (Pa. 1995).[3]

The question then is which, if any, of the claims or issues currently before this court were previously decided by the Court of Common Pleas. In Pennsylvania, issue preclusion applies if:

> (1) the issue decided in the prior adjudication was identical with the one presented in the later action; (2) there was a final judgment on the merits; (3) the party against whom the plea is asserted was a party or in privity with a party to the prior adjudication and (4) the party against whom it is asserted has had a full and fair opportunity to litigate the issue in question in a prior action.

*Greenleaf v. Garlock, Inc.* 174 F.3d 352, 357-58 (3d Cir. 1999).[4]

Prudential claims that Gypsum is estopped from using the *Prince George Center* judgment in this action for three reasons. First, by signing the Pretrial Order in March of 1996 in this matter and failing to notify this court of the *Prince George Center* Settlement before September of 1996. Prudential contends that Gypsum stipulated to try claims related to all eighteen buildings. Second, Prudential claims that Gypsum is estopped due to its breaches of two rules of professional conduct, RPC 3.3 and RPC 1.7, by failing to disclose to this Court the existence of the *Prince George Center* settlement and by failing to advise Prudential of a conflict of interest on the part of Gypsum's law firm, Morgan, Lewis & Bockius, ("MLB"), respectively. Third, Prudential asserts that Gypsum is estopped because it made affirmative misrepresentations in interrogatory answers. Prudential also argues that Gypsum waived the use of the *Prince George*

---

[3]The Court notes that Wright and Miller advocate that the term " *res judicata*" be employed as an umbrella which encompasses both claim and issue preclusion. *See* 18 Wright and Miller § 4402 (1981). According to Wright and Miller, claim preclusion provides that "a judgment, once rendered [is] the full measure of relief to be accorded between the same parties on the same 'claim' or 'cause of action.'"; issue preclusion bars "the re-litigation of issues actually adjudicated, and essential to the judgment, in a prior litigation between the same parties." Wright and Miller note, however, that the Supreme Court continues to distinguish between *res judicata*, or claim preclusion and collateral estoppel, or issue preclusion. When possible, the court will refer to claim and issue preclusion; it will otherwise follow Wright and Miller's use of *res judicata*.

9

*Center* judgment when it continued to litigate this case after entering into settlements in the Pennsylvania case.

Gypsum argues, however, that in the *Prince George Center* action, Prudential litigated certain of the issues that underlie Prudential's estoppel and waiver claims in this action. Prudential correctly asserts that only this court can determine whether the defendant's conduct waives or estops it from use of the *Prince George Center* judgments in this action. If the issues underlying estoppel and waiver have already been decided in another court of competent jurisdiction, however, then this court must grant those decisions full faith and credit.

This court finds that least one of Prudential's grounds for estoppel was litigated and decided in the *Prince George Center* action. Specifically, Prudential contended that Gypsum violated RPC 3.3 by not revealing the existence of the *Prince George Center* settlement to the Newark court before the final settlement had been entered. The Court of Common Pleas specifically ruled that Gypsum did not violate RPC 3.3. *See Prince George Center*, 33 Phila. 151, 170-172 (1997). It its decision, the Court of Common Pleas referenced Prudential's claim that it was "sandbagged" by the defendant's vigorous litigation of the New Jersey action and rejected "this specious argument." *Prince George Center* at 22. According to the court: "To the extent [Prudential] operated in the dark, it pulled the curtain down on itself." *Prince George Center* at 26. Therefore, the court concluded that since Prudential and not the defendant's counsel had a duty to track the *Prince George Center* action, defense counsel did not have a duty to report the action to the Newark court at all. According to that court, "Since defendants' counsel had no duty to speak, there was no necessity for them to make disclosure which is a prerequisite for application of Rules 3.3(b) and 4.1." *Id.* at 25-26. Although the Pennsylvania

10

court's ruling appears to rest on that court's evaluation of the duties of respective counsel to monitor the *Prince George Center* settlement. Prudential contends that the Pennsylvania court's ruling would have been different under New Jersey law because New Jersey enforces a uniquely strict duty of disclosure. If it is true that the instant court would apply a different legal standard, then Prudential's argument is not precluded. *See* Wright, Miller & Cooper, Federal Practice and Procedure: Jurisdiction § 4417 (indicating that differences in legal standards defeat claims of preclusion, even though the factual setting of two suits in the same.) Therefore, this court will consider Prudential's claim under New Jersey's standard for RPC 3.3. This court finds, however, that application of New Jersey's law concerning RPC 3.3 does not alter the fact that ultimately Prudential and not the defendant had the duty to report the *Prince George Center* settlements to this court.

Rule 3.3, which defines an attorney's duty of "Candor Towards the Tribunal", provides:

> (a) A Lawyer shall not knowingly:
> (1) make a false statement of material fact or law to a tribunal; [or] . . . .
> (5) fail to disclose to the tribunal a material fact with knowledge that the tribunal may tend to be mislead by such failure.

RPC 3.3(a)(1),(5). These ethical rules apply in the New Jersey federal district court pursuant to Local Civil Rule 103.1. As Prudential points out, New Jersey courts require an affirmative duty of disclosure and have held that such disclosure is superior to the attorney's duties to his clients. *See Crispin v. Volkswagenwerk, A.G.*, 96 N.J. 336 (1984); *Intel Containers International Corp. v. Puerto Rico Marine Management, Inc.*, 108 F.R.D. 96, 104 (D.N.J. 1985) (quoting *Van Berkel v. Fox Farm & Road Machinery*, 581 F.Supp. 1248, 1251 (D.Minn. 1984)). While the cases Prudential cites each address fact patterns in which an attorney is sanctioned for failing to

11

disclose a fact which would impact the court's determination of an issues (*See Crispin*, 96 N.J. 336; *Matter of Stein*, 97 N.J. 550 (1984); *Kernan v. Washington Park Urban Renewal Assoc.*, 154 N.J. 437 (1998); *Matter of Norton*, 128 N.J. 520 (1992)), the comments to RPC 3.3(a)(5) indicate that the disclosure obligation also applies to "facts relating the management of the case." 114 N.J.L.J. at Supp. 9 (July 19, 1984).

Prudential alleges that defense counsel had a duty to disclose to this court the existence of settlements in the *Prince George Center* action that could impact buildings in the New Jersey litigation, beginning with the initial entry of the settlement in March of 1996 and up to any time <u>before</u> the entry of the judgment finalizing that settlement in September of 1996 when Gypsum did notify the court of the settlement. Prudential asserts that the conferences and discovery that continued in that five and half month period were unnecessary in light of the settlement.

Nevertheless, while Gypsum may have speculated that Prudential had forgotten to opt out of the trial class and was not, therefore, aware that its litigation of the New Jersey action was in conflict with its position in the *Prince George Center* class action, there was no reason for Gypsum to be sure that Prudential was not simply waiting to opt out of the class action settlement, or that the *Prince George Center* settlement would even be entered. Indeed, Prudential belatedly filed its opt-out request from the first settlement class in *Prince George Center*, and the Pennsylvania court honored Prudential's belated request. Therefore, without knowledge of what Prudential would seek to do or what leeway the Pennsylvania court would allow Prudential in its participation in the *Prince George Center* action, Gypsum had a responsibility to continue to vigorously litigate the New Jersey action. Upon the final entry of the judgment, Gypsum notified this court of the conflict. Even then, Prudential attempted to

continue to litigate the New Jersey action while it sought to be excluded from the Pennsylvania final judgment. *See* Transcript of Case Management Conference, Plaintiffs' Supporting Appendix Concerning the Prince George Motions, p. 453.

Only Prudential knew both of the conflicting actions and its intentions with regard to each. Its assertion that it forgot to opt out of the *Prince George Center* action, but that the Gypsum should have known of its intentions and informed this court of the potential conflict borders on the absurd. It seems clear from Prudential's arguments in its briefs and before the court, moreover, that Prudential is not seeking a remedy for the effect such non-disclosure had on this court so much as for the effect such non-disclosure had upon its own neglect of its responsibilities in the *Prince George Center* case. In light of the limited effect that such lack of notice had on the instant case's management and given Prudential's parallel duty of disclosure, this court does not find that Gypsum is estopped from raising the issue of *res judicata* on the grounds of this purported violation.

With respect to Gypsum's alleged stipulation to try claims related to 18 buildings and its allegedly misleading interrogatories, Prudential raised these claims in the *Prince George Center* litigation, but the Pennsylvania court did not clearly decide these issues.[4] Therefore this court will consider these claims on their merits.

---

[4] The Pennsylvania court considered evidence also presented to this court relating to the defendant's signing of the Pretrial order and the allegedly false interrogatory requests. *See* Donovan, Ex. C, E, F, & G. Gypsum cites the following portion of the Court of Common Plea's decision as decisive of these issues: "As state at the beginning of this opinion this court had to determine if there were any 'circumstance' justifying the relief Pru seeks. The petitioner has cited many such 'circumstances.'" *Prince George Center*, 33 Phila. at 160. The court held that "we believe that public policy, for reasons noted above, strongly favors the finality of judgments in class actions and that this court should do nothing having the potential to risk that finality." *Id.* at 175. This statement is too broad for this court to conclude that the Pennsylvania court clearly decided the remaining issues before this court.

This court does not agree that in entering the March 1996 pretrial order, Gypsum stipulated to try all 18 buildings in this action; nor does it find that Gypsum's answers to Prudential's interrogatories were misleading. Prudential bases its claim that Gypsum stipulated to the trial of 18 buildings in this action on two paragraphs of the March 1996 pretrial scheduling order, specifically, a paragraph indicating that the remaining claims in the litigation are related to 18 properties and a paragraph indicating that a date for a comprehensive trial addressing all issues relating to all 18 properties would be set on December 2, 1996. These paragraphs constitute neither a stipulation nor a waiver of Gypsum's rights. [footnote]

As Gypsum points out, waiver is a "voluntary relinquishment of a known right evidenced by a clear, unequivocal and decisive act from which an intention to relinquish the right can be based." *Country Chevrolet, Inc. v. Twp of North Brunswick Planning Bd.*, 190 N.J. Super. 376, 380 (App. Div. 1983). In this case, no "clear, unequivocal and decisive act" is present in this case. The language of the March 1996 scheduling order cannot plausibly be read to reflect a "voluntary and deliberate" decision by Gypsum to forgo the pursuit of valid defenses to the claims against it. Instead, it establishes a schedule and the parties' current understanding of the remaining claims in the case. As this court discussed above, Gypsum did not know at the time it signed the March 1996 pretrial scheduling order whether Prudential would opt out of the trial class. This court declines to find that Gypsum should have anticipated Prudential's actions and committed itself to a litigation strategy, never mind that a scheduling order would memorialize such a commitment.

Likewise, Prudential's assertion that Grace or Gypsum made affirmative misrepresentations in their interrogatory answers itself misrepresents the inaccuracy of Grace's

14

and Prudential's responses. Prudential's Interrogatory 20 asked that defendants:

> (a) Identify every litigation in which a party has alleged that asbestos-containing material designated, manufactured, distributed or sold by your company was or is creating a unsafe or hazardous or potentially hazardous condition in a building.
> (b) for each lawsuit, set forth
> (i) the full caption, jurisdiction and docket number of the litigation in which the allegation was made;
> (ii) attorneys of record for the party making the allegation;
> (iii) the date the allegation was first made;
> (iv) whether you admitted or denied the allegation;
> (v) the date you first admitted or denied the allegation;
> (v) whether that admission of denial was ever modified, amended, or supplemented and if so, set forth the date of each modifications, amendment or supplement and the details with respect thereto.

Plaintiff's Supporting Appendix Concerning the Prince George Motion, Vol. III, 515-516. Grace responded with a standard objection as well the required list, which included the *Prince George Center* case by name, court and docket number. Grace's objection was worded as follows:

> Grace supplements its response as follows: Grace objects to this request on the grounds that it is overly broad and burdensome and seeks information not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence. Subject to and without waiving these objections, its enumerated objection and all previously asserted objections, Grace attaches a list . . . of lawsuits brought by property owners stemming from the alleged installation of Grace's asbestos-containing materials in their buildings.

*Id.* at 516. In its brief, Prudential makes the following representation as to the above quote:

> In a certified answer to Interrogatory No. 20 in this New Jersey Action, defendant Grace stated that the Prince George Action was "not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence." That sworn statement was clear and unequivocal. Grace not only represented under oath that all such actions, including Prince George, were "not relevant" to this New Jersey Action, but Grace also represented that any information about Prince George was "not reasonably calculated to lead to the discovery of admissible evidence."

15

Prudential's First Brief in Opposition to Defendants' Motions for Partial Summary Judgment Based on the Prince George Judgment at 32. Prudential's brief clearly distorts Grace's response to Interrogatory 20. Grace made no specific representations as to the *Prince George Center* action, but only as to the breadth of the Interrogatory itself. Prudential's claims of material misrepresentation are clearly unfounded, and, given that the response to this question elicited approximately 390 asbestos-property damage actions asserted against Grace, any obscuring of the *Prince George Center* action is better attributed to the breadth of Prudential's interrogatory than to Grace's response. [44]

Prudential also contends that Gypsum worked a deception by continuing to list the *Prince George Center* action under its original caption of "*Peter Kalkus v. U.S. Gypsum,*" when the lead plaintiff in that action was changed to *Prince George Center*. Under the Philadelphia Common Pleas docketing system, however, the case continued to carry this caption together with its same docket number for some substantial period after the substitution of Prince George Center as lead plaintiff. *See* Donovan Aff't., Ex. B. Even if the caption became outdated, the court does not find this evidence that a deception was worked upon Prudential to a degree that would justify estoppel.

Prudential further claims that in representing U.S. Gypsum in the *Prince George Center* action without notifying Prudential of its representation, MLB breached both its disclosure agreement with Prudential and RPC 1.7, which requires that attorneys reveal any concurrent adverse representations to their clients. While MLB advised Prudential executives of its representation of U.S. Gypsum in general and of the existence of the Newark action pending in this court in particular, Prudential contends that MLB had a further obligation to notify

16

Prudential of individual actions that could potentially pose a conflict. Gypsum's response to Prudential's claim includes the argument that Prudential's claim is barred by Pennsylvania preclusion law, and this court agrees.

According to Gypsum's expert witness, Professor Geoffrey C. Hazard, Jr., "having failed to raise the alleged conflict presented by MLB's representation of U.S. Gypsum in the *Prince George* case to the *Prince George* court, Prudential has no right to make a collateral attack on the validity of the judgment in the Prince George case based on that alleged conflict." *See* Second Supplemental Declaration of Professor Geoffrey C. Hazard, Jr., U.S. Gypsum's Appendix Containing Certifications in Further Support of Its Motion for Partial Summary Judgment Based on the *Prince George* Judgment, Ex. 1 at 9.

The Supreme Court of Pennsylvania has held that "It is hornbook law that the final determination by a court of competent jurisdiction settles not only the defenses actually raised, but also those that might have been raised." *Duquesne Light Co. v. Pittsburgh Railways Co.*, 194 A.2d 319, 321 (Pa. 1963). If a litigant was party to a previous action in which the issue could have been raised and been finally determined, that litigant may not "remain quiet and raise it in a subsequent suit." *Federal Land Bank of Baltimore v. Putnam*, 39 A.2d 586 (Pa. 1944). *See Winpenny v. Winpenny*, 643 A.2d 677, 679 (Pa. Super.) ("A party must raise all matters related to an issue or be forever barred from raising them again."); *See also Fox v. Gabler*, 626 A.2d 1141, 1144 (Pa. 1993).

Certifications filed on November 26, 1996 with the Court of Common Pleas in the *Prince George Center* action demonstrate that Prudential was aware of MLB's representation of Gypsum in the Pennsylvania proceedings. *See* Certification of Stephen Gillers and Declaration

17

of Professor Bruce A. Green, Certification of Kevin Donovan in support of U.S. Gypsum's

motion for partial summary judgment, Ex. E.   Indeed, in that action, in which Prudential sought

permission to opt out of the class late, Prudential charged MLB with violation of RPC 3.3 on the

grounds that MLB failed to disclose the existence of the Pennsylvania action to the New Jersey

court.  The existence of any impropriety arising from MLB's failure to report its representation

of Gypsum in the *Prince George Center* action could have been litigated and would have been

subject to final judgment in that action.  Therefore, this issue is *res judicata* and may not be

decided by this court.

## D. Whether Eight Buildings Fall within the Prince George Center *Class*

According to Rule 8(c) of the Federal Rules of Civil Procedure, *res judicata* is an

affirmative defense; therefore, Gypsum bears the burden of proof in asserting this defense.  In

order to demonstrate that Prudential's claims as to eight of the eighteen buildings are *res

judicata*, Gypsum must show that the eight buildings fall within the *Prince George Center* class.

The *Prince George Center* class includes buildings of which (1) Prudential was the owner (2) at

the time space in the building was leased (3) to the United States or an agency thereof.  The

plaintiff has argued, in response, that Gypsum has not met its burden of proof and that the

defendant's claims fail for one or more of four reasons: because Prudential did not own the

buildings at any point during the requisite time period (May 30, 1984 through December 22,

1994); and/or because Gypsum's proofs do not account for the fact that the properties in question

consist of more than one building; and/or because the buildings' tenants did not qualify as the

U.S. government or a federal agency; and/or because Gypsum has failed to provide proper

documentation of the leases to the federal government.

18

### 1. Twin Towers

Twin Towers, located in Atlanta, Georgia, is a property comprised of South Tower and Gaslight Tower. Prudential contends that it was only a member of a partnership which owned Twin Towers and was not the sole owner for purposes of the class; Prudential also argues that the government's lease of space in the South Tower began after Prudential sold the building and so the class settlement does not apply to the South Tower; finally, Prudential contends that the RTC is not a federal agency, and therefore the South Tower was not occupied by the federal government for class purposes.

As Gypsum points out, however, the South Tower and Gas Light Tower were owned by Twin Towers Joint Venture, in which Prudential held a partial ownership interest. The Final Order and Judgment in the Pennsylvania case, entered on July 23, 1996, dismissed "'Claims' . . . which the Named plaintiffs and members of the Trial Class, and their . . . past or present representatives, assigns, subsidiaries, divisions, affiliates, parents, partners . . . . had, now have or hereinafter may have against Remaining Defendants . . ." (Defendant Grace's Reply Memorandum, p4)(emphasis added). Therefore, the fact that Prudential owned the property in partnership with others does not remove it from the Trial Class. Moreover, Prudential was assigned the right to assert claims in this lawsuit on behalf of the partnership, and so it cannot claim that its interests are distinct from the partnership in the matter of the class action. Therefore, Prudential may be considered the "owner" of Twin Towers for purposes of the class definition.

Evidence submitted by the defendant demonstrates that Prudential held this partial ownership interest during the time that the IRS leased space in the Gaslight Towers; the

19

defendant is unable to demonstrate, however, that the government leased space in the South Tower while Prudential held a partial ownership in the Twin Towers. *See* Nanos Affidavit, Exhibits M, N, O, P, & Q. The class definition encompasses "private owners of buildings who leased or subleased their buildings in whole or in part to the United States or any agency thereof," meaning that Prudential needed to own the buildings at the time the leases occurred; contrary to the defendant's assertions, class membership is not triggered simply because the government occupied the buildings within the time period. The defendant also points out that the plaintiffs' retention of all rights to bring claims for ACM costs in the buildings it had sold should result in the inclusion of Prudential in the class; however, the defendant does not present evidence demonstrating that the rights Prudential retained would permit Prudential to sue for claims arising from tenancies after it sold its interest in a given property.

As a result, Prudential's claims as to South Tower hinge on whether the South Tower is a separate building from the Gas Light Tower, as the plaintiff alleges, or if the two towers are part of a single building.[5] If they are separate buildings, then the defendant has not satisfied the standard for summary judgment as to South Tower, as it has not presented sufficient evidence

---

[5] The Court notes that Plaintiff's contention, that the Resolution Trust Company is not a federal agency for purposes of the class, is without merit.

Plaintiff argues that the trial class definition is narrower than the settlement class definition. Specifically, while the settlement class encompassed buildings leased by the "the federal government or an agency, department or unit thereof." (Court of Common Pleas, Amended Order, February 17, 1995, para 2) the trial class definition only included the "the United States or agency thereof." *Id.*, at para 4. The plaintiff argues that the omission of reference to "department or unit thereof" is significant and that, as a result, the Resolution Trust Corporation is not a government tenant within the ambit of the class. This court finds that there are no disputed issues of fact with respect to the status of this government entity, only disputed questions of law which may be resolved by the court.

This court finds that the Resolution Trust Company is part of the United States government or an agency thereof. The RTC's enabling statute describes the RTC as an agency, as well as an instrumentality or government corporations. *See* 12 U.S.C. §1441a(b). Moreover, Section 105 of Chapter 5 of the U.S. Code indicates that a government corporation is an agency. The Third Circuit has also described the RTC as a federal agency. *See RTC v. Nernberg*, 3 F.3d 62, 63 (3d Cir. 1993).

20

that the government leased space in the South Tower while Prudential owned that tower. If the two towers are part of the same building, then the defendant has met its burden on its motion for summary judgment, in light of the evidence it has presented the court demonstrating the presence of the IRS in the Gas Light Tower in the required period under the class.

As Grace makes clear in its brief, South and Gaslight Towers are only joined by a tunnel. In the proceedings in the *Prince George Center* action, including the definition of the settlement class, the term "building" is not defined in such a way that would encompass two towers that are part of the same complex, but are only joined by a tunnel. While the Twin Towers may be considered a single property, it is not a single building. Therefore, the court grants summary judgment dismissing Prudential's claims at to the Gaslight Tower, but declines to grant summary judgment dismissing Prudential's claims as to the South Tower.

2. *Northland Towers*

Northland Towers, located in Southfield, Michigan, is comprised of an East and West Tower, the Plaza building and a medical complex. Prudential currently has claims against U.S. Gypsum for the East and West Towers. The defendant has provided evidence that the Government Services Agency leased space in the West Tower during the time that Prudential owned Northland Towers. The defendant has not demonstrated government tenancy in the East Tower during this period. As with the Twin Towers, Prudential's claims as to the East Tower hinge on the factual issue of whether Northland Towers is or is not a single building. Unlike the Twin Towers, however, the East and West Towers share a common lobby, and may therefore be considered two towers belonging to the same building. Therefore, this court grants Gypsum's

21

motion for summary judgment as to both towers of Northland Towers.

### 3. *Five Penn Center*

Prudential contends that Gypsum has failed to provide sufficient evidence of the government's tenancy in Five Penn Center, located in Philadelphia, Pennsylvania. Prudential asserts that the defendant should be put to the same proof as parties bringing claims under the class action settlement; that is, that Gypsum should be required to produce leases between Prudential and the required government entities documenting the entities' tenancy in the required period. *See* Plaintiff's Appendix, pp883-892. Gypsum is not, however, bringing claims under the settlement, but is only demonstrating that the plaintiff's claims fall within the settlement class.

Moreover, this court finds that Gypsum has provided substantial evidence of the occupancy of certain government entities within the periods defined by the class, sufficient to meet its burden of proof. Specifically, Gypsum provides a table with the start and end dates of Prudential's lease to the GSA and IRS, supplementing the lease copy which does not include the start date of the lease. These documents supply substantial proof of the government's tenancy during the period at issue. The plaintiff does not dispute the accuracy of the documentation submitted by Gypsum, or provided any evidence refuting the existence of the government leases in these buildings and therefore fails to demonstrate that the government's occupancy is a disputed issue of material fact. Therefore, this court grants Gypsum's motion for summary judgment as to Five Penn Center.

### 4. *One Embarcadero Center*

22

Prudential asserts that its wholly-owned subsidiary, PIC Realty, and not Prudential itself, held an ownership interest in the partnership One Embarcadero Center Venture which owned One Embarcadero Center, located in San Francisco, California. As discussed above, however, the Final Order and Judgment in the Pennsylvania case, entered on July 23, 1996, dismissed "'Claims' . . . which the Named plaintiffs and members of the Trial Class, and their . . . past or present representatives, assigns, <u>subsidiaries</u>, divisions, affiliates, parents, <u>partners</u> . . . . had, now have or hereinafter may have against Remaining Defendants . . ." (Defendant Grace's Reply Memorandum, p4)(emphasis added). Thus, although for some purposes, PIC Realty and Prudential have separate legal identities, for the purposes of their claims in this case, they may not distinguish their interests on the grounds that PIC is a subsidiary of Prudential, nor may PIC distinguish its interests from those of its partners in the One Embarcadero Center Venture, particularly since the other partners in the venture "assigned their rights to assert the claims in [the New Jersey] lawsuit to PIC Realty." Plaintiff's Second Brief in Opposition, p11.

Prudential also contends that the Postal Service is not a federal agency, and therefore space leased to the Postal Service is not encompassed by the Trial Class definition. This court finds, however, that the United States Postal Service is part of the United States government. While the United States Postal Service has been granted considerable autonomy for certain purposes, particularly to facilitate more competitive business practices, it remains part of the federal government. *See Baker v Runyon*, 114 F.3d 668, 670-71 (7th Cir. 1997) ("Congress may have vested the Postal Service with significant powers in order to increase its independence and autonomy, but it also provided that the Postal Service is part of the executive branch of government . . . .") [internal cites omitted]. In determining the degree of the Postal Service's

23

autonomy, courts make clear that the Postal Service is nonetheless part of the United States

government: "The [Postal Reorganization Act] abolished the Post Office Department, which

since 1789 had administered the Nation's mails, and replaced it with the United States Postal

Service, an independent agency within the executive branch." *UPS Worldwide Forwarding, Inc.*

*v United States Postal Service*, 66 F.3d 6231, 625 [internal citations omitted].) *See also Coley*

*Properties Corp. v. United States*, 593 F.2d 380 (Ct. Cl. 1979); *Kieffer v. Vilk*, 8 F.Supp. 2d 387,

392 (D.N.J. 1998). As the trial class definition includes both the United States government and

U.S. government agencies, the Postal Service clearly falls within the class definition.

Therefore, this court grants Gypsum's motion for summary judgment as to One Embarcadero

Center.

### 5. Two Embarcadero Center

As with One Embarcadero Center Prudential asserts that its wholly-owned subsidiary, PIC

Realty, and not Prudential itself, held an ownership interest in the partnership Embarcadero

Center Associates (hereinafter "ECA"), which in turn owned Two Embarcadero Center, also

located in San Francisco, California. PIC Realty was assigned the rights to assert claims in this

lawsuit by the other partners in ECA. Again, since the trial class definition encompasses both

subsidiaries and partners, PIC Realty is the representative owner and its interests are identified

with Prudential for purposes of this claim.

Prudential also contends that the Defense Department is not a federal agency. It bases

this claim on Chapter 5 of the United States Code, Section 305(a)(7), in which Congress

explicitly excluded the Defense Department from the definition of government agencies. That

section of the code, however, explicitly limits its non-agency designation "for the purposes of

24

this section," a section which defines how included agencies will make systematic review of their

operations. Other sections of Chapter 5 designate different sets of entities as non-agencies for

the purposes of their sections, not including the Defense Department. *See, e.g.* 5 USC 551(1)(a).

Thus, it is not appropriate to generalize from section 305(a)(7) regarding the status of the

Defense Department. Rather, this court relies upon the references in many federal courts to the

Defense Department as a federal agency, accountable at law as an agency. *See, e.g., United*

*States Department of Defense v. Federal Labor Relations Authority* 510 U.S. 487, 490 (1994);

*United States v Scheffer,* 523 U.S. 303, 312 (1999).

Further, Prudential argues that Grace must have provided the documentation required of a

claimant in the *Prince George Center* action, that is, a signed lease, in order to establish that a

government agency was a tenant of the building in this action. As Grace points out, however, as

the owner of the building, Prudential has access to greater documentation than Grace with respect

to the tenancies involved. For the purposes of this motion, documentation of the tenancies is

sufficient absent some demonstration by Prudential that such tenancies did not exist. With

respect to Two Embarcadero Center, Grace provides a response by plaintiff to Grace's

interrogatory regarding whether "any tenant of Embarcadero Center One and Two . . .has moved

out . . due to the presence of ACM, and, if so, identify the tenant and the date on which that

tenant gave notice of the move . . . ". Prudential responded to the interrogatory as follows: "In

July 1990, the Department of Defense was unable to renew its lease due to a governmental

directive prohibiting the leasing of office space in buildings which contain asbestos." Grace also

submits a document which addresses "Documents executed since May 17, 1984-Two

Embarcadero Center," which lists the Department of Defense under the subheading

25

"Amendments" and indicates that the amendment was for a duration of 10 months and was "to add space." These documents provide evidence of the Department of Defense's tenancy in the requisite time period.

Finally, Prudential contends that Grace did not seek summary judgment as to Two Embarcadero Center until well after October 1, 1996, the deadline for all dispositive motions set by the court in its final scheduling order of March 22, 1996. It is within this court's discretion to modify the scheduling order, upon a showing of good cause. *See* Federal Rules of Civil Procedure, Rule 16(b); Wright, Miller & Kane, Federal Practice and Procedure: Civil 2d § 1522.1. In this case, Prudential's failure to opt out of the Trial Class became final on September 13, 1996, well after the entry of the final scheduling order in March. The case was then put on hold while Prudential pursued its claims in the Pennsylvania courts, up to the United States Supreme Court. The amount of time that passed between when the *Prince George Center* settlement became final, solidifying Grace's claim, and the time the action was put on hold was negligible. Likewise, the final pretrial order was entered prior to any party's ability to know whether Prudential would opt out of the Trial Class and so did not contemplate discovery related to that issue. Moreover, Prudential has not made any showing of prejudice or lack of time to prepare a response to Grace's amendment to its original motion, entered within the required time period. claiming estoppel on the grounds of the settlement for seven buildings in this action. Therefore. this court will review Grace's motion as to Two Embarcadero Center, to the extent it impacts claims against Gypsum. This court grants Gypsum's motion for summary judgment as to Two Embarcadero Center.

*6. Century Center IV*

26

In contrast, Gypsum has failed to demonstrate that there is no disputed issue of material fact with respect to whether Prudential owned Century Center IV, located in Atlanta, Georgia, during the time the government leased space in the building. The only documents submitted by Gypsum register the presence of the government during periods after which Prudential had sold its interest in Century Center IV. *See* Nanos Affidavit, Exhibits M, N, O, P, & Q. The class definition encompasses "private owners of buildings . . . who leased or subleased their buildings in whole or in part to the United States or any agency thereof," meaning that Prudential needed to own the buildings at the time the leases occurred; contrary to Gypsum's assertions, class membership is not triggered simply because the government occupied the buildings within the time period. Gypsum also points out that Prudential's retention of all rights to bring claims for ACM costs in the buildings it had sold should result in the inclusion of Prudential in the class; however, Gypsum does not present evidence demonstrating that the rights Prudential retained would permit Prudential to sue for claims arising from tenancies after it sold its interest in a given property. As a result, this court will not dismiss Prudential's claims as to Century Center IV.

7. *Prudential Plaza, Denver*

Prudential also claims that Gypsum has failed to provide documentation that the IRS occupied the potion of the Prudential Plaza complex, located in Denver, Colorado, in which asbestos had been found. Prudential further contends that the potion of the complex to which Gypsum's documentation pertains was never part of the instant litigation. Gypsum, however, points to a memorandum of understanding which was expressly incorporated into the lease supplied by Gypsum, indicating that the government leased space in the portion of the building complex which Prudential included in this litigation, in the period of time delineated by the class

settlement. *See* Nanos Aff, Ex. R.  Therefore, this court grants Gypsum's motion for summary judgment as to Prudential Plaza.

### 8. *Renaissance Tower*

Prudential asserts that while Gypsum has provided a number of documents relating to the EPA's tenancy at Renaissance Towers, located in Dallas, Texas, Gypsum has not provided a lease. This court finds, however, that the documents submitted by Gypsum, including rent rolls, a master tenant listing, and a Complaint filed by Prudential, establish that the EPA was a tenant in the requisite time period. *See* Nanos Affidavit, Ex. I, J, L. & Ex. F, p. 6,

Plaintiff's second contention is that the trial class definition is narrower than the settlement class definition.  Specifically, while the settlement class encompassed buildings leased by the "the federal government or an agency, department or unit thereof," (Court of Common Pleas, Amended Order, February 17, 1995, para 2) the trial class definition only included the "the United States or agency thereof." *Id.*, at para 4.  The plaintiff argues that the omission of reference to "department or unit thereof" is significant and that, as a result, the Department of Treasury is not a government tenant within the ambit of the class.  Prudential cites no legal support for its assertion that the Department of Treasury is not a federal agency.  In contrast, federal courts regularly refer to the Department of the Treasury as a federal agency, and treat it as such under the law. *See, e.g., United States v Ratner*, 464 F.2d 101, 103 (9th Cir. 1972); *Mizra v. Department of the Treasury*, 17 F. Supp. 2d 759 (N.D. Ill. 1998). This court also does not find, as the plaintiff asserts, that the signature of the Comptroller of the currency of the Treasury Department rather than the United States Government on the lease signifies that the Treasury Department is not a federal agency or part of the United States government.  Therefore,

28

this court grants Gypsum's motion for summary judgment as to Renaissance Tower.

In conclusion, this court finds that there exists no substantial issue of material fact as to whether the Gaslight Tower of Twin Towers; Northland Towers; Five Penn Center; One Embarcadero Center; Two Embarcadero Center; Prudential Plaza, Denver; or Renaissance Tower fall with in the *Prince George Center* class such that the moving party Gypsum is entitled to judgment as a matter of law dismissing Prudential's claims as to those buildings. Gypsum has not provided evidence sufficient to demonstrate that the South Tower of the Twin Towers or Century Center IV fall within the *Prince George Center* class. Therefore, this court grants Gypsum's motion for summary judgment as to the Gaslight Tower of Twin Towers; Northland Towers; Five Penn Center; One Embarcadero Center; Two Embarcadero Center; Prudential Plaza, Denver; and Renaissance Tower, but denies that motion as to the South Tower of the Twin Towers and Century Center IV.

## II. Statute of Limitations

### A. The Legal Standard

#### 1. The RICO Statute of Limitations

When it originally enacted RICO, Congress did not include a statue of limitations for civil RICO claims. In 1987, the United States Supreme Court held that the Clayton Act's four-year statute of limitations period applies to civil RICO actions. *See Agency Holding Corp. v. Malley-Duff and Associates*, 483 U.S. 143, 156 (hereinafter *Malley-Duff*). The *Malley-Duff* Court did not, however, define when RICO actions accrued.

The Third Circuit has subsequently attempted to fashion a standard for accrual. Immediately following the *Malley-Duff* decision, the Third Circuit held that a claim accrued

29

when the plaintiff discovered its injury, with the exception that if the defendant committed

subsequent predicate acts, the plaintiff's cause of action would accrue on the date of the last

predicate act. *See Keystone Insurance Co. v. Houghton*, 863 F.2d 1125 (3d Cir. 1988). The

Supreme Court, however, rejected the "last predicate act" standard in *Klehr v. A.O. Smith Corp.*,

521 U.S. 179, 187 (1997). The Third Circuit then adopted the injury and pattern discovery rule,

requiring that the plaintiff should know that each element of a RICO claim existed, "namely, that

he was injured, that the defendant was the source of this injury, and that a pattern of activity

prohibited by RICO caused this harm." *Annuli v. Panikkar*, 200 F.3d 189, 192 (3rd Cir. 1999).

Again, the Supreme Court rejected the "pattern discovery" portion of this rule; however, the

Court did not identify an appropriate accrual rule. *See Rotella v. Wood*, 120 S. Ct. 1075, 1079

(2000).

In light of the *Rotella* decision, the Third Circuit has adopted an injury discovery rule to

determine when a civil claim accrues under RICO. *See Forbes v Eagleson*, 228 F.3d 471 (2000).

According to the Third Circuit, "[u]nder the injury discovery rule, we must determine when the

plaintiffs knew or should have known of their injury," *Id.* at 484. Plaintiffs must also know of

the source of their injury. *Id.* at 487 [citations omitted].

In *Rotella*, the Supreme Court observed that the federal statutes of limitations are

generally subject to equitable tolling. *See Rotella.* 120 S. Ct. at 1084. According to the Third

Circuit, if the defendant actively misled the plaintiff, the statute of limitations is tolled until the

plaintiff's cause of action became or should have become apparent to a "person in the plaintiff's

position with reasonably prudent regard for his or her rights." *Forbes*, 228 F.3d at 486. The

Third Circuit has distinguished the discovery rule and doctrine of equitable tolling in the

30

following manner:

> The two doctrines differ . . . with respect to the type of knowledge or cognizance that triggers their respective applications. The discovery rule keys on a plaintiff's cognizance, or imputed cognizance, of actual injury. Equitable tolling, on the other hand, keys on a plaintiff's cognizance, or imputed cognizance, of the facts supporting the plaintiff's cause of action.

*Forbes*, 228 F.3d at 486, quoting *Oshiver v. Levin, Fishbein, Sedran & Berman*, 38 F.3d 1380, 1390 (3d Cir. 1994).

*2. Summary Judgment*

In 1993, when resolving a summary judgment motion brought by Prudential to estop Grace and Gypsum from bringing their statute of limitations claims, this court first considered the issue of when Prudential knew or should have known of its injury. The court denied Prudential summary judgment on the grounds that Grace and Gypsum had demonstrated that a substantial issue of material fact existed as to whether the plaintiff should have known of its injury. *See Prudential Insurance Co. of America v. United States Gypsum Co.*, 828 F.Supp. 287 (D.N.J. 1993). In 1994, Grace and Gypsum brought a motion for summary judgment on the plaintiff's RICO claim, on the grounds that the statute of limitations precluded the plaintiff's claim. Based on its 1993 decision that a triable issue of fact existed as to whether Prudential should have known of its injuries, the court reserved the issue of what Prudential should have known for trial. The court then denied Grace and Gypsum's motion on the grounds that they had not demonstrated the absence of a dispute of material fact as to what the plaintiff *knew*. *See Prudential Insurance Co. of America v. United States Gypsum Co.*, No. 87-4227, slip. op. (D.N.J.

31

June 9, 1994).

The court now finds, however, that in its 1994 opinion, it should not have reserved the issue of what Prudential should have known for trial. While Prudential's 1993 motion for summary judgment raised the issue of whether Grace and Gypsum could provide evidence sufficient to show that Prudential should have known of its injuries, Grace and Gypsum's 1994 motion for summary judgment asked a different question: whether Prudential could provide evidence sufficient to *refute* the claim that it should have known of its injuries. This court has not addressed the later question and will do so now.[44]

## B. Defining Prudential's Injury

Gypsum argues that Prudential's injury accrued when it became aware of the potential hazards of asbestos. Thus, according to Gypsum, the statute of limitations should begin to run from when Prudential first knew or should have known of such potential for injury, which was well before October 20, 1983. In response, Prudential urges that its injury is not the possibility of contamination, but actual contamination and the money it spent to abate the asbestos in its buildings: "Prudential is not claiming injury from knowledge that ACM poses potential health hazards . . . . rather, Prudential is claiming injury because in and after 1984 it had to spend hundreds of millions of dollars to deal with the hazards posed by ACM in its buildings." Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment to Dismiss Plaintiffs' RICO Claim Based on the Four-Year Limitations Period, at 17.

In cases in which a plaintiff brings a general claim for damages from asbestos, many courts find that the asbestos must pose a hazard, for instance, by having contaminated the building. before a claim accrues. *See City of Wichita, Kan v. U.S. Gypsum, Co.*, 72 F3d 1491

32

(10th Cir. 1996); *MDU Resources Group v. W.R. Grace & Co.*, 14 F.3d 1274, 1279 (8th Cir. 1994). *But see Roseville Plaza Ltd. Partnership v U.S. Gypsum Co.* 31 F.3d 397, 400 (6th Cir. 1994) (holding knowledge of presence of asbestos enough to put plaintiff on notice of possible contamination).

Despite Prudential's assertion in its reply to Gypsum's motion that its injury is only for contamination, Prudential's complaint explicitly seeks damages for potential as well as actual contamination:

> Because of the contamination caused by the asbestos-containing materials in plaintiffs' buildings, plaintiffs have paid and will continue to pay substantial costs and fees relating to abatement and buildings monitoring actions, buildings survey and testing costs, tenant relocation costs, operations and maintenance program costs for asbestos-containing materials before their removal from buildings, substantial disruption to their business, substantial property damage to their property . . . and other costs associated with the <u>contamination or potential contamination</u> of the buildings.

Prudential's Amended Complaint, ¶30 [emphasis added].

There is no need, therefore, to apply standards which pinpoint the date of a plaintiff's injury in a general claim for asbestos damages; the plaintiff has already specified its injury in its complaint. Prudential did not wait for indications that each of its properties was contaminated to bring its suit against Gypsum, but instead brought a claim for potential contamination as well as actual contamination.[6] As a result, Prudential's injury accrued when Prudential knew or should have

---

[6]While the Plaintiff would not have standing to bring suit for a prospective injury, in this case, the court finds that the plaintiff's potential injury from asbestos is in fact an actual liability: at the very least, Prudential must take extra precautions when renovating or demolishing a holding which contains asbestos; it must monitor the air quality in its buildings and address tenant concerns regarding the presence of asbestos; and, because of these responsibilities. it should account for the presence of asbestos in the valuation of its properties.

33

known of the potential for asbestos contamination in its buildings.

## C. When Prudential's Injury Accrued

Gypsum contends that Prudential should have been alerted to any potential injury from the presence of ACM in the 1970's and early 1980's. In support of its argument, Gypsum cites EPA regulations and documents issued in the 1970's and early 1980's describing the potential hazards of asbestos; internal investigations by Prudential into the existence of asbestos in its buildings; and studies performed by Prudential in response to tenant complaints. Prudential responds that it did not know of the EPA documents and that the results of its investigations, whether internal or in response to tenant complaints, showed that the air in its buildings did not contain hazardous levels of asbestos fibers. Instead, Prudential identifies two events as significant to its discovery of its injury: its 1984 abatement of asbestos in conjunction with its demolition of the Chubb Building and testing performed by experts on its holdings in 1985 and 1986.

The court does not find that the two events identified by Prudential reasonably served as sources of new information for Prudential in identifying the existence of its injuries. The EPA had issued the regulations requiring asbestos encapsulation during demolition a decade earlier, and one of Prudential's engineers had brought the regulations to Prudential's attention by at least as early as 1981. The testing which Prudential performed in 1985 and 1986 was in response to the demolition and could have been performed at an earlier juncture had Prudential chosen to inform itself of the hazards it faced. Therefore, the court must determine which other events served or should have served to trigger Prudential's awareness of its claim. To this end, the

34

events cited by Gypsum, including the EPA publications and regulations of asbestos and Prudential's own testing, are, or should have been more compelling triggers.

Prudential, however, has presented evidence that it did not have knowledge of EPA regulations and various media releases documenting the hazards of asbestos. Prudential has also presented evidence that it conducted testing of its buildings which showed that the air in those buildings was not contaminated and the asbestos in the buildings posed, as one testor put it, no "immediate" hazzard to their occupants. In its 1994 opinion, this court substantially addressed the issue of whether the statue of limitations prevented Prudential for recovering damages for injuries of which it had actual knowledge. The court found that a dispute of material facts existed as to Prudential's actual knowledge, and therefore denied the defendants in that action summary judgment. The court will assume, *arguendo*, that Gypsum has not submitted any evidence in this motion which causes the court to overrule its 1984 opinion regarding Prudential's actual knowledge.

Prudential's showing regarding its actual knowledge falls far short, however, of demonstrating why Prudential remained unaware of the potential hazard asbestos posed in its holdings. While the court may accept for the purposes of this motion that Prudential was not aware of the EPA's repeated warnings about the potential hazards of in-place asbestos, the court nevertheless concludes that such events should have triggered Prudential's inquiry into the hazards posed by asbestos. Even if all of the EPA's attention was not directed to the niche of the building industry occupied by Prudential, a reasonably prudent building owner, and particularly one with investments as extensive as Prudential's, would have monitored the issue. Moreover, Prudential's own tenants repeatedly voiced their concerns to Prudential about the hazards of

35

asbestos. While the testors hired by Prudential reported that the asbestos was not an immediate

hazard, they noted that asbestos required continual monitoring since it could become hazardous if

it is disturbed or deteriorates.

Prudential asserts that Gypsum is estopped from bringing its claims because Gypsum

misled Prudential about the likelihood that asbestos would deteriorate. Prudential's claim would

carry weight if Gypsum served as the only source of information about the friability of in-place

asbestos. Gypsum demonstrates, however, that information on such friability was widely

available. Most importantly, Prudential itself had found that asbestos in one of its own buildings

had deteriorated and therefore was on notice that asbestos in any of its holdings could also

deteriorate and thus posed a potential hazard.

*1. Events Prudential Claims Triggered Its Awareness*

According to Prudential, the watershed event in its awareness of its injury was its 1984

abatement of asbestos prior to its demolition of the Chubb Building:

> In 1984, Prudential began to develop an appreciation of some of the
> potential hazards of ACM in buildings because it had to remove the ACM
> from a building it was demolishing. In November 1983, Prudential decided
> to demolish the Chubb Building in Short Hills, New Jersey. ACM was
> discovered and Prudential employees were informed by outside consultants
> that government regulations required that the ACM would have to be
> removed prior to demolition. Consequently, in 1984, the ACM from the
> Chubb building was removed at a cost of approximately $1,000,000.
> Following the removal of ACM at the Chubb Building, in late 1984
> Prudential set up a task force to investigate the issue of in place ACM.

Plaintiff's Brief in Opposition to Defendants' Motion for Summary Judgment to Dismiss

Plaintiffs' RICO Claim Based on the Four-Year Limitations Period, p7.

36

Prudential's brief in opposition to Gypsum's motion for summary judgment implies that Prudential only discovered its responsibility under governmental regulations in 1984, when provided with information about those regulations by outside consultants. Gypsum shows, however, that the responsibility for abatement as a result of demolition or renovations was established by EPA regulation in 1973 and 1975, and that subsequent studies by Prudential employees provided Prudential with knowledge of these regulations and the presence of asbestos in Prudential buildings.

Gypsum demonstrates that in April 1973, the United States Environmental Protection Agency ("EPA") issued the National Emission Standard for Hazardous Air Pollutants (Asbestos, Beryllium, and Mercury) ("NESHAPS"), 40 C.F.R. § 61.20-24. This standard applied to "demolition by an owner or operator of a demolition operation who intends to demolish any institutional, commercial or industrial building (including apartment buildings having more than four dwelling units ) . . . . which is insulated or fireproofed with friable asbestos material." In 1975, § 61.22 was amended to include "demolition or renovation." 40 CFR § 61.22. Prudential responds that these regulations only applied to industrial uses of asbestos; however, the plain language of the regulations indicate that they encompass "demolition and renovation activities" of "any . . . commercial . . . building."

As Prudential acknowledges in its Amended Counterstatement and Response to Defendant's Rule 56.1 Statement ("Plaintiff's Amended Counterstatement"), Arcadius Zielinski, an architect in Prudential's Corporate Services & Buildings Department, was aware of these regulations and informed Prudential's executives of them at least as early as 1981. Plaintiff's Amended Counterstatement at p.24. Mr. Zielinski wrote memoranda in May of 1981 to the Vice President

37

of Prudential's Corporate Services and Buildings Department, in July of 1981 to the Vice President of Real Estate Operations in the Real Estate Investment Department, and in May of 1981 to the Vice President of Administrative Services of the North Central Home Office "in order to monitor compliance with any applicable OSHA or EPA regulations." According to Plaintiff's Amended Counterstatement, [Zielinski] wrote the memoranda by looking at the specifications on file in Newark to see whether asbestos was specified . . . . He summarized regulations that would have applied if Prudential had undertaken removal." *Id.* at pp. 23-24.

In these memoranda, Mr. Zielinski repeatedly asserted the following explanation of Prudential's responsibilities for asbestos abatement:

> Whenever alteration work is contemplated, a review should be made to determine whether asbestos bearing materials will be disturbed. If that should be the case, the documents issued for bidding should identify the material and the documents should advise the bidders that the asbestos bearing material shall be removed and disposed of in accordance with regulations of the United States Environmental Protection Agency.

Affidavit of Christopher W. Nanos in Support of W.R. Grace's Motion for Summary Judgment to Dismiss Plaintiffs' RICO Claim as Barred by the Four-Year Limitations Period ("Nanos Aff't"). Ex. 19. Thus, Plaintiff's Amended Counterstatement contradicts its own brief by admitting Prudential knew of the EPA regulations at least as early as 1981, based on an inquiry performed by its own employee. Moreover, Mr. Zielinski's reports demonstrate that Prudential knew or should have known of the presence of ACM in those holdings which he or any other Prudential employee investigated or should have investigated in light of the EPA's regulations on asbestos.

Prudential also claims that it confirmed its awareness of the contamination and potential

38

contamination it suffered as a result of the presence of ACM when it received the results of a

study it commissioned of its holdings in 1985 and 1986. According to Plaintiff's Amended

Counterstatement:

> When Prudential received the result of the survey of its properties for
> asbestos, it learned or confirmed that the eighteen buildings in this
> litigation had ACM. The information and advice Prudential received in
> connection with the survey of its properties in 1985 and 1986 caused it to
> appreciate that in-place ACM could potentially be hazardous even when
> not disturbed through demolition or when delaminating. . . . After 1985,
> Prudential began to incur hundreds of millions of dollars in property and
> other damages related to, among other things, (a) monitoring and
> operations costs, (b) abatement and removal costs, and, eventually, (c) loss
> as on the sale of buildings that contain asbestos.

Plaintiff's Amended Counterstatement, at pp.7-10.

Prudential asserts that such testing triggered its awareness of the hazards of asbestos and

therefore the running of the statute of limitations. Yet the timing of expert testing and the

expenditure of funds for abatement is controlled by the plaintiff and is not directly tied to

plaintiff's awareness of a hazard. As the Supreme Court of Ohio observed:

> [Plaintiff]'s contention that accrual should not occur until remediation begins or
> upon the expert determination that the condition is harmful is, in our view,
> unworkable. A test requiring expert determination or actual remediation before
> accrual would allow a plaintiff to stay the running of the statute of limitations until
> a time of its choosing, by simply refraining from investigation or refusing to take
> remedial measures.

*NCR Corp. v. U.S. Mineral Products Co.*, 649 N.E.2d 175, 177-78 (Ohio 1995). The affidavit of

David Holick, Jr., submitted to this court by Prudential as Exhibit 97 in support of Prudential's

counterstatement and response, suggests that Prudential may have pursued such a policy of delay in order to avoid the publicity and liability that would attend public announcements and containment. Mr. Holick served as director of architecture at Prudential's real estate investment department in Houston, Texas from 1979 to 1984. According to the affidavit, Mr. Holick was "one of three trouble shooters responsible for overseeing the $11 billion real estate investment portfolio in Prudential's southern and western regions," including IBM's complaints about asbestos in the Jacksonville, Florida building. Holick Affidavit, at para. 2. Mr. Holick asserted that "[i]t was common knowledge among Prudential architects and engineers by 1979 that the presence of asbestos-containing materials in buildings constituted a potential health hazard to building occupants." *Id.*, at para. 4. Mr. Holick further contended that

> Prudential viewed its liability for asbestos in its buildings as a problem of great scope and magnitude. Due to the great expense that Prudential believed was required to alleviate the asbestos problem in its buildings, the alarm among tenants and unfavorable publicity that Prudential believed would result from immobilizing asbestos-containing materials present in its building, Prudential decided to keep the asbestos issue confidential.

*Id.* at para. 15. While the issue of what Prudential knew about the hazards of asbestos remains a disputed issue of fact, its clear interest in restricting the flow of information about the hazards of asbestos in its holdings could well have impacted its decision about when to conduct testing. Therefore, while its own testing may have contributed to its awareness of the hazards of asbestos, the timing of the testing is not a reliable trigger for the running of the statute of limitations.

*2. When Prudential should have known about the hazards of asbestos*

While Prudential demonstrates that a dispute exists as to whether it actually knew of its injuries, it does not demonstrate that such a dispute exists as to whether it *should have* known of

its injuries prior to October 11, 1983. In light of the existing EPA regulations banning the continued use of asbestos in any building construction, the guidelines issued by the EPA governing demolition and renovation, and Prudential's own monitoring of its properties, this court finds that Prudential should have known of its potential and actual injuries no later than 1981. Moreover, Prudential has acknowledged that it is one of the largest property and casualty insurance underwriters in the world, and also one of the largest real estate investors in North America, (See Prudential's Amended Complaint, para. 4) and therefore its liabilities are multiplied by the large numbers of its holdings. Given such exposure, prudence dictates that Prudential should have remained informed of its legal responsibilities.

a. EPA Regulations and Publications

Between the years of 1978-1983, the EPA produced several reports on the hazards of asbestos, as well as regulations severely restricting the use of sprayed-on asbestos. Two reports from this era clarify that in-place asbestos is widely used for fireproofing and insulation, and that this asbestos can easily break down and become hazardous to the health of building occupants. Two other reports and a federal statute focus on schools, but the second of the reports expressly states that its findings apply to buildings that experience similar heavy traffic and high occupancy. While Prudential asserts that there is no evidence on the record clearly demonstrating that its executives read these publications, this court finds that these documents and the public controversy which they evince should have triggered Prudential's inquiry in the hazards of asbestos several years before it actually initiated its studies, in 1985.

As discussed above in Section III.B.1, the EPA placed regulations on the demolition and renovation of buildings containing asbestos materials in October 1975 and extended these

41

regulations in June of 1978. Prudential contends that it only became aware of these regulations when it sought to demolish the Chubb building in 1984; however memoranda of Zielinski, also cited above, indicate that at least some senior executives at Prudential were informed of these regulations in 1981. As this court decided in 1994, evidence of Prudential's knowledge of these regulations is not evidence of Prudential's actual knowledge of the hazards of in-place asbestos. Just as Prudential argues, however, that the Chubb demolition alerted it to the EPA regulations and the potential hazards of asbestos in its other buildings, so the Zielinski memoranda on the existence of these regulations should have alerted Prudential potential hazards in its buildings.

The EPA focused next on the hazards of in-place asbestos in school and in buildings put to similar uses as schools. Two EPA documents aimed at asbestos management in schools were *Asbestos Containing Materials in School Buildings*, published in 1979 and *Asbestos Exposure Assessment in Buildings*, published in 1982. Likewise, in 1980, Congress enacted the Asbestos School Hazard Detection and Control Act, 20 U.S.C. §§3601-11, encouraging educational agencies to implement asbestos abatement programs. These documents and particularly the attendant legislation focused national attention on the hazards of in-place asbestos. Prudential contends that it did not know of these documents and this legislation because it was not directed towards owners of commercial buildings. While the court will not evaluate the credibility of Prudential's statement for the purposes of this motion, it finds that a responsible building owner should have been aware of such dramatic steps regarding asbestos and should at least have considered how its holdings compared to schools before dismissing the information presented in those reports.

Gypsum produces one document without a date, which it asserts was released in April 1980.

42

The document is entitled: "Toxic Information Series: Asbestos," and is intended to stimulate inquiry into asbestos monitoring. A box in the document indicates: "The [EPA's Asbestos Guidance] Package can help a building owner identify and eliminate asbestos hazards. It's available, free, by calling, toll free 800-424-9065." The document explains the potential hazards of in place asbestos quite clearly:

> [A]sbestos is widely used for fire-proofing and insulating homes and all kinds of public and private buildings. . . .Unless it is completely sealed into a product, as in asbestos floor tile, asbestos can easily break into a dust of tiny fibers. These fibers, much smaller and more buoyant than ordinary dust particles, float almost indefinitely in the air and can easily be inhaled or swallowed. Once the fibers enter the body, they can cause a number of serious diseases. . . . No safe limit or threshold of exposure is known. Any exposure to asbestos carries some risk to health, and people exposed to low levels of asbestos for a very brief period have later contracted mesothelioma."

Nanos Aff't, Ex. 9., pp.1-2. The document also indicates that the EPA prohibited the spraying of all asbestos-containing materials in 1978. Prudential contends the document appears to focus on the schools and that Gypsum has not demonstrated that Prudential ever received the document. The document, however, explicitly states that it is "NOT for Schools Alone! . . . Asbestos material have been used in the construction or renovation of . . .commercial and residential buildings." Given the wide circulation of EPA documents and Prudential's position in the real estate market, Prudential should have taken notice of the publication; however, given the absence of a date on this document, the Court is unable to give this evidence substantial weight.

Prudential implies that because the EPA had not yet passed regulations addressing the hazards of in-place asbestos in commercial buildings, the EPA regulations of the 1970's were not relevant to its activities as a commercial building owner. Plaintiff's Amended Counterstatement,

43

at p.16. Yet the second EPA document, "Guidance for Controlling Friable Asbestos-Containing Materials in Buildings," also know as the EPA "Blue Book," published in March, 1983, explicitly argues otherwise. It indicates that federal law does not mandate corrective action or set exposure standards, but asserts in its introduction that building owners are not thereby relieved of responsibility for monitoring asbestos in their buildings: "The potential for exposure to airborne asbestos in buildings and the associated risk of asbestos-related disease cannot be ignored. The decision whether or not to take action and the selection among alternative courses of action are the responsibility of the individual building owner." Blue Book, pviii, Nanos Aff't., Ex. 12.. The Blue Book then outlines in detail the steps a building owner should take to survey its buildings, the ways its should analyze the results of the survey and methods for controlling asbestos.

Gypsum also points to a document used by the EPA for training in February 1983 indicating that while building owners might remain in denial about the potential hazards of asbestos, by that date, such owners should know of the hazards of asbestos:

> A building owner might choose to believe there is no problem in his/her building, but, as we have seen, it is clearly prudent to find out the facts. With the rising public awareness of asbestos hazards, most any building owner would be hard pressed to justify no reasonable knowledge of the hazard.

Nanos Aff't, Ex. 13, at 3. Prudential contends that this document was used internally by the EPA and so Gypsum cannot prove that Prudential ever saw it. The document is significant, however, not for the information it provided to Prudential but for what it demonstrates about what a

44

reasonably prudent building owner should have known at that time, specifically that asbestos was

a potential hazard.

b. *Prudential's monitoring, internally generated and in response to tenants.*

Through the surveys of its architect, Zielinski, Prudential became aware of the presence

of asbestos in its holdings and also of the conditions which could cause it to become hazardous.

As a result of tenant complaints, Prudential also commissioned studies of the air quality and the

condition of asbestos in several of its holdings. While these studies indicated that the air in these

buildings was not contaminated, the testors informed Prudential of the limited durability of test

results in light of the potential that asbestos could deteriorate. Moreover, in two of the buildings

which Prudential examined, evidence of such deterioration already existed. As a result,

Prudential should have been aware of the potential hazards of asbestos in its buildings long

before it asserts it became aware of those hazards.

Zielinski examined the building specifications of Prudential's many holdings to

determine which probably contained asbestos. He advised Prudential executives of the existence

of the asbestos, regulations concerning its monitoring, and when asbestos was known to pose a

hazard. For instance, as Prudential asserted in its Amended Counterstatement, in May of 1981

Zielinski informed the Vice President of Prudential's Corporate Services and Building

Department that "as long as the asbestos was firm and in-place, it was not a hazard." Plaintiff's

Amended Counterstatement at p.24-25. Likewise, in July of 1982, Anthony Murphy, Vice

President of Buildings in Prudential's Corporate Services and Buildings Department reported

that "asbestos-bearing materials in good condition are not a concern." *Id.* at p.26. Prudential

goes on to argue that its personnel concluded from these reports that it 'did not view the issue of

45

asbestos in buildings as an issue that merited further attention." *Id.* at p.26. A more prudent building owner should have concluded that it had a responsibility to ensure that its asbestos-bearing materials remained in good condition.

Prudential asserts that only tenant complaints brought in the late 1970's and early 1980's led it to investigate the condition of the asbestos and the air quality in some of its buildings. Prudential contends that these investigations were purely a matter of tenant relations, and that at no time did it suspect that the asbestos actually posed a hazard to building occupants. Gypsum demonstrates, however, that even if Prudential regarded the presence of asbestos in its buildings as a mere tenant relations issue, as such it was still a considerable liability and of great concern to Prudential. For instance, Prudential was very attentive to IBM's objections to the presence of asbestos in Prudential's Jacksonville, Florida building, in which IBM was a tenant. Prudential did not want to lose IBM as a tenant over asbestos contamination: According to Prudential's Director of Real Estate Operations, "if IBM vacates because of asbestos contamination, the property would probably be unrentable for a period of time. Much like the Philadelphia hotel that had the outbreak of Legionnaires Disease." ,Nanos Aff't., Ex 58. Prudential also did not want to risk losing IBM as a tenant due to the potential of contamination. According to Prudential. "Earl Starr, of Prudential's Florida office, testified that he did not perceive the asbestos as a problem but that 'we were really concerned about how IBM was reacting to it.' As noted by Ronald Harmsen at that time: 'We want to retain IBM as a tenant, if at all possible.'" Plaintiff's Amended Counterstatement at p.46 [citations omitted].

The testing consultants who evaluated the asbestos in Jacksonville also alerted Prudential to the need for on-going asbestos surveillance, because "[a]irborne concentrations of asbestos fibers

46

may increase as the asbestos-containing fireproofing deteriorates through aging." Nanos Aff't,

Ex. 61. Similarly, the inspector of the Kent-Albert Building in Ottawa, Canada, which belonged

to one of Prudential's wholly-owned subsidiaries, indicated in January, 1981 that the building's

fireproofing contained asbestos and recommended that the fireproofing be reinspected every two

to three years. Defendant's Counterstatement at 31. In such instances, Prudential claimed that

because asbestos did not present an "immediate" hazard, and because it did not need to contain

asbestos, it was not concerned about the potential hazards posed by asbestos. Prudential should

have been aware, however, of the limited durability of any test results since the testers expressly

informed Prudential of these limitations and the potential hazard posed by asbestos should its

condition change.

According to Gypsum, in late 1980, at 5 Penn Center in Philadelphia, a tenant retained an

industrial hygienist, who determined that the fireproofing coating the steel had "degraded to a

point where material had dropped off and collected at floor level." In response, Prudential hired

a company to remove "all accessible evidence of loose asbestos bulk, dust particles and debris"

and to immobilize "[r]emaining intact accessible sprayed-on asbestos matrix" for a fee of

$36,720. Prudential responds that it identified no apparent hazard in the building or in the loose

asbestos material, but that it conducted encapsulation to "appease" its tenant. *See* Plaintiff's

Amended Counterstatement, at 33-34. Nevertheless, this incident demonstrates that Prudential

knew or should have known that asbestos in one of its buildings was already deteriorating and

that responding to tenant concerns over the deterioration and the potential hazard of in-place

asbestos was a considerable liability.

In March, 1981, results of tests commissioned by Prudential and performed on a building

47

in which Prudential leased space in Wayne, New Jersey indicated that the insulation in the building contained high levels of asbestos. The tester was not concerned about the levels of asbestos in the building's air circulation system, but noted that the material located in areas accessible to maintenance workers was flaking off. According to the report, the condition of material containing asbestos in the ceiling void and plant room was as follows:

> Material located on all structural beams and patches of deck in ceiling void
> Material is flakey at edges where coverage stops and has a tendency to 'flap in the wind' when air is circulating.
> Particles (clusters) have dropped onto the tops of air ducts and ceiling tiles.
> Accessibility: can be reached by maintenance personnel-electrical was easily. [sic]
> Plant room had loose particles (groups or clusters) lying on A.H. unit and on floor where it had dropped from ceiling or been brushed off the exposed columns. Danger of possible transportation into office area by maintenance crews.
> Floors of Plant room very dirty-exposure potential high!

*See* Prudential's Exhibit 65 in Support of its Counterstatement. While Prudential was a tenant, not an owner in this building, the report provided Prudential with another example of deteriorating ACM, raising its awareness of the potential hazards of in-place ACM in its own buildings.

Again, at its building in Boston, Massachusetts, Prudential was notified by two different tenants that fireproofing or insulation material in the tenant's space was disintegrating. In both instances, Prudential sent employees to speak with tenants, and those employees indicated in depositions that they "did not recollect" seeing asbestos deteriorating in either space; it is not clear from the depositions submitted by the parties whether the Prudential employees examined the spaces for deterioration. In response to a third tenant's complaint, Prudential discovered that

in-place asbestos was deteriorating and causing an airborne hazard to building occupants. In a case it brought to recover damages from the manufacturer of asbestos used in the building, Prudential identified the date it became aware of its injury as July, 1983. Prudential claims that this discovery was not meaningful with respect to the present litigation because the asbestos used in Boston was of a different type; however, Prudential does not clarify how the difference affected the asbestos's disintegration rates, nor does Prudential demonstrate that it knew of the difference at the time, particularly given Prudential's stated policy of not concerning itself with the presence of asbestos in its holdings. A reasonably prudent building owner who has been notified of the disintegration of asbestos in three of its buildings would at least investigate its holdings and would recognize the potential hazard posed by even presently intact asbestos.

Thus, this court finds that while Prudential may not have known of its injury prior to its demolition of the Chubb building in 1984, it should have known of its injury prior to October 20, 1983. Prudential was aware of the hazards of ACM when released into the air, and should have been aware that in-place ACM could pose a hazard if it was disturbed or if it disintegrated. Prudential knew that ACM was deteriorating in two of its holdings: at 5 Penn Center in late 1980 and again at the Prudential Building in Boston in July of 1983. As a result, Prudential should have known that the ACM in its other buildings posed a potential hazard and that it would have to spend considerable amounts of money monitoring the material and potentially encapsulating or abating it if it should also begin to deteriorate, or if Prudential should renovate or demolish a holding. When it first discovered in 1980 that ACMs in one its properties had begun to deteriorate. Prudential should have launched an investigation into the condition of all the ACM in its buildings. By waiting until 1985, Prudential postponed its own understanding of its

49

potential and actual liability, but it did not stop the running of the statute of limitations period. Prudential's assertions to the contrary are not supported by evidence such that a jury could reasonably find for Prudential on its claim. As a result, this court grants Gypsum's motion for summary judgment on the grounds that the four-year statute of limitations had run before Prudential brought its claim in October of 1987.

### D. Estoppel

Prudential claims that Gypsum should be equitably estopped from asserting a statute of limitations defense because Gypsum actively misled Prudential with respect to the hazards of in-place asbestos. In support of its claim, Prudential cites several documents purporting to show that Gypsum knew of the hazards of in-place asbestos and did not reveal that information to building owners. *See* Prudential's Brief in Opposition to Defendants' Motion for Summary Judgment to Dismiss Plaintiffs' RICO Claim Based on the Four-Year Limitations Period, at 5. Estoppel is only available to parties, however, if their injury has not become apparent or should not have become apparent to a "person in the plaintiff's position with reasonably prudent regard for his or her rights." *Forbes*, 228 F.3d at 27.

The documents cited by Prudential do not demonstrate that Gypsum could have succeeded in disguising Prudential's injury from Prudential, so long as Prudential had a "reasonably prudent regard" for its rights. Several of the documents may show that Gypsum knew and did not rush to publicize information it obtained in the 1940's, 50's and 60's that asbestos caused serious harm to human beings. By the time Prudential was considering the potential hazards of ACM, however, several independent and widely-publicized sources of this information existed, including the EPA regulations discussed above in Part C(2)(a).

50

In conclusion, based on reconsideration of record and facts before it, and in light of changes in the law regarding the accrual period under RICO, this court finds that statute of limitations period has run and Gypsum's motion to dismiss plaintiff's RICO claims must be granted. As a result, this court will not address Gypsum's motion for summary judgment dismissing Prudential's RICO claims on substantive grounds.

## III. Supplemental Jurisdiction

Having dismissed the plaintiff's federal claims and finding no extraordinary circumstances, this court declines to exercise supplemental jurisdiction over the plaintiffs' state-law claims.

According to § 1367 (c)(1) of the United States Code, "The district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if the district court has dismissed all claims over which it has original jurisdiction. *See Hedges v Musco*, 204 F.3d 109 (3d Cir. 2000). The Third Circuit has held that, "where the claim over which the district court has original jurisdiction is dismissed before trial, the district court must decline to decide the pendent state claims unless considerations of judicial economy, convenience, and fairness to the parties provide an affirmative justification for doing so." *Borough of West Mifflin v. Lancaster*, 45 F.3d 780, 788 (3d Cir.1995). This court finds that none of these considerations weigh in favor of retention of the plaintiff's remaining claims.

This court takes exception to Prudential's assertion that, having overseen the case for twelve years, this court "would not dare" remand it to state court. Parties initially brought this matter as a CERCLA claim, and after determining that this was an inappropriate characterization,

51

the court allowed the plaintiff to recharacterize its claims. The court has since handled this case expeditiously, in spite of the fact that fifty major office buildings were involved at its inception, and that expert testimony and massive discovery were necessary with respect to product identification in each building. Based upon Prudential's decision to reduce the number of building involved in the litigation, the court provided the parties with an expedited pretrial schedule and concluded pretrial of this case in 1996. This case was further delayed by one year of abortive efforts because the original counsel were disqualified and three years during which the Pennsylvania action was appealed to the U.S. Supreme Court. A writ of certiorari was denied by the Supreme Court in November, 1999, this court heard oral argument on the case in February of 2000, and the parties briefed their positions subsequent to oral argument. In November of 2000, Prudential sought a further delay in the proceedings because one of its counsel was extremely involved in the dispute of the national election in Florida.

In this case, Prudential is not prevented from filing a claim in state court. Therefore, the court finds that Prudential is not prejudiced by this court's dismissal of the case. The remaining claims, moreover, are all state law claims and are best left to that court to decide.

Hon. Harold A. Ackerman, U.S.D.J.

52

Westlaw.

359 F.3d 226                                                                    Page 1
359 F.3d 226, RICO Bus.Disp.Guide 10,633
(Cite as: 359 F.3d 226)

**H**
Briefs and Other Related Documents
Prudential Ins. Co. of America v. U.S. Gypsum
Co.C.A.3 (N.J.),2004.
    United States Court of Appeals,Third Circuit.
    PRUDENTIAL INSURANCE COMPANY OF
    AMERICA; PIC Realty Corp; 745 Property INV
                          v.
    UNITED STATES GYPSUM COMPANY; W.R.
      Grace & Company; The Celotex Corporation;
    United States Mineral Products Company; Keene
    Corporation; Pfizer, Inc.; Asbestospray Corporation;
    John Doe Companies, fictitious names for presently
    unidentified entities (District of New Jersey Civil No.
                        87-cv-4227)
        The Prudential Insurance Company
                          v.
    National Gypsum Company (District of New Jersey
                  Civil No. 87-cv-4238)
    The Prudential Insurance Company of America, PIC
    Realty Corporation and 745 Property Investments,
                       Appellants.
                      No. 02-3837.

                  Argued Sept. 3, 2003.
                    Feb. 20, 2004.

**Background:** Owners of buildings brought action
under Comprehensive Environmental Response,
Compensation, and Liability Act (CERCLA) against
manufacturers of asbestos-containing materials
(ACMs) to recover costs for monitoring, removing,
and dealing with ACMs in buildings. The United
States District Court for the District of New Jersey,
Harold A. Ackerman, J., 711 F.Supp. 1244,
dismissed CERCLA claim but granted leave to file
amended complaint adding count under Racketeer
Influenced and Corrupt Organizations Act (RICO).
The District Court subsequently granted summary
judgment for manufacturers on RICO claim on
ground it was untimely, 146 F.Supp.2d 643, and
owners appealed.

**Holdings:** The Court of Appeals, Sloviter, Circuit
Judge, held that:

(1) owners' claims accrued outside four-year
limitations period;

(2) accrual did not require owners to have suffered

actual injury; and

(3) limitations period was not equitably tolled on
ground of fraudulent concealment.

Affirmed.
West Headnotes
[1] Limitation of Actions 241 ⟢95(3)

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud, and
    Concealment or Discovery of Cause of Action
            241k95 Ignorance of Cause of Action
                241k95(3) k. Nature of Harm or
    Damage, in General. Most Cited Cases
Under "injury discovery rule" for determining statute
of limitations issues in civil claims under Racketeer
Influenced and Corrupt Organizations Act (RICO),
court must determine when the plaintiffs knew or
should have known of their injury; in addition to the
injury, the plaintiffs must also have known or should
have known of the source of their injury, but nothing
more than these two requirements is required to
trigger the running of the four-year limitations
period. 18 U.S.C.A. § 1961 et seq.

[2] Limitation of Actions 241 ⟢95(3)

241 Limitation of Actions
    241II Computation of Period of Limitation
        241II(F) Ignorance, Mistake, Trust, Fraud, and
    Concealment or Discovery of Cause of Action
            241k95 Ignorance of Cause of Action
                241k95(3) k. Nature of Harm or
    Damage, in General. Most Cited Cases
Racketeer Influenced and Corrupt Organizations Act
(RICO) claims asserted by owner of buildings against
manufacturers of asbestos-containing materials
(ACMs) accrued when owner should have known of
alleged injuries sustained due to presence of ACMs
in buildings, which was more than four years prior to
date it brought suit against manufacturers, so claims
were time-barred; owner was sophisticated company
that operated large casualty insurance business and
extensive estate investment business, government
information and warnings on asbestos were available,
and owner knew that asbestos was present in some of
its buildings and that ACMs were sources of potential

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

future hazards.  18 U.S.C.A. § 1961 et seq.

**[3]** Limitation of Actions 241 ⬥95(3)

241 Limitation of Actions
 241II Computation of Period of Limitation
  241II(F) Ignorance, Mistake, Trust, Fraud, and
Concealment or Discovery of Cause of Action
   241k95 Ignorance of Cause of Action
    241k95(3) k. Nature of Harm or
Damage, in General. Most Cited Cases
Accrual of building owner's civil claims under
Racketeer Influenced and Corrupt Organizations Act
(RICO) against manufacturers of asbestos-containing
materials (ACMs) did not require owner to have
suffered actual, rather than potential, injury, such that
it would not suffer injury until actual contamination
required it to address or remedy the hazards posed,
where owner sought damages for both past and future
injuries, choosing to pursue redress under RICO for
both monitoring and testing costs associated with
potential contamination as well as costs for
abatement and repair. 18 U.S.C.A. § 1961 et seq.

**[4]** **Racketeer Influenced and Corrupt
Organizations 319H** ⬥55

319H Racketeer Influenced and Corrupt
Organizations
 319HI Federal Regulation
  319HI(B) Civil Remedies and Proceedings
   319Hk55 k. In General. Most Cited Cases
Racketeer Influenced and Corrupt Organizations Act
(RICO) provision creating a civil remedy was
enacted to turn plaintiffs into prosecutors, "private
attorneys general," dedicated to eliminating
racketeering activity. 18 U.S.C.A. § 1961 et seq.

**[5]** **Limitation of Actions 241** ⬥104.5

241 Limitation of Actions
 241II Computation of Period of Limitation
  241II(G) Pendency of Legal Proceedings,
Injunction, Stay, or War
   241k104.5 k. Suspension or Stay in
General; Equitable Tolling. Most Cited Cases
Limitations period on building owner's civil
Racketeer Influenced and Corrupt Organizations Act
(RICO) claims against manufacturers of asbestos-
containing materials (ACMs) was not equitably tolled
on ground of fraudulent concealment, in view of
owner's failure to exercise reasonable diligence in
discovering or investigating its injuries; owner had
many other sources of information sufficient to place

it on inquiry notice of its ACM-related injuries. 18
U.S.C.A. § 1961 et seq.

**[6]** **Limitation of Actions 241** ⬥104(1)

241 Limitation of Actions
 241II Computation of Period of Limitation
  241II(F) Ignorance, Mistake, Trust, Fraud, and
Concealment or Discovery of Cause of Action
   241k104 Concealment of Cause of Action
    241k104(1) k. In General. Most Cited
Cases
Where civil Racketeer Influenced and Corrupt
Organizations (RICO) defendants seek summary
judgment on ground that claims against them are
time-barred, but plaintiffs claim that limitations
period should be tolled based on fraudulent
concealment, court must determine: (1) whether there
is sufficient evidence to support a finding that
defendants engaged in affirmative acts of
concealment designed to mislead the plaintiffs
regarding facts supporting their claim, (2) whether
there is sufficient evidence to support a finding that
plaintiffs exercised reasonable diligence, and (3)
whether there is sufficient evidence to support a
finding that plaintiffs were not aware, nor should they
have been aware, of the facts supporting their claim
until a time within the limitations period measured
backwards from when the plaintiffs filed their
complaint. 18 U.S.C.A. § 1961 et seq.

*228 Robert J. Gilson (Argued), Khaled J. Klele,
Riker, Danzig, Scherer, Hyland & Perretti,
Morristown, David Boies, Robin A. Henry, Boies,
Schiller & Flexner, Armonk, for Appellants.
Kell M. Damsgaard, Kevin M. Donovan (Argued),
Morgan, Lewis & Bockius, Philadelphia, for
Appellee U.S. Gypsum Company.
Nancy McDonald, Meredith Walling, McElroy,
Deutsch & Mulvaney, Morristown, for Appellee U.S.
Mineral Products.

Before SLOVITER, NYGAARD and ROTH, Circuit
Judges.

*OPINION OF THE COURT*
SLOVITER, Circuit Judge.
This case, one of the myriad asbestos cases that have
besieged the courts, both state and federal, comes to
us from a somewhat different perspective than most
of the others. The plaintiffs, The Prudential
Insurance Company of America, PIC Realty
Corporation, and 745 Property Investments
(hereinafter referred to collectively as "Prudential"),

359 F.3d 226
359 F.3d 226, RICO Bus.Disp.Guide 10,633
(Cite as: 359 F.3d 226)

are owners and operators of buildings that installed asbestos-containing materials ("ACMs") that sued asbestos manufacturers to recover the costs of monitoring and remediation. Prudential appeals the District Court's orders granting the motions of defendants United States Gypsum Company ("Gypsum") and United States Mining Company ("USMP") for summary judgment dismissing Prudential's claims under the Racketeer Influenced and Corrupt Organizations Act ("RICO"), 18 U.S.C. § 1961 et seq., as time-barred by the statute of limitations. *229 Prudential argues that the District Court erred in applying the "injury discovery rule" in ascertaining when Prudential's RICO claims began to accrue, that there exist disputed issues of material fact concerning when Prudential knew or should have know of its injuries from ACMs in its properties, and that the statute of limitations for Prudential's RICO claims should have been tolled due to Gypsum's active and fraudulent concealment of known health risks associated with ACMs. We will affirm.

## INTRODUCTION

Prudential, a mutual insurance company, is one of the largest life, property, and casualty insurance underwriters in the world. It is also one of the largest real estate investors in North America, maintaining from the 1970s to the early 1980s "the largest real estate portfolio of any company in the world" with hundreds of commercial real estate properties. App. at 394a. Gypsum and USMP previously engaged in the manufacturing and sale of ACMs. Their products were widely used as construction materials throughout the United States.

Prudential contends that ACMs manufactured by both Gypsum and USMP, as well as other defendants not parties to this appeal, were used for fireproofing in at least eighteen of its buildings.[FN1] According to Prudential, it only began to appreciate the hazards associated with in-place asbestos in 1984 at the time it had to remove ACMs from one of its properties, the Chubb Building in Short Hills, New Jersey, before its demolition. The ACMs were removed at a cost of approximately one million dollars. In late 1984, Prudential established a task force to investigate the in-place ACMs in its buildings. A Prudential internal survey conducted between 1985 and 1986 discovered that most of the buildings involved in this litigation, as well as approximately 100 others, contained ACMs. As a result, Prudential incurred hundreds of millions of dollars in expenses relating to the maintenance, testing, and removal of ACMs in its

buildings. It has refused to acquire or mortgage properties containing ACMs since 1986.

> FN1. Although Prudential's initial claims covered approximately sixty-one buildings, that number was reduced to eighteen buildings by the time the District Court entered a Final Pretrial Order in 1996.

Asbestos had, however, already become a well-known and important public health and safety issue in the United States prior to 1984. In April 1973, the Environmental Protection Agency ("EPA") established a National Emission Standard for Asbestos that severely restricted the manufacturing and application of ACMs, as well as the demolition of buildings containing fireproofing and insulation ACMs. 38 Fed.Reg. 8829 (Apr. 6, 1973). That standard regulated spray-on ACMs by limiting the concentration of asbestos in such ACMs and forbidding the visible emission of such materials to the outside air during the spraying process. Id. at 8830. It also required that "[a]ny owner or operator of a demolition operation who intends to demolish any institutional, commercial, or industrial building ... which contains any boiler, pipe, or lead-supporting structural member that is insulated or fireproofed with friable asbestos material" shall notify the EPA in advance of the demolition and follow proper ACM-removal procedures set forth in the standard. Id. at 8829. In 1975, the EPA expanded this National Emission Standard to cover renovation activities involving buildings containing ACMs by mandating specific notification and removal procedures for such in-place ACMs. 40 Fed.Reg. 48,299-,300 (Oct. 14, *230 1975). It further amended the standard in 1978 to "extend coverage of the demolition and renovation provisions ... to all friable asbestos materials and extend the scope of the asbestos spraying provisions ... to all materials that contain more than 1 percent asbestos." 43 Fed.Reg. 28,372 (June 19, 1978).

The EPA also published various guidelines and regulations on asbestos management. One such EPA document from 1978, titled "Hazard Abatement from Sprayed Asbestos-Containing Materials in Buildings: A Guidance Document" that was prepared "for those involved in the use, removal, and disposal of asbestos materials in the building trades," states that "[a]sbestos in all its forms is considered a serious respiratory hazard.... Unlike most chemical carcinogens, the mineral fibers persist in the environment almost indefinitely and, when present in

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

a building space open to its occupants, represent a continuous source of exposure." App. at 439a. The document also includes information on asbestos exposure, control, containment, and removal. App. at 480a-500a. The EPA issued a similar "guidance document" for ACMs in school buildings in 1979 and another report on controlling friable ACMs in buildings in March 1983. App. at 556a-626a, 736a-817a.

In addition, the Occupational Safety and Health Administration ("OSHA") had issued regulations on construction workers' exposure to asbestos. The imposition of these regulations and the increasing public debate regarding the health hazards of asbestos led various asbestos manufacturers, including Gypsum, to disseminate additional information regarding the use and risks of ACMs.

As Gypsum correctly states in its brief:
In sum, before October 20, 1983, not only had the federal government (OSHA and EPA) issued mandatory regulations regarding asbestos products in buildings, but the EPA had issued numerous guidance documents detailing for building owners the widespread use of asbestos-containing building materials, the association between asbestos exposure and disease, the potential risks of in-place asbestos-containing products, methods to detect asbestos, and recommendations for proper actions to be taken once asbestos-containing products are identified.

Appellee Gypsum's Br. at 13.

There is record evidence that various Prudential employees were aware of the existence of ACMs in at least some of Prudential's properties prior to 1984. Arcadius E. Zielinski, an architect formerly in Prudential's Corporate Services and Building Department, testified in a deposition that he surveyed filed specifications of Prudential's home office buildings to determine whether they contained ACMs. He stated that he told the Vice President of Prudential's Corporate Services and Building Department in May 1981 that such ACMs would not be hazardous so long as they were firm and remained in-place. An affidavit of David Holick, Jr., the director of architecture at Prudential's real estate investment department in Houston from 1979 to 1984, states that ACMs were a topic discussed among some of Prudential's employees. In addition, asbestos testings were conducted, either by or at the request of local tenants, in several of Prudential's buildings prior to 1984. For example, in 1979 IBM Corporation, as tenant, tested the airborne asbestos

levels at Prudential's Jacksonville, Florida building and forwarded the results to Prudential. App. at 48a-49a, 1053a-1151a. Asbestos testing was also conducted at least twice on the premises of Five Penn Center in Philadelphia prior to 1981. Similar asbestos testings were also conducted in several *231 Prudential buildings not at issue in this litigation.

Prudential initiated this action on October 20, 1987 in the United States District Court for the District of New Jersey, asserting a claim under the Comprehensive Environmental Response, Compensation, and Liability Act ("CERCLA"), 42 U.S.C. § 9601 et seq., and state claims under theories of absolute liability, strict liability, negligence, breach of express and implied warranties, fraud, misrepresentation, fraudulent concealment, unfair and deceptive trade practices, civil conspiracy, restitution, and indemnification. App. at 11,097a-11,153a. The District Court, upon motions by defendants, dismissed Prudential's CERCLA claim, but granted Prudential's motion for leave to amend its complaint to add claims under the RICO statute. _Prudential Ins. Co. of Am. v. U.S. Gypsum Co._, 711 F.Supp. 1244 (D.N.J.1989). Prudential's RICO claims thus form the sole basis for federal subject matter jurisdiction in this case.

In its First Amended Complaint, Prudential alleged that ACMs manufactured by defendants and used in its properties pose a potential health risk, and that it has expended and will continue to expend resources to inspect, monitor, maintain, and abate any problems caused by the presence of ACMs. It also asserted past and future damages resulting from actual property damages, diminution of property values, loss of rental income, and disruption to tenants' businesses. App. at 11,107a-08a.

After several years of discovery, Gypsum and W.R. Grace, another defendant, filed a motion for summary judgment in October 1991 to dismiss Prudential's RICO claims on both substantive and statutes of limitations grounds. They also sought to dismiss Prudential's state law claims based on statutes of limitations. Prudential, in turn, filed a motion to strike defendants' statute of limitations defenses. The District Court, in a published opinion dated July 21, 1993, denied defendants' motion for summary judgment to dismiss Prudential's RICO claims on substantive grounds and also denied Prudential's motion to strike defendants' statute of limitations defenses. _Prudential Ins. Co. of Am. v. U.S. Gypsum Co._, 828 F.Supp. 287 (D.N.J.1993). Focusing on the causation requirement of a RICO claim, the District

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

Court stated that it "cannot rule as a matter of law" that causation did not exist between defendants' alleged violations and Prudential's injuries. *Id.* at 296. It also ruled that "there are disputed issues of fact as to whether Prudential actually knew of its injury prior to 1984; and ... the defendants are entitled to argue to a jury that Prudential should have known of its injury prior to 1984." *Id.* at 297.

On June 9, 1994, the District Court denied the motion for summary judgment by Gypsum and another defendant, Asbestospray Corporation, to dismiss Prudential's RICO claims on statute of limitations grounds, finding that disputed issues of material fact existed as to whether Prudential had knowledge of the elements of its RICO claims more than four years prior to filing the suit. *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.,* No. 87-4238 (D.N.J. June 9, 1994). Based on its 1993 ruling, the District Court also reserved the issue of what Prudential should have known for trial. The District Court then denied defendants' summary judgment motions dismissing Prudential's state law claims, although it did dismiss Prudential's breach of warranty claims.

The parties proceeded to complete pretrial discovery, and the District Court entered its Final Pretrial Order in 1996. Thereafter Gypsum, joined by W.R. Grace, filed summary judgment motions to dismiss*232 Prudential's RICO claims on statute of limitations and substantive grounds.[FN2] USMP joined in these motions. After oral argument, the District Court on June 20, 2001 granted Gypsum's motion for summary judgment dismissing Prudential's RICO claims as barred by the statute of limitations. It also granted the motion with respect to USMP on July 12, 2001. Noting developments subsequent to its 1993 and 1994 opinions in both the Supreme Court and this court regarding when a civil RICO claim accrues, the District Court held that Prudential "should have known" of its injury before October 24, 1983, the relevant date for purposes of the four-year RICO statute of limitations. *Prudential Ins. Co. of Am. v. U.S. Gypsum Co.,* 146 F.Supp.2d 643 (D.N.J. 2001). In stating that "it should not have reserved the issue of what Prudential should have known [regarding its RICO claims] for trial" in its 1994 opinion, the District Court explained:

> FN2. Subsequent to the filing of these motions, W.R. Grace filed a petition for voluntary relief pursuant to Chapter 11 of the United States Bankruptcy Code. This action therefore was automatically stayed as

to W.R. Grace pursuant to 11 U.S.C. § 362(a).

While Prudential's 1993 motion for summary judgment raised the issue of whether Grace and Gypsum could provide evidence sufficient to show that Prudential should have known of its injuries, Grace and Gypsum's 1994 motion for summary judgment asked a different question: whether Prudential could provide evidence sufficient to *refute* the claim that it should have known of its injuries. App. at 34a (emphasis in original).

The District Court then concluded that based on its reconsideration of the record and facts before it, and in light of changes in the law regarding the accrual period under RICO, Prudential did not satisfy its summary judgment burden with respect to that latter question. App. at 53a. Having thus dismissed Prudential's only federal claim, the District Court declined to exercise supplemental jurisdiction and dismissed Prudential's remaining state law claims against Gypsum and USMP without prejudice. Shortly thereafter, both Gypsum and USMP filed for bankruptcy.

Prudential timely appealed the June 20, 2001 order after securing a stay of Gypsum's and USMP's federal bankruptcy proceedings as well as certification by the District Court under Federal Rule of Civil Procedure 54(b). The only issue on appeal is whether the District Court erred in dismissing, on summary judgment, Prudential's RICO claims as time-barred.

### JURISDICTION AND STANDARD OF REVIEW

The District Court properly exercised jurisdiction over this action under 28 U.S.C. § 1331 based on Prudential's claims arising under RICO. The District Court also had supplemental jurisdiction over Prudential's state law claims pursuant to 28 U.S.C. § 1367. We have jurisdiction over the District Court's final judgment pursuant to 28 U.S.C. § 1291.

We exercise plenary review of a district court's grant of summary judgment. *SEC v. Hughes Capital Corp.,* 124 F.3d 449, 452 (3d Cir.1997). Summary judgment may be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c).

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

### DISCUSSION

Although the RICO statute does not expressly provide a statute of limitations, the *233 Supreme Court, by analogy to the Clayton Act, has established a four-year limitations period for civil RICO claims. _Agency Holding Corp. v. Malley-Duff & Assoc. Inc.,_ 483 U.S. 143, 156, 107 S.Ct. 2759, 97 L.Ed.2d 121 (1987). Prudential filed this action on October 20, 1987. Therefore, we may uphold the District Court's summary judgment order only if the statute of limitations for Prudential's RICO claims did not begin to accrue before October 20, 1983.

#### A. *Test for Accrual of Civil RICO Claims*

In *Malley-Duff,* the Supreme Court left open the question of when the statute of limitations for civil RICO claims begins to accrue. It has not resolved that issue but it has rejected several standards this court had used to determine when the RICO statute of limitations period accrues. Although most of the Courts of Appeals at that time applied forms of an "injury and pattern discovery rule" for determining the accrual of RICO claims, this court applied a "last predicate act" exception under which "[if], as a part of the same pattern of racketeering activity, there is further injury to the plaintiff or further predicate acts occur, ... the accrual period shall run from the time when the plaintiff knew or should have known of the last injury or the last predicate act which is part of the same pattern of racketeering activity. The last predicate act need not have resulted in injury to the plaintiff but must be part of the same 'pattern.' " _Keystone Ins. Co. v. Houghton,_ 863 F.2d 1125, 1126 (3d Cir.1988). In _Klehr v. A.O. Smith Corp.,_ 521 U.S. 179, 117 S.Ct. 1984, 138 L.Ed.2d 373 (1997), the Supreme Court rejected the Third Circuit exception. The Court reasoned that such a test would result in a limitations period longer than that which Congress could have contemplated, as well as would improperly allow claimants to recover for injuries outside of the limitations period by "bootstrapping" them onto a later and independent predicate act. _Klehr,_ 521 U.S. at 187-90. 117 S.Ct. 1984.

A few years later, in _Rotella v. Wood,_ 528 U.S. 549, 120 S.Ct. 1075, 145 L.Ed.2d 1047 (2000), the Supreme Court also rejected the "injury and pattern discovery rule" itself, under which the statute of limitations begins to run when the plaintiff knew or should have known that each element of a civil RICO

claim existed: the injury, the source of the injury, and the pattern of activities prohibited under RICO causing the injury. _Id._ at 554, 120 S.Ct. 1075. However, the Court did not "settle upon a final rule," noting that among available remaining alternatives were the injury discovery rule and the injury occurrence rule. _Id._ at 554 n. 2.

[1] After *Rotella,* we adopted the injury discovery rule in _Forbes v. Eagleson,_ 228 F.3d 471 (3d Cir.2000), holding that in determining statute of limitations issues in civil RICO claims "we must determine when the plaintiffs knew or should have known of their injury." _Id._ at 484. In addition to the injury, the plaintiffs must also have known or should have known of the source of their injury. _Id._ at 485. As we explained in *Forbes,* "nothing more" than these two requirements "was required to trigger the running of the four-year limitations period [of a civil RICO claim]." _Id._ (citations omitted).

Prudential does not dispute that the injury discovery rule is the governing legal standard in this case. It quarrels, rather, with that rule's application in this case. Specifically, Prudential argues that, based on the record of this case, it could not have known its injuries prior to October 20, 1983, and that in any event, the injury it suffered must be an "actual" injury before the statute of limitations is triggered.

#### *234 B. *Whether Prudential Should Have Known of Its Injuries Prior to October 20, 1983*

[2] To evaluate Prudential's argument, we start by looking to the injury it alleged in its amended complaint. App. at 11,097a-11,153a. In that complaint, Prudential alleges injuries:
relating to *abatement and building monitoring actions, building survey and testing costs,* tenant relocation costs, operations and maintenance program costs for asbestos-containing materials before their removal from buildings, substantial disruption to their business, substantial property damage to their property (such as carpeting, ceilings, curtains, etc.), and other costs associated with the contamination or *potential contamination* of the buildings. Plaintiffs have also suffered and will suffer, among other damages, the loss of rental income from the buildings during abatement procedures or due to premature tenant departures, and the diminution in the commercial value of the properties.

App. at 11,108a (emphasis added). This language explicitly states broad injuries that included both past

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

and future harm to Prudential. More specifically, the complaint alleges injuries that include prospective damages for complying with federal regulations concerning the renovation, alteration, or demolition of buildings containing ACMs:Because of the potential health and contamination dangers, plaintiffs have been compelled to determine the extent to which asbestos-containing materials are present in their buildings and the extent to which the buildings and their contents have been or may be contaminated with asbestos fibers.     Where such materials or contamination have been or are found, plaintiffs have adopted or will have to adopt, pursuant to governmental regulations and common-law duties, costly abatement measures to remove and replace, enclose, encapsulate, or repair such materials in order to eliminate the potential asbestos health hazard created by such contamination of the buildings.

App. at 11,107a.   Prudential's amended complaint thus seeks recovery for both past and future injuries caused by the presence of ACMs in Prudential's properties.

In holding that Prudential has not, and could not, produce evidence sufficient to refute the defendants' claims that Prudential should have known of the injury it alleged in its amended complaint prior to October 20, 1983, the District Court reviewed government regulations and publications as well as evidence pertinent to Prudential's own buildings and employees regarding the hazards of ACMs and related precautions.   Some of the evidence examined by the District Court is recited in the introductory section of this opinion.    In reviewing the effect of government information regarding asbestos on Prudential's awareness of ACM hazards, it is important to note that Prudential is a very sophisticated company that operates a large casualty insurance business and an extensive estate investment business.   Such a sizable business operation not only provided Prudential with more opportunities than an average plaintiff to access ACM-related information, but it should have also given Prudential a greater incentive to diligently research and investigate any potential injuries it may suffer through the presence of ACMs in its own properties.   As the District Court correctly pointed out, because Prudential's liability exposure was magnified by the large size of its real estate portfolio, "prudence dictates that Prudential should have remained*235 informed of its legal responsibilities."   App. at 43a.

Nor was Prudential obliged to rely solely on government warnings.   Multiple incidents and tenant

complaints in Prudential's own buildings should have also provided Prudential notice of the ACM-related injuries it alleges in the amended complaint.   At Five Penn Center in Philadelphia, Prudential knew that the ACMs were used for fireproofing, and that the ACMs were sources of potential future hazards;   it sent a letter on September 29, 1976 to the building's seller, giving formal notice that the seller was in breach of the Agreement of Sale because, among other things, "it appears that the building was in violation of law pertaining to concentration of air-borne asbestos on and prior to the date of settlement under said Agreement of Sale." App. at 936a.   Colonial Penn, a major tenant in the building, complained in 1981 that ACMs fell from ceiling in one of its offices, and Prudential incurred cleaning and encapsulating expenses related to the incident.

Similarly, Prudential was aware of the presence of ACMs in the IBM Building in Jacksonville, Florida as early as 1979, when tenant IBM requested Prudential's assistance in surveying the fireproofing material in the building.   Based on its own testing, IBM informed Prudential in January 1980 that a sample of the fireproofing material contained six percent of Chrysotile asbestos.   App. at 1055a.  At Prudential's own request, IBM forwarded a copy of its asbestos and air sample analyses to Prudential in March 1980.   These incidents and tenant complaints, combined with government information, should therefore have provided Prudential inquiry notice regarding the potential hazards of ACMs in its properties.[FN3]

> FN3.  As the proprietor of a large real estate portfolio, Prudential should have also become aware of ACM-related hazards through the existence of ACMs in other Prudential properties not at issue in this litigation.   Evidence show, for example, that Prudential was aware of the presence of ACMs in Prudential Center, Boston as early as 1978;   it received multiple inquiries and from tenants, OSHA, and the Massachusetts Office of Occupational Hygiene regarding ACM-related issues.      App. at 50a-51a, 1006a-25a.

Despite the facts supporting the District Court's legal conclusion, Prudential argues that because these incidents did not reflect actual contamination prior to 1984, they do not show the same type of injuries for which Prudential currently seeks damages.     It contends that pre-1984 government regulations and

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.

359 F.3d 226
359 F.3d 226, RICO Bus.Disp.Guide 10,633
(Cite as: 359 F.3d 226)

information were not directly related to in-place ACMs, and that its actions with respect to building tenants merely demonstrated business decisions to placate tenants rather than actual awareness of potential hazards related to ACMs. These contentions are to support Prudential's principal argument that it had no reason to know of its ACM-related injuries until it took on the demolition of the Chubb Building in 1984, when ACMs in that building released sufficient asbestos fibers so as to contaminate its building.

We note, however, that the injury discovery rule in *Forbes* allows the limitations period of civil RICO claims to accrue not only if Prudential actually knew of its injuries, but also if Prudential should have known of its injuries. *Forbes*, 228 F.3d at 484. As the District Court explained in its opinion, because Gypsum and USMP in support of their motions for summary judgment provided sufficient evidence that Prudential "should have known" before October 20, 1983 of the injuries it alleged in the amended complaint, Prudential was required to provide sufficient evidence to refute that claim in order to defeat summary judgment. Given the above facts, we agree with the District Court that:

*236 Prudential's showing regarding its actual knowledge falls far short ... of demonstrating why Prudential remained unaware of the potential hazard asbestos posed in its holdings. While the court may accept for the purposes of this motion that Prudential was not aware of the EPA's repeated warnings about the potential hazards of in-place asbestos ... such events should have triggered Prudential's inquiry into the hazards posed by asbestos.

App. at 37a. For example, the EPA regulations on the removal of asbestos during building demolitions were promulgated in the 1970s. Therefore even if the demolition of the Chubb Building in 1984 was the first demolition of any of Prudential's buildings, it should have had prior awareness, as a major real estate investor, of the regulations and the ACM-related danger to which they were aimed. As stated in an EPA training document from February 1983: A building owner might choose to believe there is no problem in his/her building, but, as we have seen, it is clearly prudent to find out the facts. With the rising public awareness of asbestos hazards, most any building owner would be hard pressed to justify no reasonable knowledge of the hazard.

App. at 46a.

Prudential also admits that some of its own

employees "had some awareness of asbestos as an issue in certain of Prudential's buildings during the late 1970s and early 1980s." Appellants' Br. at 34. We therefore agree with the District Court that Prudential should have known of the injuries alleged in its complaint prior to October 20, 1983.

### C. *Prudential's "Actual Injury" Argument*

[3] In addition to its factual contentions regarding the timing of its awareness of ACM-related hazards, Prudential argues that the *Forbes* standard requires actual, rather than potential, harm to a civil RICO plaintiff. It asserts that it suffered no injuries either from its knowledge of the existence of in-place ACMs in its properties or from the risk of injuries stemming from those ACMs. Prudential asserts that ACMs only cause injury when they deteriorate and begin releasing hazardous levels of asbestos fibers that contaminate buildings, and therefore it suffered injury only when actual contamination required it to address or remedy the hazards such contaminations posed. Appellants' Br. at 21-22.

[4] As we previously noted, Prudential's amended complaint clearly seeks damages for both past and future injuries. Consequently, Prudential cannot also argue that the statute of limitations for its RICO claims should not have begun to run until those injuries became "actual" injuries and it needed to take remedial measures and incurred expenses for remediation. Such a legal rule would place too much discretion in the plaintiff's hands, and would be antithetical to the "basic policies of all limitations provisions: repose, elimination of stale claims, and certainty about a plaintiff's opportunity for recovery and a defendant's potential liabilities." *Rotella*, 528 U.S. at 550, 120 S.Ct. 1075. RICO's provision of a civil remedy was enacted to "turn [plaintiffs] into prosecutors, 'private attorneys general,' dedicated to eliminating racketeering activity.... It would, accordingly, be strange to provide an unusually long basic limitations period that could only have the effect of postponing whatever public benefit civil RICO might realize." *Id.* at 557-58, 120 S.Ct. 1075. Prudential's proposed "actual injury" standard would allow a civil RICO plaintiff to control when the relevant limitations*237 periods accrue through its timing of the assessment, investigation, and correction of its injuries, thereby producing precisely the long limitations periods frowned upon in *Rotella*.

Prudential cites, as support for the "actual injury" standard it puts forth, several federal and state cases

supporting its argument that in-place ACMs only cause injuries when they release hazardous levels of asbestos fibers into buildings. Appellants' Br. at 20-22. We note, however, that it is Prudential itself that chose to pursue redress under RICO for both monitoring and testing costs associated with potential contamination as well as costs for abatement and repair in its amended complaint. In contrast, the plaintiffs in the cases cited by Prudential confined their claims to costs of remediation, and pursued their redress through state-law claims that require different accrual analyses than used in RICO cases. The plaintiffs in *Port Authority of New York and New Jersey v. Affiliated FM Insurance Co.,* 311 F.3d 226 (3d Cir.2002), for example, pursued their asbestos claims under New Jersey state law based on first-party insurance contracts rather than on RICO or tort liability grounds. They also sought recovery only "for expenses incurred in conjunction with the abatement of asbestos-containing materials in their structures...." *Id.* at 230. The injury analysis in that case, therefore, turned on the interpretation of contract provisions rather than on any statute of limitations.

Similarly, the plaintiff in *MDU Resources Group v. W.R. Grace and Co.,* 14 F.3d 1274 (8th Cir.1994), filed claims under North Dakota state-law theories of negligence, strict liability, failure to warn, and breach of warranty, and only sought recovery for the costs of removing ACMs from one of its buildings. *Id.* at 1276. The *MDU* court, therefore, focused on actual asbestos contamination as the point when injury occurs, because under North Dakota's economic-loss doctrine MDU could not have brought suit until the only injury it asserted-the ACM-removal costs it already incurred-materialized. *See id.* at 1279 n. 8 (suggesting that the statute of limitations could have begun to run earlier had MDU claimed different injuries).

The different legal principles governing the claims and the limited scopes of injury involved in these cases required different considerations for calculating statute of limitations periods that are not applicable to Prudential's broad RICO claims here. We therefore join the District Court in rejecting Prudential's "actual injury" concept as it relates to the accrual of the statute of limitations for Prudential's civil RICO claims.

D. *Fraudulent Concealment*

[5] Finally, Prudential contends that the statute of limitations should have been equitably tolled because defendants fraudulently concealed from Prudential that it could be or had been injured by in-place ACMs manufactured by defendants. It argues that despite long-standing knowledge of the adverse health effects of asbestos, defendants did not publicly disclose these risks and instead advertised their products as safe in pamphlets, brochures, direct mailing catalogs, and other forms of advertisement. Prudential contends that because of these efforts by defendants to conceal hazards associated with ACMs, there exists a genuine issue of material fact regarding fraudulent concealment that is sufficient to toll the limitations period for its RICO claims. Appellants' Br. at 9-14.

[6] In *Forbes,* we held that fraudulent concealment could be a basis for equitably tolling the RICO limitations *238period. 228 F.3d at 486-88. At the summary judgment stage, a court must determine:
(1) whether there is sufficient evidence to support a finding that defendants engaged in affirmative acts of concealment designed to mislead the plaintiffs regarding facts supporting their ... claim, (2) whether there is sufficient evidence to support a finding that plaintiffs exercised reasonable diligence, *and* (3) whether there is sufficient evidence to support a finding that plaintiffs were not aware, nor should they have been aware, of the facts supporting their claim until a time within the limitations period measured backwards from when the plaintiffs filed their complaint.

*Id.* at 487 (emphasis in original).

The Supreme Court has stated that to equitably toll the running of a limitations period in the civil-RICO context by claiming fraudulent concealment, plaintiffs must have exercised "reasonable diligence" to discover their claim. *Klehr,* 521 U.S. at 194, 117 S.Ct. 1984. We also stated in *Mathews v. Kidder, Peabody & Co., Inc.,* 260 F.3d 239 (3d Cir.2001), where we rejected an equitable tolling claim after finding that the plaintiff should have known of its injuries, that "[i]n order to avoid summary judgment, there must be a genuine issue of material fact as to whether the Appellants exercised reasonable due diligence in investigating their claim." *Id.* at 257.

We conclude that Prudential has failed to satisfy the *Forbes* standard for tolling the limitations period for its RICO claims. Even assuming, as the District Court did, that Gypsum engaged in fraudulent concealment, Prudential had not demonstrated that it exercised reasonable diligence in discovering or

359 F.3d 226
359 F.3d 226, RICO Bus.Disp.Guide 10,633
**(Cite as: 359 F.3d 226)**

investigating its injuries.   As the discussion above shows, irrespective of defendants' attempts to conceal from Prudential the hazards posed by ACMs in Prudential's buildings, Prudential had many other sources of information sufficient to place it on inquiry notice of such ACM-related injuries. Prudential should have, for example, given heed to government warnings and regulations to undertake surveys and testing of its buildings.   Moreover, as we noted in *Mathews,* "to determine what constitutes 'reasonable' due diligence [for determining if a plaintiff should have known of its injury], we must consider the magnitude of the existing storm warnings.   The more ominous the warnings, the more extensive the expected inquiry." 260 F.3d at 255.   Here, given the magnitude of Prudential's commercial real estate investments and the significance of the threat ACMs posed to that investment, a substantial and diligent investigation by Prudential was called for prior to October 20, 1983. Its failure to have undertaken such an investigation regarding ACM-related hazards was, as a matter of law, the failure to exercise due diligence.     We therefore conclude that the limitations period for Prudential's RICO claims was not tolled under a fraudulent concealment theory.


### CONCLUSION

For the foregoing reasons, we will affirm the District Court's orders granting Gypsum and USMP summary judgment on statute of limitations grounds and dismissing Prudential's remaining state law claims without prejudice.

C.A.3 (N.J.),2004.
Prudential Ins. Co. of America v. U.S. Gypsum Co.
359 F.3d 226, RICO Bus.Disp.Guide 10,633

Briefs and Other Related Documents (Back to top)

• 2003 WL 24162660 (Appellate Brief) Reply Brief of Plaintiffs/Appellants the Prudential Insurance Company of America, PIC Realty Corporation and 745 Property Investments (Feb. 24, 2003) Original Image of this Document (PDF)
• 2003 WL 24162661 (Appellate Brief) Brief of Defendant-Appellee United States Mineral Products Company (Feb. 05, 2003) Original Image of this Document (PDF)
• 2003 WL 24162662 (Appellate Brief) Brief of Appellee United States Gypsum Company (Feb. 05, 2003) Original Image of this Document (PDF)
• 2003 WL 24162659 (Appellate Brief) Brief of

Plaintiffs/Appellants the Prudential Insurance Company of America, Pic Realty Corporation and 745 Property Investments (Jan. 06, 2003) Original Image of this Document (PDF)
• 02-3837 (Docket) (Oct. 16, 2002)


END OF DOCUMENT

© 2006 Thomson/West. No Claim to Orig. U.S. Govt. Works.